45

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 0 5 2004

Michael N. Milby
Clerk of Court

ESTATE OF JOSE VARGAS, by and            *
through MARIA H. COVARRUBIAS, *etc.*     *
Plaintiffs,                              *
                                         *
v.                                       *    CIVIL ACTION No. B-02-132
                                         *
GEORGE F. FELTON, III.,                  *
DANIEL ZAEHRINGER, PATRICK B.            *
McDERMOTT, ETC.                          *
                                         *
Defendants.                              *

## DEFENDANT GEORGE F. FELTON'S
## BRIEF IN SUPPORT OF HIS MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)
## OF THE FRCP AND ALTERNATIVE MOTION FOR SUMMARY JUDGEMENT

*TO THE HONORABLE JUDGE OF SAID COURT:*

Defendant, George "Trip" Felton, III. (Felton), who has been sued in his
individual capacity, moves to dismiss the allegations against him pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure.  Alternatively, Felton moves for
summary judgement on the basis that under the doctrine of qualified immunity, he is
immune from suit.

In support of this motion, Felton submits this brief.[1]

1.      **Factual Background**

On July 1, 2000[2], Felton, who was an agent for the United States Border Patrol
at the time, was assigned to work line watch duties in the area of Santa Maria, Texas.
*See Defendants' Exhibit 4.*   "Line watch duties" requires an agent to patrol the area
along the Rio Grande River and its levees for illegal immigrant/alien activities.   See
*Defendants Exhibits 2, 3, and 4.*  At about 3:45 p.m., Felton responded to a radio

---

[1]Referenced exhibits are included within a separately filed exhibit packet entitled "Defendants'
Summary Judgement Motions' Exhibit Packet" which is incorporated by reference herein.

[2]At paragraph 9,  the Plaintiff's Amended Complaint states that the drownings of Jose Guadalupe
Vargas and Guillermo Acosta Zamora took place on June 30, 2000 at or near Brownsville, Texas.  While it
is true that a drowning occurred at or near Brownsville, Texas, on June 30, 2000, the drownings of Mssrs.
Vargas and Acosta-Zamora occurred on July 1, 2000, at the Anacua Wildlife Refuge near Santa Maria,
Texas–some 20 miles northwest of Brownsville. See Defendant's Exhibits 1 through 4.

dispatch that indicated that there was seismic sensor activity at an area of the Rio Grande River (River) located in the Anacua Wildlife Refuge. *See Defendants' Exhibit 4.* Due to his experience as a Border Patrol Agent working in South Texas, Felton was familiar with the area where this sensor was activated. Felton knew that this particular sensor was located close to a "landing" area that was regularly used by aliens crossing the river from Mexico into the United States illegally. *Id.* Felton also knew that this landing area was frequently used by individuals crossing narcotics into the country. *Id.*

Felton, who was not working with a partner that day, responded to the dispatch concerning the sensor. *Id.* Felton drove up the levee road leading to the sensor's location and stopped his vehicle close to the intersection with River Drive (a.k.a. Anacua Road). Seeing no one, Felton got out and started using his binoculars looking for illegal alien activity. *Id.* Soon thereafter, he was joined by Border Patrol Agents (and co-Defendants), Pat McDermott and Daniel Zaehringer; like Felton, they also heard and responded to the radio dispatch. *See, Defendants' Exhibits 2, 3, and 4.*

Agents Felton, McDermott and Zaehringer waited several minutes to see if any illegal aliens would come up out of the brush to cross over the levee. *Id.* The Anacua Wildlife Refuge–where this landing was located–is known for its rough terrain and jungle-like environment. *Id.* There was no way any of the agents could see the river–much less people in the river--from this vantage point. *Id.* When no one appeared, the agents decided to split up and take two different trails leading to the landing area to investigate what set off the sensor. *Id.*

Agents Felton and Zaehringer started walking south down the road. *Id.* Just south of the levee, the road begins to curve upriver (west) forming something like a semi-circle where the other end comes out on the levee about a quarter of a mile west from where they entered. *Id.* Hence, this particular part of the River Road is often referred to as "The Horseshoe". Once they got about half way through "The Horseshoe", Agents Felton and Zaehringer arrived at a spot where they saw at least three trails that had been created by illegal aliens over the past several months. *See Defendants' Exhibit 4.* Using one of these trails, the pair continued on their way down to the landing area. *Id.* Walking this trail was somewhat treacherous due to the heavy foliage and steep terrain as it sloped downward toward the river. *See Defendants' Exhibits 2, 3, and 4.*

-2-

When Agents Felton and Zaehringer arrived at the trail that lead southward toward the landing area, they stopped to look and listen for activity. Detecting no activity, Agents Felton and Zaehringer continued down the trail toward the landing. *See Defendants' Exhibit 4.* Several yards from the landing, the trail split into two separate trails. Agent Zaehringer took the right path and Agent Felton took the left path. *See Defendants' Exhibits 3 and 4.*

Soon after they split up, Felton heard Agent Zaehringer shouting out commands in Spanish. Felton hurried to Zaehringer's location. *See Defendants' Exhibit 4.* When he got there, Felton saw that Zaehringer had detained around six people. *See Defendants' Exhibits 3 and 4.* Looking upriver, Felton saw more people trying to hide in the foliage along the river's edge as well as about four individuals in the water. *See Defendants' Exhibit 4.* Agents Felton and Zaehringer both called out to the people in the water to come back. None of these people heeded their call. *See Defendants' Exhibits 3 and 4.* None of these people appeared to be in distress, and none of these people indicated that they could not swim. *See Defendants' Exhibits 3 and 4.*

Agent Felton found two people hiding in bushes at the water's edge and took them into custody. *See Defendants' Exhibit 4.* When he initially took them into custody, one of the men made an abrupt motion toward his waistband; Felton reacted by quickly unsnapping his holster and partially lifting his pistol from the holster. *Id.* After confirming that the man had no weapons on him, Agent Felton began to walk the detainees back to Agent Zaehringer's location. *Id.* Before he reached Agent Zaehringer's location, Felton found another person hiding in the dense foliage along the river's edge. *Id.* Once he reached Agent Zaehringer's location, he had the three persons he detained sit on the ground along with the persons Zaehringer detained. *Id.* It was around this time that Felton noticed a couple of inner tubes sticking out from under some kind of plant or tree root near the river's edge. *Id.* Felton did not take possession of the inner-tubes. *Id.*

In order to keep a better eye on the group they detained, Felton took a position behind the group while Agent Zaehringer took a position at the front of the group. *See Defendants' Exhibits 3 and 4.* Agent Zaehringer asked to borrow Felton's knife. *Id.* Felton walked over to Zaehringer and gave him the knife. *Id.* As Felton was walking back to his position behind the group of detainees, he heard air escaping from what he

assumed were the inner tubes he saw earlier near the river's edge. *See Defendants'
Exhibit 4.* Since it was a common practice and procedure for Border Patrol Agents to
destroy the inner tubes they found, Zaehringer's actions didn't strike Felton as unusual.
*See Defendants' Exhibits 2, 3, and 4.* Inner-tubes found close to the river like this were
often in poor, unsafe condition and re-used by other potential illegal aliens in their
attempts to cross the river; hence, agents would destroy the tubes to discourage their
use in future crossings. *See Defendants' Exhibit 4.*

Felton did not see anyone using a rope to aid in their crossing of the river on July
1, 2000. Felton did see a tangled ball of twine lying in the mud. *Id.* This ball of twine
was not tied to anything-and was certainly not being use by anyone-when Felton saw it.
*Id.* Like with the inner-tubes, it was always the Border Patrol's practice to cut any
ropes strung across the river so they could not be used again for future illegal
crossings. *See Defendants' Exhibits 2, 3, and 4.*

Not too long after Agent Zaehringer borrowed Felton's knife, they heard more
splashes in the water. *See Defendants' Exhibits 3 and 4.* Agent Zaehringer walked
over to check out the location of the splashes. *See Defendants' Exhibits 3 and 4.*
Felton observed two people swimming in the river. *See Defendants' Exhibit 4.* They
did not appear to be in distress. Felton shouted to these men as well as some others
he saw upriver from that location to come back; however, none of these people heeded
his call. *Id.*

Agents Zaehringer and Felton returned back to the group that he and Felton had
detained. *See Defendants' Exhibits 3 and 4.* Soon thereafter, Agents Felton and
Zaehringer heard shouting from the Mexican side of the riverbank. *Id.* About half way
across the river, they saw two men struggling in the water. *Id.* Agents Zaehringer and
Felton started throwing empty and partially empty water jugs out to the men but they
didn't get out far enough. *Id.* Felton considered the possibility of using the twine he
saw lying in the mud, but decided it would be fruitless given the condition of the twine.
*See Defendants' Exhibit 4.* Felton saw one man go under and not re-surface. *Id.*
Then, seconds later, a second man drifted into the same location as the first man; and,
like the first man, he disappeared under the water and did not re-surface. *Id.*

While Felton is unable to say whether these two men were the two men he saw a
few seconds before or members of the other group he saw swimming up-river earlier in

-4-

the afternoon, Felton is certain that the men (Messrs. Vargas and Acosta-Zamora) were never in his custody or control. *Id.* Felton is also certain that Messrs. Vargas and Acosta-Zamora were never a part of the group of individuals that he and Agent Zaehringer had detained. *Id.*

Some men that were on the Mexican riverbank jumped into the river in what appeared to be a rescue attempt; however, the men abandoned their rescue attempts and swam quickly back to the Mexican river bank. *See Defendants' Exhibits 3 and 4.* Agent Zaehringer - based on his experience patrolling along the river - suspected that Messrs. Vargas and Acosta-Zamora were dragged under the water by a whirlpool. *See Defendants' Exhibit 3.*

Neither Agent Felton nor Agent Zaehringer ever threatened, ordered, or otherwise instructed any potential rescuers cease any rescue attempts. *See Defendants' Exhibits 3 and 4.* Felton tried to contact Agent McDermott, who had not yet reached the scene. Unfortunately, the foliage and terrain of the Anacua Wildlife Refuge prevented radio communications with McDermott. *See Defendants' Exhibit 4.* When Agent McDermott reached the scene and learned of the situation, he tried several more times to contact the Sector Station (Sector). *See Defendants' Exhibits 2 and 4.* When Agent McDermott was finally able to contact someone at Sector, he asked for emergency personnel to be sent to the location as well as a helicopter. *Id.*

As they waited for emergency assistance to arrive, Agent McDermott prepared himself to attempt a rescue should the men re-surface, but they never did. *See Defendants' Exhibit 2.* The aliens that had been detained by Agents Zaehringer and Felton sat on the ground and would occasionally try to stand up to see what was happening. Agents Felton and McDermott instructed them to sit down. *See Defendants' Exhibits 2 and 3.* None of the detained aliens indicated to the agents that they wanted to attempt a rescue; however, even if they had, the agents would not have permitted anyone in their custody to jeopardize their life by going back into the river. See *Defendants' Exhibits 2,3, and 4.*

Other than when he detained the first two aliens he found, Felton never used his weapon. *Defendants' Exhibits 1, 2, 3, and 4.* Nor did Felton observe Agents Zaehringer or McDermott draw or aim their firearms--or any other weapon--at any of the individuals present that day. *Defendants' Exhibit 4.*

-5-

## 2.    Defendants' Exhibits Summary

In filing their respective motions to dismiss the allegations against them, the Defendants have submitted an Exhibit Packet for this Court to consider in reviewing the arguments set forth herein.  This packet consists of Declarations executed by each of the named defendants pursuant to 28 U.S.C. § 1746 (Defendant's Exhibits 2 - 4) as well as a copy of Requests for Admissions (Defendant's Exhibit 1) that were forwarded to Plaintiffs in June of 2003.   Attached to Defendant's Exhibit 1 is a copy of the "green card" receipt indicating that Plaintiffs' counsel received these Requests for Admission on July 1, 2003.  To date, Plaintiffs have not responded to the Requests for Admissions or otherwise sought an extension of time.  As such, the Requests for Admissions should be deemed admitted.

### Admissions Deemed Admitted Under Rule 36 of the FRCP

Rule 36(a) of the Federal Rules of Civil Procedures states, in relevant part:

*...The matter is admitted unless, within 30 days after service of the request, or within such shorter time or longer time as the court may allow or as the parties may agree to in writing, subject to Rule 29, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by the party's attorney....*

There has been no written stipulation or agreement between counsel regarding the lengthening of the time period for which to respond to any discovery in this case. There is no Court order in place allowing the Plaintiffs an additional three months to respond to the Defendants' discovery.  Therefore, the admissions should be deemed admitted.

Therefore, the following points of fact have been established by way of Plaintiffs' admissions:

1.    **The incident at issue in this lawsuit occurred on July 1, 2000;**
2.    **The incident at issue in this lawsuit occurred at the Anacua Wildlife Refuge located near the town of Santa Maria, Texas;**
3.    **Jose Vargas died on July 1, 2000;**
4.    **Guillermo Acosta Zamora died on July 1, 2000;**
5.    **Jose Vargas had not been detained by United States Border Patrol agents at any time on July 1, 2000;**
6.    **Guillermo Acosta Zamora had not been detained by United States Border Patrol Agents at any time on July 1, 2000;**
7.    **None of the Border Patrol Agents present immediately before, during, or**

after the incident involving Jose Vargas drew their weapons on Jose
Vargas;

8.   None of the Border Patrol Agents present immediately before, during, or
     after the incident involving Jose Vargas drew their weapons on Guillermo
     Acosta Zamora;

9.   None of the Border Patrol Agents present immediately before, during, or
     after the incident involving Jose Vargas drew their weapons on any of the
     persons detained at the scene of the drownings of Jose Vargas and
     Guillermo Acosta Zamora;

10.  The United States, nor any of its employees or agents, did anything to
     prevent the possible rescue of Jose Vargas; and,

11.  The United States, nor any of its employees or agents, did anything to
     prevent  the possible rescue of Guillermo Acosta Zamora.

*See Defendant's Exhibit 1.*

For purposes of this lawsuit, Plaintiffs' failure to respond to these admissions has
"conclusively established" the matters stated, and cannot, without a Court order be
withdrawn or otherwise amended.  See Rule 36(b) of the FRCP; see also, *In Re
Carney*, 258 F.3d 415 (5th Cir. 2001).

## 3.   Statement of the Issues

1.   Whether the constitutional claims against George Felton should be
     dismissed for failure to state a claim upon which relief can be
     granted when the Plaintiffs are based on pure conjecture.

2.   Whether George Felton is entitled to qualified immunity since the
     evidence shows that there was no violation of the decedents'
     Fourth, Fifth and Fourteenth Amendment rights.

## 4.   Summary of Argument

The allegations made against George Felton should be dismissed for failure to
state a claim.  All the allegations against George Felton are based on pure conjecture
and speculation.  As such, they should be dismissed pursuant to Rule 12(b)(6) of the
Federal Rules of Civil Procedure.

Alternatively, summary judgement should be rendered in favor of George Felton
and against the Plaintiffs herein on the basis that George Felton is entitled to qualified
immunity.  In evaluating a case to see if a defendant is entitled to qualified immunity,
the court must undertake a two step analysis.  The court must determine "whether the

-7-

'plaintiffs allegations, if true, establish a constitutional violation.'" *Williams v. Kaufman County*, 352 F.3d 994, 1002 (5th Cir. 2003), quoting *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S.Ct 2508, 153 L.Ed.2d 666(2002).  If they do, then the court must determine "whether the defendant's actions violated 'clearly established statutory or constitutional rights of which a reasonable person should have known.'" *Id.* quoting *Hope*, 536 U.S. at 739 (2002).  Plaintiffs have failed to establish a constitutional violation in this case and, as such, George Felton is entitled to qualified immunity.

5.    **Argument**

   A.    **This Court Should Dismiss the Speculative Allegations Made Against George Felton for Failure to State a Claim Upon Which Relief Can Be Granted.**

   At first glimpse, the Plaintiffs' paint a horrifying picture of mean spirited Border Patrol agents forcibly taking innocent people into custody at gunpoint and coldly stand back while two people drowned.   However, upon harder examination of the allegations in this case, one must conclude that–as tragic as the deaths of Messrs. Vargas and Acosta-Zamora was and is--the tale as told by the Plaintiffs of the circumstances leading to their deaths was created like most  fairy-tales are–by pure speculation.

   Plaintiffs original  and amended complaints set forth a rambling series of unsupported allegations that the Defendants took Messrs. Vargas and Acosta-Zamora "into custody" thus creating a "special relationship" with the defendants in this case. Defendants then took "custody and control of" inner-tubes that the aliens were using to cross the river so as to "deprive" Messrs. Vargas and Acosta-Zamora "from any flotation device should they re-enter the river".  See Plaintiffs' First Amended Complaint at paras. 21 - 23.  Plaintiffs then say that the Defendants "maliciously and intentionally punctured the inner tubes and cut the rope which spanned the river, so as to get Jose Guadalupe Vargas and Guillermo Acosta Zamora to return the  U.S. bank of the river." See Plaintiffs' First Amended Complaint at para. 24.

   Plaintiffs continue their tale by asserting: (a) that the Defendants "believed" that Messrs. Vargas and Acosta-Zamora "could not swim" ; (b) that the Defendants "believed"  that by "denying them the inner-tubes and by cutting the rope" that Messrs.

Vargas and Acosta-Zamora "would return to the U.S. bank of the river..."; and, (c) that the Defendants prevented other persons from attempting a rescue by destroying the inner-tubes and cutting the rope that spanned the river. Plaintiffs' First Amended Complaint at paras. 24.

In *Oliver v. Scott*, 276 F.3d 736, 740, the Fifth Circuit noted that while the generic pleading requirement of Rule 8 of the Federal Rules of Civil Procedure would suffice in instances where government officials are sued in their official capacity, a heightened standard existed when a Plaintiff was making claims against a government official in his individual capacity:

> **'Plaintiffs suing governmental officials in their individual capacities, however, must allege specific conduct giving rise to a constitutional violation' [ ][3] 'This standard requires more than conclusional assertions: The Plaintiff must allege specific facts giving rise to a constitutional violation.'[4]**

Consequently, this "heightened pleading" requirement requires the Plaintiff to set forth facts that focus "specifically on the conduct of the individual who caused the Plaintiff's injury". *Reyes v. Sazan*, 168 F.3d 158, 161 (5th Cir. 1999).

In the case at bar, there is absolutely no evidence that any of these conclusory allegations are true.   There is no evidence that Felton (or the other Defendants in this case) ever took  Messrs. Vargas and Acosta-Zamora into custody.  There is no evidence that Felton ever took custody of the inner-tubes being used by the aliens crossing the river.  There is no evidence that Felton cut a rope that spanned the river. And, there is no evidence that Felton did anything to stop or prevent any rescue attempt.

Plaintiffs' complaint is replete with conclusory unsupported allegations; therefore, the allegations against Felton should be dismissed on their face.  As such the allegations made against George Felton should be dismissed fo failure to state a claim upon which relief can be granted.

---

[3]Quoting *Anderson v. Pasadena I.S.D.*, 184 F.3d 439, 443 (5th Cir. 1999).

[4]Quoting *Baker v. Putnal*, 75 F.3d 190, 194 (5th Cir. 1996).

**B.    Overview of Qualified Immunity and Summary Judgement Standard**

In *Burge v. Parish of St. Tammany*, 187 F.3d 452, 464-465 (5th Cir. 1999), the Fifth Circuit described the summary judgement standard as follows:

> **Summary judgement is proper when the pleadings, depositions, admissions, and answers to interrogatories, together with affidavits, demonstrate that no genuine issue exists as to any material fact and that the movant is entitled to judgement or partial judgement as a matter of law. Fed.R.Civ.P. 56(c); *Burns v. Harris County Bail Bond Bd.*, 139 F.3d 513, 517-18 (5th Cir.1998).**
>
> **The party seeking summary judgement has the initial responsibility of informing the court of the basis for its motion, and identifying those parts of the record that it believes demonstrate the absence of a genuine issue of material fact. *Johnston v. City of Houston, Tex.*, 14 F.3d 1056, 1060 (5th Cir.1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 [1986]). If the moving party carries its initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of a genuine issue of material fact. "This showing requires more than 'some metaphysical doubt as to the material facts.' " Id. (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 [1986]). While the party opposing the motion may use proof filed by the movant to satisfy its burden, " 'only evidence--not argument, not facts in the complaint--will satisfy' " the burden. Id. (quoting *Solo Serve Corp. v. Westowne Assoc.*, 929 F.2d 160, 164 [5th Cir.1991]).**

See also, *Priester v. Lowndes County*, —F.3d—, 2004 WL 32944 (5th Cir. Jan. 7, 2004)(No. 02-60750).

In the case at bar, however, Defendant George Felton is moving for summary judgement not only on the basis that there is a total lack of evidence to support the claims set forth by Plaintiffs in their complaint, but also on the basis that he is entitled to qualified immunity.

The defense of qualified immunity is the product of a series of Supreme Court decisions that began with *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). In *Harlow v. Fitzgerald*, 457 U.S. at 818, the Supreme Court found that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

Before *Harlow*, qualified immunity was sometimes referred to as "good faith and

-10-

reasonable belief" immunity –which was effectively no immunity at all. The subjective branch of the two-part objective-subjective test for qualified immunity embodied in *Butz v. Economou*, 438 U.S. 478 (1978), and *Wood v. Strickland*, 420 U.S. 308 (1975), virtually guaranteed a trial because, under governing Fed.R.Civ.P. 56 principles, whether the defendant intended to act in good faith or acted maliciously was viewed as inherently an issue of fact requiring trial.

However, under current qualified immunity doctrine--beginning with *Harlow*--the defendant's subjective good faith is irrelevant. See *Harlow v. Fitzgerald*, 457 U.S. at 815-818. Since Harlow, "an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); see also *Gefer v. Fortenberry,* 882 F.2d 167, 169 (5th Cir. 1989).

The reason for this is that courts recognize that in the day-to-day discharge of their duties, government officials may make mistakes, even to the extent of violating a person's constitutional or statutory rights. By adopting an objective "reasonable official" standard for governmental actors without reference to the defendant's subjective good faith, the court intends to afford government officials sufficient latitude to discharge their duties without fear of being enmeshed in the toils of civil litigation holding the prospect of personal liability in damages. In effect, qualified immunity is a doctrine of judicial forgiveness for errors of judgement by government officials. *Hunter v. Bryant*, 502 U.S. 224, 228 112 S.Ct. 534, 537 (1991); see also, *Goodson v. City of Corpus Christi,* 202 F.3d 730, 736 (5th Cir. 2000) and *Glenn v. City of Tyler,* 242 F.3d 307, 312 (5th Cir. 2001).

"[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgements--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). With this in mind, the Supreme Court has set forth a two part test to determine whether qualified immunity should apply. First, this Court must determine "whether a 'plaintiff's allegations, if true, establish a constitutional violation'". *Williams v. Kaufman County*,

-11-

352 F.3d 994, 1002 (5th Cir. 2003), quoting *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S.Ct 2508, 153 L.Ed.2d 666(2002). If the Court does find that Plaintiff has established a constitutional violation, then the Court must determine "whether the defendant's actions violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id*. quoting *Hope*, 536 U.S. at 739 (2002).

In the case at bar, Felton is immune from suit.

## C.     Applying Qualified Immunity to the Case at Bar

In their complaint, plaintiffs allege, *vis a vis* two causes of action, that Felton violated decedents Jose Vargas's and Guillermo Acosta Zamora's Fourth, Fifth, and Fourteenth Amendment rights under the United States Constitution (see pages 6 and 8 of Plaintiffs' First Amended Complaint).

### (1)     Defendant George Felton, III., Did Not Violate Plaintiffs (or their Decedents) Rights under the Fourth and Fifth Amendments of the United States Constitution.

Plaintiffs allege that Felton violated the procedural and substantive due process rights of Messrs. Vargas and Acosta-Zamora by suggesting that Felton–after taking custody of Messrs. Vargas and Acosta-Zamora by gunpoint–took possession of inner tubes being used by the duo to cross the river. Plaintiffs further assert that after the two men (Messrs. Vargas and Acosta-Zamora) jumped back into the river; and, believing that neither man could swim,[5] Felton (as well as Agents Zaehringer and McDermott) deliberately destroyed the inner-tubes that were earlier confiscated and cut a rope that spanned the river in a deliberate attempt to thwart the mens' escape and/or their rescue. (See Paragraph 24 of the Plaintiffs' First Amended Complaint). Aside from these allegations being completely baseless and lacking any credible support, the Plaintiffs claims fail to overcome Defendant George Felton's claim for qualified immunity.

---

[5]Plaintiffs never explain why the decedents would jump into the river and attempt to swim back to Mexico if they didn't know how to swim in the first place.

-12-

The essence of the Fourth Amendment is a balancing test, weighing the individual's expectation of privacy against the governmental interest in investigating and preventing crime. See *United States v. Leon*, 468 U.S. 897, 901-14 (1984). The amendment itself draws the line: the seizure must be reasonable. *Graham v. Connor*, 490 U.S. 386, 392-99 (1989). This "reasonableness" inquiry directs this Court to determine whether Felton's actions were "objectively reasonable" in light of the facts and circumstances confronting him--without regard to his underlying intent or motivation. Id at 396-97.

Looking to the case at bar, Plaintiffs have absolutely no evidence to show that Felton ever arrested, detained, seized, or searched the plaintiffs' decedents or their belongings or property–much less, did so without probable cause. *See Defendants' Exhibit 4.*

Messrs. Vargas and Zamora were attempting to enter into this country illegally; if they had been in custody, their detention would have been reasonable under the circumstances. Further, even though there is no evidence that Felton took custody of the inner-tubes being used by the aliens, there is no evidence that the inner tubes were taken or destroyed to prevent Messrs. Vargas and Zamora escape or rescue. The Plaintiffs simply cannot establish a Fourth Amendment violation of the Constitution.

Likewise, any Fifth Amendment claims that Felton unconstitutionally deprived Messrs. Vargas and Acosta-Zamora of their lives, must fail. Messrs. Vargas and Acosta-Zamora, for whatever reason, chose to go into the river.

Again, there is no evidence that these men were ever in the custody of Felton or any of the Defendants that day. See Defendant's Exhibits 1, 2, 3, and 4. Felton was under no duty to effect a rescue of Messrs. Vargas and Acosta-Zamora. Even so, Felton did what he could to assist the struggling men by throwing water jugs out to them for use as flotation devices and trying to call for help on his radio. *See Defendants' Exhibit 4.*

In short, Defendant George Felton's actions that day were well within the parameters established by the constitution. The Plaintiffs attempt to shock this Court by accusing the agents of deliberately causing the drownings of these two men and

-13-

prevent their rescue is totally void of any credible evidence.

Therefore, judgement as to any Fourth and Fifth Amendment violation claims should be rendered in favor of Felton and against the Plaintiffs.

### (2)    Any Fourteenth Amendment Claims Should be Dismissed for Failure to State Claim because the Fourteenth Amendment applies only to persons Acting under color of State Authority.

"The Fourteenth Amendment, by definition, requires state action." *McGuire v. Turnbo*, 137 F.3d 321, 323 (5th Cir. 1998), citing to U.S. CONST. amend. XIV.   The Plaintiffs in this case are suing George Felton, III., as a result of actions (or omissions) as a federal employee.  As a matter of law, Plaintiffs cannot maintain a Fourteenth Amendment claim against a federal employee for actions he took as a federal employee. *Id.*

It is worthy to note, however, that the Fifth Circuit has examined situations where it is alleged that state actors violated an individual's Fourteenth Amendment rights by preventing a rescue.  In determining whether a state officer is entitled to qualified immunity, the Fifth Circuit  has looked to such factors as "the safety of those involved" as well as whether the officer used his authority to cut off all avenues of rescue. *Salas v. Carpenter*, 980 F.2d 299, 307 (5th Cir.1992).

In this case, Plaintiffs alleged that the Defendants prevented other persons they had in their custody from attempting a rescue.  *(See Plaintiffs' First Amended Complaint, para. 24)*. This contention is not supported by the evidence.   No one in the defendants' custody indicated that they wanted to attempt a rescue; however, if they had, none of the agents would not have permitted any of the detainees to enter the dangerous waters for fear that they would succumb to the same fate as Messrs. Vargas and Zamora. *See Defendants' Exhibits 2, 3, and 4.*  If anything, such conduct should be interpreted as the Defendants' attempts to use their authority to prevent more tragic deaths.

Finally, there is no evidence that any of the defendants did anything to interfere with any rescue attempts made by other third parties that day.  See *Defendants' Exhibits 2, 3, and 4.*

-14-

Plaintiffs have failed to establish any Fourteenth Amendment violation. Therefore, if not dismissed, judgement should be rendered for Defendant George Felton as to any Fourteenth Amendment claims.

## 6.   **Conclusion**

George Felton, III., should be dismissed from this lawsuit because the Plaintiffs have failed to state a claim upon which relief can be granted against him.  Alternatively, George Felton, III., should be deemed immune from liability for the constitutional violations alleged by the plaintiffs and judgement should be rendered in his favor against the Plaintiffs.  Plaintiffs have failed to adequately allege or support the existence of the violation of either of the decedents constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

Respectfully submitted,

MICHAEL T. SHELBY
United States Attorney

NANCY L. MASSO
Assistant United States Attorney
600 E. Harrison St., No. 201
Brownsville, Texas 78520
Tel:  (956) 548-2554
Fax: (956) 548-2549
State Bar No. 00800490
Federal I.D. No.  10263

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the true and foregoing copy of DEFENDANT GEORGE FELTON'S BRIEF IN SUPPORT OF HIS MOTION TO DISMISS PURSUANT TO RULE 12(b)(6) OF THE FRCP AND ALTERNATIVE MOTION FOR SUMMARY JUDGEMENT was mailed, via certified mail, return receipt requested, on February 5, 2004, to Plaintiffs' attorney, Gregory W. Moreno and Arnoldo Casillas at MORENO, BECERRA, GUERRERO & CASILLAS, 3500 West Beverly Blvd., Montebello, CA 90640.

NANCY L. MASSO
Assistant United States Attorney