United States District Court
Southern District of Texas
FILED

FEB 0 5 2004

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| ESTATE OF JOSE VARGAS, by and through MARIA H. COVARRUBIAS, *etc.* Plaintiffs, | * * * * |
| v. | * CIVIL ACTION No. B-02-132 |
| GEORGE F. FELTON, III., DANIEL ZAEHRINGER, PATRICK B. McDERMOTT, ETC. | * * * * * |
| Defendants. | * |

### DEFENDANT DANIEL ZAEHRINGER'S
### BRIEF IN SUPPORT OF HIS MOTION TO DISMISS PURSUANT TO RULE 12(b)(6) OF THE FRCP AND ALTERNATIVE MOTION FOR SUMMARY JUDGEMENT

*TO THE HONORABLE JUDGE OF SAID COURT:*

    Defendant, Daniel Zaehringer (Zaehringer), who has been sued in his individual capacity, moves to dismiss the allegations against him pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Alternatively, Zaehringer moves for summary judgement on the basis that under the doctrine of qualified immunity, he is immune from suit.

    In support of this motion, Zaehringer submits this brief.[1]

### 1. Factual Background

    On July 1, 2000[2], Daniel Zaehringer was employed as a Border Patrol Agent in the McAllen Sector. See *Defendants' Exhibit 2*. On this particular day, Zaehringer was working line watch duties in the area of Santa Maria, Texas, with fellow Border Patrol Agent Patrick McDermott. See *Defendants' Exhibits 2 and 3*. "Line watch duties" requires agents to patrol the area along the Rio Grande River and its levees for

---

[1] Referenced exhibits are included within a separately filed exhibit packet entitled "Defendants' Summary Judgement Motions' Exhibit Packet" which is incorporated by reference herein.

[2] At paragraph 9, the Plaintiff's Amended Complaint states that the drownings of Jose Guadalupe Vargas and Guillermo Acosta Zamora took place on June 30, 2000 at or near Brownsville, Texas. While it is true that a drowning occurred at or near Brownsville, Texas, on June 30, 2000, the drownings of Mssrs. Vargas and Acosta-Zamora occurred on July 1, 2000, at the Anacua Wildlife Refuge near Santa Maria, Texas–some 20 miles northwest of Brownsville. See Defendant's Exhibits 1 through 4.

illegal immigrant/alien activities. *Id.*

At around 3:30 p.m., Zaehringer and McDermott learned *vis a vis* radio dispatch that there was seismic sensor activity near a "landing" area located in the Anacua Wildlife Refuge off the Rio Grande River. *Id.* Zaehringer was familiar with this area and knew that this "landing" area was frequently used by illegal aliens and drug smugglers to cross the river. *See Defendants' Exhibits 2, 3, and 4.* Since this location was within their assigned area for patrol, Zaehringer and McDermott responded to the sensor. *Id.*

As Zaehringer and McDermott drove up Cobarubias Road (aka Anacua Road) to where the road met the river levee service road, they saw that Border Patrol Agent George "Trip" Felton was already there scanning the levee for alien traffic using a pair of binoculars. *Id.* Agent Felton, who was working alone that day, also heard the dispatch on the sensor and came to assist. *Id.*

The Anacua Wildlife Refuge, known for its very rough and densely overgrown terrain, was often referred to as "the jungle". *Id.* The agents decided to wait at the levee to see if any illegal aliens would try to sneak out of the vegetation to cross the levee service road. *Id.*

After waiting several minutes, and seeing no activity, the agents decided to split up to determine what set off the sensor. *Id.* It was decided that Agents Zaehringer and Felton would walk directly to the landing area closest to the sensor. Once there, Agents Zaehringer and Felton planned to walk north up a trail from the landing area while, at the same time, Agent McDermott would come down one of the other trails leading southward to the landing from the levee road. *See Defendants' Exhibit 3.*

Agents Zaehringer and Felton made their way down one of the trails to the landing area. *See Defendants' Exhibits 3 and 4.* At one point. Agents Zaehringer and Felton stopped to look and listen for activity. *Id.* Seeing no activity, the agents continued on their route to the landing. *Id.* Several yards from the landing, the trail Agents Zaehringer and Felton were using split into two separate trails leading to the landing area. *Id.* Agent Felton took the left path and Zaehringer took the right path. *Id.*

Soon after starting down the path, Agent Zaehringer heard running movements in the brush and splashes in the water. *See Defendants' Exhibit 3.* As he made his way to the landing, Zaehringer came across several individuals who were

undocumented aliens. *Id.* Zaehringer, who is fluent in Spanish, instructed the people to sit down on the ground. *Id.* After the people sat down, Zaehringer searched for more illegal aliens. *Id.*

Agent Zaehringer saw several people in the water, and he called to them to come back to shore. *Id.* They ignored him and began to swim back to the Mexican side of the river. *Id.*

Agent Zaehringer continued searching for illegal aliens. *Id.* As he was searching, Zaehringer saw that Agent Felton had apprehended two aliens. *Id.* Felton had the people sit with the group of aliens Zaehringer detained. *See Defendants' Exhibits 3 and 4.*

Soon thereafter, Zaehringer saw a piece of twine where one end was tied to what looked like a large tree root near the water's edge, while the other end laid in a tangled bundle at the muddy base of a tree root. *See Defendants' Exhibit 3.* Zaehringer borrowed a knife from Agent Felton and cut the twine from the tree root. *Id.* It was not uncommon to see pieces of rope strung from one side of the river bank to the other. *See Defendants' Exhibits 2, 3, and 4.* It was a common practice of illegal aliens to string a rope across the river to assist them in crossing the river. As a consequence, it was Border Patrol's procedure and practice to cut these ropes so they could not be used for future illegal entries. *Id.*

Zaehringer then saw two inner tubes stashed in an "up/down" position in the undergrowth on the riverbank. *See Defendants' Exhibit 3.* Consistent with Border Patrol practice and procedure at the time, Zaehringer cut the inner tubes to release the air so they could not be used for future illegal entries into the country. *Id.* As the tubes were deflating, Zaehringer spotted three or four men down river from their location trying to hide in the brush that came right up to the river's edge. *Id.* They looked at Zaehringer, and he told them to come back. *Id.* They ignored him and jumped into the river. *Id.* At the same time, Zaehringer heard splashes coming from people that must have been hiding upriver from his location. *Id.* He again called out for them to come back; all but one heeded his call.

As the people were swimming back to Mexico, Zaehringer returned back to the group that he and Felton earlier detained. *See Defendants' Exhibits 3 and 4.* At about that time, Zaehringer heard someone from the Mexico side of the river bank calling for

help. *See Defendants' Exhibit 3.* Agent Zaehringer turned around and saw one man struggling in the water about fifteen feet from the Mexican riverbank. *Id.* In less than thirty seconds, the man went under the water. *Id.* Zaehringer-along with Agent Felton-started to throw empty water jugs that were lying on the ground near them out toward the area where the man went under the water; unfortunately, none of the water jugs got any where close to where the man was last seen. *See Defendants' Exhibits 3 and 4.*

Then, just a few seconds later, a second man swam into the same area as the first; and, like the first man, he began to struggle. *Id.* Agents Zaehringer and Felton continued to throw out water jugs with no success. *Id.* Zaehringer saw two or three men from the Mexican side of the riverbank jump in the river in an attempt to rescue the man, but they suddenly retreated back to the riverbank. *See Defendants' Exhibit 3.* Based upon his experience with working along the Rio Grande River, Agent Zaehringer believed there was a whirlpool or strong river current that scared them into ending their rescue attempt. *Id.* Like the first man, the second man disappeared under the water and never re-surfaced. *Id.*

Agent Zaehringer never used his weapon that day, nor did he observe any of the other agents use their weapons that day. *Id.* Agent Zaehringer never instructed anyone not to rescue these men although, he admits that if any of the detainees would have tried a rescue he would have stopped them for their own safety. *See Defendants' Exhibits 1, 3, and 4.*

The decedents, Messrs. Vargas and Acosta-Zamora were never in Zaehringer's (or Felton's for that matter) custody. *Id.* Agent McDermott did not arrive on the scene until after the men had drowned. *See Defendants' Exhibits 2, 3, and 4.*

Initially, it was difficult to call for emergency assistance. *See Defendants' Exhibits 2 and 4.* The terrain and dense vegetation of the Anacua Wildlife Refuge made it extremely difficult to get a radio signal out to emergency personnel. *Id.* Once authorities arrived and it was determined that nothing could be done, the agents returned to their station and processed the persons they had detained. *See Defendants' Exhibit 2.*

2.  **Defendants' Exhibits Summary**

In filing their respective motions to dismiss the allegations against them, the Defendants have submitted an Exhibit Packet for this Court to consider in reviewing the

arguments set forth herein. This packet consists of Declarations executed by each of the named defendants pursuant to 28 U.S.C. § 1746 (Defendant's Exhibits 2 - 4) as well as a copy of Requests for Admissions (Defendant's Exhibit 1) that were forwarded to Plaintiffs in June of 2003. Attached to Defendant's Exhibit 1 is a copy of the "green card" receipt indicating that Plaintiffs' counsel received these Requests for Admission on July 1, 2003. To date, Plaintiffs have not responded to the Requests for Admissions or otherwise sought an extension of time. As such, the Requests for Admissions should be deemed admitted.

### Admissions Deemed Admitted Under Rule 36 of the FRCP

Rule 36(a) of the Federal Rules of Civil Procedures states, in relevant part:

*...The matter is admitted unless, within 30 days after service of the request, or within such shorter time or longer time as the court may allow or as the parties may agree to in writing, subject to Rule 29, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by the party's attorney....*

There has been no written stipulation or agreement between counsel regarding the lengthening of the time period for which to respond to any discovery in this case. There is no Court order in place allowing the Plaintiffs an additional three months to respond to the Defendants' discovery. Therefore, the admissions should be deemed admitted.

Therefore, the following points of fact have been established by way of Plaintiffs' admissions:

1. The incident at issue in this lawsuit occurred on July 1, 2000;
2. The incident at issue in this lawsuit occurred at the Anacua Wildlife Refuge located near the town of Santa Maria, Texas;
3. Jose Vargas died on July 1, 2000;
4. Guillermo Acosta Zamora died on July 1, 2000;
5. Jose Vargas had not been detained by United States Border Patrol agents at any time on July 1, 2000;
6. Guillermo Acosta Zamora had not been detained by United States Border Patrol Agents at any time on July 1, 2000;
7. None of the Border Patrol Agents present immediately before, during, or after the incident involving Jose Vargas drew their

weapons on Jose Vargas;
8. None of the Border Patrol Agents present immediately before, during, or after the incident involving Jose Vargas drew their weapons on Guillermo Acosta Zamora;
9. None of the Border Patrol Agents present immediately before, during, or after the incident involving Jose Vargas drew their weapons on any of the persons detained at the scene of the drownings of Jose Vargas and Guillermo Acosta Zamora;
10. The United States, nor any of its employees or agents, did anything to prevent the possible rescue of Jose Vargas; and,
11. The United States, nor any of its employees or agents, did anything to prevent the possible rescue of Guillermo Acosta Zamora.

**See Defendant's Exhibit 1.**

For purposes of this lawsuit, Plaintiffs' failure to respond to these admissions has "conclusively established" the matters stated, and cannot, without a Court order be withdrawn or otherwise amended. See Rule 36(b) of the FRCP; see also, *In Re Carney*, 258 F.3d 415 (5th Cir. 2001).

3. **Statement of the Issues**
    A. Whether the constitutional claims against Daniel Zaehringer should be dismissed for failure to state a claim upon which relief can be granted when the Plaintiffs are based on pure conjecture.
    B. Whether Daniel Zaehringer is entitled to qualified immunity since the evidence shows that there was no violation of the decedents' Fourth, Fifth and Fourteenth Amendment rights.

4. **Summary of Argument**

The allegations made against Daniel Zaehringer should be dismissed for failure to state a claim. All the allegations against Zaehringer are based on pure conjecture and speculation. As such, they should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Alternatively, summary judgement should be rendered in favor of Daniel Zaehringer and against the Plaintiffs herein on the basis that Daniel Zaehringer is entitled to qualified immunity. In evaluating a case to see if a defendant is entitled to

qualified immunity, the court must undertake a two step analysis. The court must determine "whether the 'plaintiffs allegations, if true, establish a constitutional violation.'" *Williams v. Kaufman County*, 352 F.3d 994, 1002 (5th Cir. 2003), quoting *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S.Ct 2508, 153 L.Ed.2d 666(2002). If they do, then the court must determine "whether the defendant's actions violated 'clearly established statutory or constitutional rights of which a reasonable person should have known.'" *Id*. quoting *Hope,* 536 U.S. at 739 (2002). Plaintiffs have failed to establish a constitutional violation in this case and, as such, Daniel Zaehringer is entitled to qualified immunity.

5.  **Argument**
    
    A.  **This Court Should Dismiss the Speculative Allegations Made Against Daniel Zaehringer for Failure to State a Claim Upon Which Relief Can Be Granted.**

At first glimpse, the Plaintiffs' paint a horrifying picture of mean spirited Border Patrol agents forcibly taking innocent people into custody at gunpoint and coldly stand back while two people drowned. However, upon harder examination of the allegations in this case, one must conclude that–as tragic as the deaths of Messrs. Vargas and Acosta-Zamora was and is--the tale as told by the Plaintiffs of the circumstances leading to their deaths was created like most fairy-tales are–by pure speculation.

Plaintiffs original and amended complaints set forth a rambling series of unsupported allegations that the Defendants took Messrs. Vargas and Acosta-Zamora "into custody" thus creating a "special relationship" with the defendants in this case. Defendants then took "custody and control of" inner-tubes that the aliens were using to cross the river so as to "deprive" Messrs. Vargas and Acosta-Zamora "from any flotation device should they re-enter the river". See Plaintiffs' First Amended Complaint at paras. 21 - 23. Plaintiffs then say that the Defendants "maliciously and intentionally punctured the inner tubes and cut the rope which spanned the river, so as to get Jose Guadalupe Vargas and Guillermo Acosta Zamora to return the U.S. bank of the river." See Plaintiffs' First Amended Complaint at para. 24.

Plaintiffs continue their tale by asserting: (a) that the Defendants "believed" that Messrs. Vargas and Acosta-Zamora "could not swim" ; (b) that the Defendants

"believed" that by "denying them the inner-tubes and by cutting the rope" that Messrs. Vargas and Acosta-Zamora "*would return to the U.S. bank of the river...*"; and, (c) that the Defendants prevented other persons from attempting a rescue by destroying the inner-tubes and cutting the rope that spanned the river. Plaintiffs' First Amended Complaint at paras. 24.

In *Oliver v. Scott*, 276 F.3d 736, 740, the Fifth Circuit noted that while the generic pleading requirement of Rule 8 of the Federal Rules of Civil Procedure would suffice in instances where government officials are sued in their official capacity, a heightened standard existed when a Plaintiff was making claims against a government official in his individual capacity:

> **'Plaintiffs suing governmental officials in their individual capacities, however, must allege specific conduct giving rise to a constitutional violation'** [ ][3] **'This standard requires more than conclusional assertions: The Plaintiff must allege specific facts giving rise to a constitutional violation.'**[4]

Consequently, this "heightened pleading" requirement requires the Plaintiff to set forth facts that focus "specifically on the conduct of the individual who caused the Plaintiff's injury". *Reyes v. Sazan*, 168 F.3d 158, 161 (5th Cir. 1999).

In the case at bar, there is absolutely no evidence that any of these conclusory allegations are true. There is no evidence that Zaehringer (or the other Defendants in this case) ever took Messrs. Vargas and Acosta-Zamora into custody. There is no evidence that Zaehringer ever took destroyed the inner-tubes he found for the purpose of squelching a rescue or escape attempt. There is no evidence that Zaehringer cut a rope that spanned the river for the purpose of prohibiting its use by the decedents or potential rescuers.

Plaintiffs' complaint is replete with conclusory unsupported allegations. The claims made against Daniel Zaehringer should be dismissed on their face for failure to state a claim upon which relief can be granted.

---

[3] Quoting *Anderson v. Pasadena I.S.D.*, 184 F.3d 439, 443 (5th Cir. 1999).

[4] Quoting *Baker v. Putnal*, 75 F.3d 190, 194 (5th Cir. 1996).

B.  **Overview of Qualified Immunity and Summary Judgement Standard**

In *Burge v. Parish of St. Tammany*, 187 F.3d 452, 464-465 (5th Cir. 1999), the Fifth Circuit described the summary judgement standard as follows:

> **Summary judgement is proper when the pleadings, depositions, admissions, and answers to interrogatories, together with affidavits, demonstrate that no genuine issue exists as to any material fact and that the movant is entitled to judgement or partial judgement as a matter of law. Fed.R.Civ.P. 56(c);** *Burns v. Harris County Bail Bond Bd.*, **139 F.3d 513, 517-18 (5th Cir.1998).**
>
> **The party seeking summary judgement has the initial responsibility of informing the court of the basis for its motion, and identifying those parts of the record that it believes demonstrate the absence of a genuine issue of material fact.** *Johnston v. City of Houston, Tex.*, **14 F.3d 1056, 1060 (5th Cir.1994) (citing** *Celotex Corp. v. Catrett*, **477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 [1986]). If the moving party carries its initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of a genuine issue of material fact. "This showing requires more than 'some metaphysical doubt as to the material facts.' " Id. (quoting** *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, **475 U.S. 574, 584-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 [1986]). While the party opposing the motion may use proof filed by the movant to satisfy its burden, " 'only evidence--not argument, not facts in the complaint--will satisfy' " the burden. Id. (quoting** *Solo Serve Corp. v. Westowne Assoc.*, **929 F.2d 160, 164 [5th Cir.1991]).**

See also, *Priester v. Lowndes County*, —F.3d—, 2004 WL 32944 (5th Cir. Jan. 7, 2004)(No. 02-60750).

In the case at bar, however, Defendant Daniel Zaehringer is moving for summary judgement not only on the basis that there is a total lack of evidence to support the claims set forth by Plaintiffs in their complaint, but also on the basis that he is entitled to qualified immunity.

The defense of qualified immunity is the product of a series of Supreme Court decisions that began with *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). In *Harlow v. Fitzgerald*, 457 U.S. at 818, the Supreme Court found that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

Before *Harlow*, qualified immunity was sometimes referred to as "good faith and reasonable belief" immunity –which was effectively *no* immunity at all. The subjective branch of the two-part objective-subjective test for qualified immunity embodied in *Butz v. Economou*, 438 U.S. 478 (1978), and *Wood v. Strickland*, 420 U.S. 308 (1975), virtually guaranteed a trial because, under governing Fed.R.Civ.P. 56 principles, whether the defendant intended to act in good faith or acted maliciously was viewed as inherently an issue of fact requiring trial.

However, under current qualified immunity doctrine--beginning with *Harlow*--the defendant's subjective good faith is irrelevant. See *Harlow v. Fitzgerald*, 457 U.S. at 815-818. Since Harlow, "an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); see also *Gefer v. Fortenberry*, 882 F.2d 167, 169 (5th Cir. 1989).

The reason for this is that courts recognize that in the day-to-day discharge of their duties, government officials may make mistakes, even to the extent of violating a person's constitutional or statutory rights. By adopting an objective "reasonable official" standard for governmental actors without reference to the defendant's subjective good faith, the court intends to afford government officials sufficient latitude to discharge their duties without fear of being enmeshed in the toils of civil litigation holding the prospect of personal liability in damages. In effect, qualified immunity is a doctrine of judicial forgiveness for errors of judgement by government officials. *Hunter v. Bryant*, 502 U.S. 224, 228 112 S.Ct. 534, 537 (1991); see also, *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000) and *Glenn v. City of Tyler,* 242 F.3d 307, 312 (5th Cir. 2001).

"[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgements--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). With this in mind, the Supreme Court has set forth a two part test to determine whether qualified immunity should apply. First, this Court must determine "whether a 'plaintiff's

allegations, if true, establish a constitutional violation'". *Williams v. Kaufman County*, 352 F.3d 994, 1002 (5th Cir. 2003), quoting *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S.Ct 2508, 153 L.Ed.2d 666(2002). If the Court does find that Plaintiff has established a constitutional violation, then the Court must determine "whether the defendant's actions violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* quoting *Hope*, 536 U.S. at 739 (2002).

In the case at bar, Zaehringer is immune from suit.

### C.     Applying Qualified Immunity to the Case at Bar

In their complaint, plaintiffs allege, *vis a vis* two causes of action, that Zaehringer violated decedents Jose Vargas's and Guillermo Acosta Zamora's Fourth, Fifth, and Fourteenth Amendment rights under the United States Constitution (see pages 6 and 8 of Plaintiffs' First Amended Complaint).

### (1)     Defendant Daniel Zaehringer Did Not Violate Plaintiffs (or their Decedents) Rights under the Fourth and Fifth Amendments of the United States Constitution.

Plaintiffs allege that Zaehringer violated the procedural and substantive due process rights of Messrs. Vargas and Acosta-Zamora by suggesting that Zaehringer–after taking custody of Messrs. Vargas and Acosta-Zamora by gunpoint–took possession of inner tubes being used by the duo to cross the river. Plaintiffs further assert that after the two men (Messrs. Vargas and Acosta-Zamora) jumped back into the river; and, believing that neither man could swim,[5] Zaehringer (as well as Agents Felton and McDermott) deliberately destroyed the inner-tubes that were earlier confiscated and cut a rope that spanned the river in a deliberate attempt to thwart the mens' escape and/or their rescue. (See Paragraph 24 of the Plaintiffs' First Amended Complaint). Aside from the allegations being completely baseless and lacking any credible support, the Plaintiffs' claims fail to overcome Defendant Daniel

---

[5]Plaintiffs never explain why the decedents would jump into the river and attempt to swim back to Mexico if they didn't know how to swim in the first place.

Zaehringer's claim for qualified immunity.

The essence of the Fourth Amendment is a balancing test, weighing the individual's expectation of privacy against the governmental interest in investigating and preventing crime. See *United States v. Leon*, 468 U.S. 897, 901-14 (1984). The amendment itself draws the line: the seizure must be reasonable. *Graham v. Connor*, 490 U.S. 386, 392-99 (1989). This "reasonableness" inquiry directs this Court to determine whether Zaehringer's actions were "objectively reasonable" in light of the facts and circumstances confronting him--without regard to his underlying intent or motivation. *Id* at 396-97.

Looking to the case at bar, Plaintiffs have absolutely no evidence to show that Zaehringer ever arrested, detained, seized, or searched the plaintiffs' decedents or their belongings or property–much less, did so without probable cause. *See Defendants' Exhibit 4*.

Messrs. Vargas and Zamora were attempting to enter into this country illegally; if they had been in custody, their detention would have been reasonable under the circumstances. Further, even though Zaehringer destroyed a couple inner tubes he found hidden along the river bank, there is no evidence that the inner tubes were taken or destroyed to prevent Messrs. Vargas and Zamora escape or rescue. As attested to by the Defendants in this case, it was the practice of the Border Patrol to destroy such items as they found them in order to prevent their continued use by illegal aliens in crossing the river. The Plaintiffs simply cannot establish a Fourth Amendment violation of the Constitution.

Likewise, any Fifth Amendment claims that Zaehringer unconstitutionally deprived Messrs. Vargas and Acosta-Zamora of their lives, must fail. Messrs. Vargas and Acosta-Zamora, for whatever reason, chose to go into the river.

Again, there is no evidence that these men were ever in the custody of Zaehringer or any of the Defendants that day. *See Defendant's Exhibits 1, 2, 3, and 4*. Zaehringer was under no duty to effect a rescue of Messrs. Vargas and Acosta-Zamora. Even so, Zaehringer did what he could to assist the struggling men by throwing water jugs out to them for use as flotation devices. *See Defendants' Exhibits 3*

*and 4.*

In short, Zaehringer's actions that day were well within the parameters established by the constitution.

Therefore, judgement as to any Fourth and Fifth Amendment violation claims should be rendered in favor of Zaehringer and against the Plaintiffs.

### (2) Any Fourteenth Amendment Claims Should be Dismissed for Failure to State Claim because the Fourteenth Amendment applies only to persons Acting under color of State Authority.

"The Fourteenth Amendment, by definition, requires state action." *McGuire v. Turnbo*, 137 F.3d 321, 323 (5th Cir. 1998), citing to U.S. CONST. amend. XIV. The Plaintiffs in this case are suing Daniel Zaehringer, as a result of actions (or omissions) as a federal employee. As a matter of law, Plaintiffs cannot maintain a Fourteenth Amendment claim against a federal employee for actions he took as a federal employee. *Id.*

It is worthy to note, however, that the Fifth Circuit has examined situations where it is alleged that state actors violated an individual's Fourteenth Amendment rights by preventing a rescue. In determining whether a state officer is entitled to qualified immunity, the Fifth Circuit has looked to such factors as "the safety of those involved" as well as whether the officer used his authority to cut off all avenues of rescue. *Salas v. Carpenter*, 980 F.2d 299, 307 (5th Cir.1992).

In this case, Plaintiffs alleged that the Defendants prevented other persons they had in their custody from attempting a rescue. *(See Plaintiffs' First Amended Complaint, para. 24)*. This contention is not supported by the evidence. No one in the defendants' custody indicated that they wanted to attempt a rescue; however, if they had, none of the agents would not have permitted any of the detainees to enter the dangerous waters for fear that they would succumb to the same fate as Messrs. Vargas and Zamora. *See Defendants' Exhibits 2, 3, and 4.* If anything, such conduct should be interpreted as the Defendants' attempts to use their authority to prevent more tragic deaths.

Finally, there is no evidence that any of the defendants did anything to interfere

with any rescue attempts made by other third parties that day.  See *Defendants' Exhibits 2, 3, and 4.*

Plaintiffs have failed to establish any Fourteenth Amendment violation. Therefore, if not dismissed, judgement should be rendered for Defendant Daniel Zaehringer as to any Fourteenth Amendment claims.

### 6. Conclusion

Daniel Zaehringer, should be dismissed from this lawsuit because the Plaintiffs have failed to state a claim upon which relief can be granted against him.  Alternatively, Daniel Zaehringer, should be deemed immune from liability for the constitutional violations alleged by the plaintiffs and judgement should be rendered in his favor against the Plaintiffs.  Plaintiffs have failed to adequately allege or support the existence of the violation of either of the decedents constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

Respectfully submitted,

MICHAEL T. SHELBY
United States Attorney

NANCY L. MASSO
Assistant United States Attorney
600 E. Harrison St., No. 201
Brownsville, Texas 78520
Tel: (956) 548-2554
Fax: (956) 548-2549
State Bar No. 00800490
Federal I.D. No. 10263

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the true and foregoing copy of DEFENDANT DANIEL ZAEHRINGER'S BRIEF IN SUPPORT OF HIS MOTION TO DISMISS PURSUANT TO RULE 12(b)(6) OF THE FRCP AND ALTERNATIVE MOTION FOR SUMMARY JUDGEMENT was mailed, via certified mail, return receipt requested, on February 5, 2004, to Plaintiffs' attorney, Gregory W. Moreno and Arnoldo Casillas at MORENO, BECERRA, GUERRERO & CASILLAS, 3500 West Beverly Blvd., Montebello, CA 90640.

NANCY L. MASSO
Assistant United States Attorney