50

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 0 5 2004

Michael N. Milby
Clerk of Court

| | |
|---|---|
| ESTATE OF JOSE VARGAS, by and through MARIA H. COVARRUBIAS, *etc.* Plaintiffs, | * * * * |
| v. | * CIVIL ACTION No. B-02-132 |
| GEORGE F. FELTON, III., DANIEL ZAEHRINGER, PATRICK B. McDERMOTT, ETC. | * * * * * |
| Defendants. | * |

## DEFENDANTS' SUMMARY JUDGEMENT MOTIONS' EXHIBIT PACKET

TO THE HONORABLE JUDGE OF SAID COURT:

Attached hereto are Defendants' Exhibits 1 through 4 which are referred to and incorporated by reference in summary judgement motions and supporting briefs filed by the Defendants on this date. These exhibits are filed in "packet form" in the hope that it will better assist the Court in its review and consideration of the summary judgement motions filed by the individually named defendants.

Respectfully submitted,

MICHAEL T. SHELBY
United States Attorney

NANCY L. MASSO
Assistant United States Attorney
600 E. Harrison St., No. 201
Brownsville, Texas 78520
Tel: (956) 548-2554
Fax: (956) 548-2549
State Bar No. 00800490
Federal I.D. No. 10263

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the true and foregoing copy of DEFENDANTS' SUMMARY JUDGEMENT MOTIONS EXHIBIT PACKET was mailed, via certified mail, return receipt requested, on February 5, 2004, to Plaintiffs' attorney, Gregory W. Moreno and Arnoldo Casillas at MORENO, BECERRA, GUERRERO & CASILLAS, 3500 West Beverly Blvd., Montebello, CA 90640.

NANCY L. MASSO
Assistant United States Attorney



**U.S. Department of Justice**

United States Attorney
Southern District of Texas

---

U.S. Courthouse
600 E. Harrison Suite 201
Brownsville, TX 78520

Phone (956) 548-2554
Fax (956) 548-2549

July 15, 2003

Arnoldo Casillas
Attorney at Law
MORENO, BECERRA, GUERRERO & CASILLAS
3500 W. Beverly Blvd.
Montebello, CA 90640

In Re: **ESTATE OF JOSE VARGAS et al v. FIVE UNKNOWN BORDER PATROL AGENTS, ET AL**; In the United States District Court for the Southern District of Texas; Brownsville Division; Civil Action No. B-02-132

Dear Mr. Casillas:

Please find enclosed the United States of America's First Set of Interrogatories to Plaintiff Estate of Guillermo Acosta Zamora Through Maria Teresa Alvarado Mendez; United States of America's First Set of Interrogatories to Plaintiff Estate of Jose Vargas Through Maria Covarrubias; and United States of America's Requests for Admissions to Plaintiffs submitted in the above-entitled and numbered cause.

Should you have any questions, please feel free to contact me.

Sincerely,

MICHAEL T. SHELBY
UNITED STATES ATTORNEY

NANCY L. MASSO
Assistant United States Attorney

NLM:mt

Enclosures

bcc:  Dona Justus







IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| ESTATE OF JOSE VARGAS, by and through MARIA H. COVARRUBIAS, *etc.* Plaintiffs, | * * * * |
| v. | * CIVIL ACTION No. B-02-132 |
| GEORGE FELTON, III., DANIEL ZAEHRINGER, PATRICK B. McDERMOTT, TWO UNKNOWN INS BORDER PATROL AGENTS; U.S. DEPARTMENT OF IMMIGRATION and NATURALIZATION; UNITED STATES BORDER PATROL; UNITED STATES OF AMERICA; and DOE Defendants 1-10, inclusive, Defendants. | * * * * * * * * * * |

## UNITED STATES OF AMERICA'S REQUESTS FOR ADMISSIONS TO PLAINTIFFS

TO: Estate of Jose Vargas, through Maria H. Covarrubias, etc. by and through their attorney of record, Arnoldo Casillas, Attorney at Law, MORENO, BECERRA, GUERRERO & CASILLAS, 3500 West Beverly Boulevard, Montebello, CA 90640.

In accordance with Rule 36, Federal Rules of Civil Procedure, the United States of America requests that Plaintiffs herein, respond to the attached Requests for Admission in accordance with Rule 36(a) to the undersigned attorney for the United States of America at the offices of the United States Attorney, 600 East Harrison, No. 201, Brownsville, Texas 78520, no later than thirty (30) days from the date of service of this request.

Respectfully submitted,
MICHAEL T. SHELBY
UNITED STATES ATTORNEY

NANCY L. MASSO
Assistant United States Attorney
600 East Harrison, No. 201
Brownsville, Texas 78520
Tel: 956-548-2554
Fax: 956-548-2549
State Bar No. 00800490
Fed. I.D. No. 10263

## REQUESTS FOR ADMISSIONS

1.  The incident at issue in this lawsuit occurred on July 1, 2000.

**ANSWER:**

2.  The incident at issue in this lawsuit occurred at the Anacua Wildlife Refuge located near the town of Santa Maria, Texas.

**ANSWER:**

3.  Jose Vargas died on July 1, 2000.

**ANSWER:**

4.  Guillermo Acosta Zamora died on July 1, 2000.

**ANSWER:**

5.  Jose Vargas had not been detained by United States Border Patrol agents at any time on July 1, 2000.

**ANSWER:**

6.  Guillermo Acosta Zamora had not been detained by United States Border Patrol Agents at any time on July 1, 2000.

**ANSWER:**

7.  None of the Border Patrol Agents present immediately before, during, or after the incident involving Jose Vargas drew their weapons on Jose Vargas.

**ANSWER:**

8.  None of the Border Patrol Agents present immediately before, during, or after the incident involving Jose Vargas drew their weapons on Guillermo Acosta Zamora.

**ANSWER:**

9.  None of the Border Patrol Agents present immediately before, during, or after the incident involving Jose Vargas drew their weapons on any of the persons detained at the scene of the drownings of Jose Vargas and Guillermo Acosta Zamora.

**ANSWER:**

10. The United States, nor any of its employees or agents, did anything to prevent the possible rescue of Jose Vargas.

**ANSWER:**

11. The United States, nor any of its employees or agents, did anything to prevent the

possible rescue of Guillermo Acosta Zamora.

**ANSWER:**

Case 1:02-cv-00132   Document 50   Filed in TXSD on 02/05/2004   Page 7 of 20

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "United States of America's Requests For Admissions to Plaintiffs" was mailed via certified mail, return-receipt requested to Plaintiffs' counsel:

>Arnoldo Casillas
>Attorney at Law
>MORENO, BECERRA, GUERRERO & CASILLAS
>3500 West Beverly Boulevard, Montebello, CA 90640

on this the 15 day of July, 2003.

NANCY L. MASSO, AUSA

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ESTATE OF JOSE VARGAS, by and through MARIA H. COVARRUBIAS, *etc.* Plaintiffs, | * * * * | |
| v. | * * | CIVIL ACTION No. B-02-132 |
| GEORGE F. FELTON, III., DANIEL ZAEHRINGER, PATRICK B. McDERMOTT, TWO UNKNOWN INS/BORDER PATROL AGENTS; UNITED SATES DEPT. OF IMMIGRATION and NATURALIZATION; UNITED STATES BORDER PATROL; UNITED STATES OF AMERICA, and DOE Defendants 1-10, inclusive, Defendants. | * * * * * * * * * * | |

## DECLARATION OF PATRICK B. McDERMOTT

I, PATRICK B. McDERMOTT, DO HEREBY VERIFY, SWEAR AND AFFIRM AS FOLLOWS:

1. I have served as a Border Patrol Agent with the United States since November 1998. I have been named as a defendant in the lawsuit referenced above and submit the following, under oath, in order to advise the Court of the factual circumstances regarding the incident at issue. I have personal knowledge of the events described herein.

2. On July 1, 2000, I was on duty in my official capacity as Border Patrol Agent with the United States Border Patrol. In July 2000, the Border Patrol was an agency of the United States Department of Justice. In March of 2003, the Border Patrol became an agency of the newly formed Department of Homeland Security

3. At paragraph 9, the Plaintiff's Amended Complaint states that the drownings of Jose Guadalupe Vargas and Guillermo Acosta Zamora took place on June 30, 2000 at or near Brownsville, Texas. While it is true that a drowning occurred at or near Brownsville, Texas, on June 30, 2000, the drownings of Mssrs. Vargas and Acosta-Zamora occurred on July 1, 2000, at the Anacua Wildlife Refuge near Santa Maria, Texas—some 20 miles northwest of Brownsville.



Page 2

4. On July 1, 2000, Border Patrol Agent Dan Zaehringer and I were working line watch duties in the area of Santa Maria, Texas. "Line watch duties" requires that we patrol the area along the Rio Grande River and its levees for illegal immigrant/alien activities. At about 3:30 p.m., Agent Zaehringer and I were advised by dispatcher that there was seismic sensor activity at an area of the Rio Grande River located in the Anacua Wildlife Refuge. This particular area where the sensor was located was known to us to be a regularly used "landing" area for illegal aliens crossing the river as well as an area used by individuals crossing narcotics into the country. Since this location was within our assigned area for patrol, we responded to the sensor.

5. We drove up Cobarubias Road (aka Anacua Road) to where the road met the river levee service road. When we arrived, Border Patrol Agent George "Trip" Felton was already there scanning the levee for alien traffic using a pair of binoculars. Agent Felton, who was working alone that day, also heard the dispatch on the sensor and came to assist.

6. Between the levee service road and the river itself the terrain slopes in a downward projectory–pretty steep at some places. The terrain is very rough and densely overgrown with all kinds of vegetation native to this area of South Texas. It was impossible to see the river, much less anyone that might be crossing it, from the levee service road. We waited a few minutes to see if any illegal aliens would try to sneak out of the vegetation to cross the levee service road.

7. Seeing no activity, we decided to split up to determine what set off the sensor. It was decided that Agents Zaehringer and Felton would walk directly to the landing area known to us to be used by aliens that trip this particular sensor, and walk north up a trail from the landing area; at the same time, I would enter one of the trails leading southward to the landing from the levee road. It was our hope that this approach would allow us to better apprehend any individuals walking up any one of the trails leading from the landing area. Since this area was also well known for its illegal drug activity, I was carrying a government issued Remington 870 -12 Gauge shotgun, using a shoulder strap for added protection.

8. The distance from the levee road to the landing area was about half a mile. When I was about half way to the landing, I heard Agent Felton on the radio saying that he saw suspected aliens moving down river. I quickened my pace down the trail, however, as I got closer to their position, I heard Agents Felton and Zaehringer instructing the subjects to stop and sit down. I could not see anyone at this point; however, it sounded as if they had everything under control so I slowed my pace.

Page 3

9. As I got closer, I heard frantic shouting from both sides of the river. When I reached the landing, I saw several water jugs floating in the river and a man climbing up the riverbank on the Mexican side of the river. Agent Felton then advised me that two other men who were swimming in the river had gone under and not resurfaced. He advised that he tried to reach me on my radio to call for assistance, but I did not hear his call. This is not too surprising; radio communications in this area are tremendously hindered by the terrain and vegetation.

10. I, along with Agents Zaehringer and Felton, scanned the river looking for the men. I took off my gun belt, bullet proof vest, and handed my shotgun to Agent Felton in preparation of jumping in to attempt a rescue, but neither one of them re-surfaced. I unsuccessfully tried to call the Harlingen Border Patrol Station for assistance using my cell phone. After several attempts on the hand held radio, I was able to get a message out for EMS. I requested a helicopter too but was advised that none were in the area. There was a time or two when one of the detained alines that were sitting on the ground would get up in what appeared to be an attempt to search for the victims. When this happened, we instructed them to sit back down. We did this for their own safety and to hopefully prevent yet another drowning from occurring. After about an hour, we decided that there was nothing more that could be done.

11. We transferred the aliens, some of whom I recognized as having been apprehended and voluntarily returned to Mexico--without incident-- just the night before, back to the Harlingen Station for processing.

12. At no time during the actions described herein did I ever draw, level, or aim my side arm or shotgun. At no time did I observe Agent Felton or Agent Zaehringer draw or aim their firearms. If it were possible for me to save the lives of Mssrs. Vargas and Acosta-Zamora, I would have done so. In my opinion, these gentlemen drowned as a result of their own actions and their own decisions and not as the result of any actions taken-or not taken-on my part or the part of Agents Felton or Zaehringer.

Pursuant to 28 U.S.C. § 1746, I, Patrick B. McDermott, declare under penalty of perjury that the foregoing is true and correct.

01/29/2004
DATE

*[signature]*
PATRICK B. McDERMOTT

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ESTATE OF JOSE VARGAS, by and through MARIA H. COVARRUBIAS, etc. Plaintiffs, | * * * * | |
| v. | * * | CIVIL ACTION No. B-02-132 |
| GEORGE F. FELTON, III., DANIEL ZAEHRINGER, PATRICK B. McDERMOTT, TWO UNKNOWN INS/BORDER PATROL AGENTS; UNITED SATES DEPT. OF IMMIGRATION and NATURALIZATION; UNITED STATES BORDER PATROL; UNITED STATES OF AMERICA, and DOE Defendants 1-10, inclusive, Defendants. | * * * * * * * * * * * | |

## **DECLARATION OF DANIEL ZAEHRINGER**

I, DANIEL ZAEHRINGER, DO HEREBY VERIFY, SWEAR AND AFFIRM AS FOLLOWS:

1.	I served as a Border Patrol Agent with the United States from July 1999 to July 2002. Since August of 2002 I have been employed as an Immigration Inspector with the Bureau of Customs and Border Protection. I have been named as a defendant in the lawsuit referenced above and submit the following, under oath, in order to advise the Court of the factual circumstances regarding the incident at issue. I have personal knowledge of the events described herein.

2.	On July 1, 2000, I was on duty in my official capacity as Border Patrol Agent with the United States Border Patrol. In July 2000, the Border Patrol was an agency of the United States Department of Justice. In March of 2003, the Border Patrol became an agency of the newly formed Department of Homeland Security

3.	At paragraph 9, the Plaintiff's Amended Complaint states that the drownings of Jose Guadalupe Vargas and Guillermo Acosta Zamora took place on June 30, 2000 at or near Brownsville, Texas. While it is true that a drowning occurred at or near Brownsville, Texas, on June 30, 2000, the drownings of Mssrs. Vargas and Acosta-Zamora occurred on July 1, 2000, at the Anacua Wildlife Refuge near Santa Maria, Texas–some 20 miles northwest of



2

Brownsville. I did not learn the names of the two drowning victims until I was served with this lawsuit.

4. On July 1, 2000, Border Patrol Agent Patrick McDermott and I were working line watch duties in the area of Santa Maria, Texas. "Line watch duties" requires that we patrol the area along the Rio Grande River and its levees for illegal immigrant/alien activities. At about 3:30 p.m., Agent McDermott and I were advised by radio dispatch that there was seismic sensor activity at an area of the Rio Grande River located in the Anacua Wildlife Refuge. This particular area where the sensor was located was known to us to be a regularly used "landing" area for illegal aliens crossing the river as well as an area used by individuals crossing narcotics into the country. Since this location was within our assigned area for patrol, we responded to the sensor.

5. We drove up Cobarubias Road (aka Anacua Road) to where the road met the river levee service road. When we arrived, Border Patrol Agent George "Trip" Felton was already there scanning the levee for alien traffic using a pair of binoculars. Agent Felton, who was working alone that day, also heard the dispatch on the sensor and came to assist.

6. Between the levee service road and the river itself the terrain is very rough and densely overgrown with all kinds of vegetation native to this area of South Texas. In fact, this area was often referred to as "the jungle" due to its abundant tropical vegetation. It was impossible to see the river, much less anyone that might be crossing it, from the levee service road. We waited a while to see if any illegal aliens would try to sneak out of the vegetation to cross the levee service road.

7. After several minutes had passed, and seeing no activity, we decided to split up to determine what set off the sensor. It was decided that Agent Felton and I would walk directly to the landing area known to us to be used by aliens that trip this particular sensor. From there, we planned to walk north up a trail from the landing area; at the same time, Agent McDermott would enter one of the trails leading southward to the landing from the levee road. It was our hope that this approach would put us in a better position to apprehend any individuals walking up any one of the trails leading from the landing area.

8. When Agent Felton and I arrived at the trail that eventually leads to the landing area, we stopped to look and listen for activity. We detected no activity so we continued on our route to the landing. Several yards from the landing, the trail splits into two separate trails leading to the landing area. Agent Felton took the left path and I took the right path.

9. After taking a few steps down the path, I heard running movements in the brush and splashes in the water. As I made my way to the landing I came upon several dressed

3

individuals who were undocumented aliens. I am fluent in Spanish. I instructed the individuals to sit down on the ground while I continued to look for anyone else who may have entered the country illegally.

10.     At this point I saw several people in the water and I called to them to come back to shore. They ignored me and began to swim back to the Mexican side of the river.

11.     I continued my search for more aliens likely hiding in the heavy brush along a rather steep river bank. As I was searching, I saw that Agent Felton had apprehended two aliens. He sent them over to me so I could have them sit with the group of aliens I initially detained.

12.     Agent Felton met me at my position. At that point, I thought we had apprehended all the aliens that were on our side of the river. I looked around and I saw a piece of twine tied at one end to what looked like a large tree root near the water's edge; the rest of the twine was lying in a bundle in the mud at the base of the root. I borrowed a knife from Agent Felton and cut the twine from the tree root. It was not uncommon to see pieces of rope strung from one side of the river bank to the other. It was, and as far as I know it continues to be, a common practice of illegal aliens to string a rope across the river to assist them in crossing the river. It was always the Border Patrol's procedure and practice to cut these ropes when we came across them so they could not be used for future illegal entries.

13.     Then I saw two inner tubes stashed in an "up/down" position in the undergrowth on the riverbank. As was our practice, I cut the inner tubes to release the air so they could not be used for future illegal entries into the country. As the tubes were deflating, I spotted three or four men down river from my location trying to hide in the brush that came right up to the river's edge. They looked at me, and I told them to come back. They ignored me and jumped into the river. At the same time I heard splashes coming from individuals that must have been hiding upriver from my location. I again called out for them to come back; all but one heeded my call.

14.     As the people were swimming back to Mexico, I returned back to the group that we had detained. At about that time, I heard someone from the Mexico side of the river bank calling for help. I turned around and saw one man struggling in the water about fifteen feet from the Mexican riverbank. In less than thirty seconds, the man went under. I started to throw empty water jugs that were lying on the ground near me out toward the area where the man went under, but I was unable to get them any where close enough that they could do any good.

15.     Then, just a few seconds later, a second man swam in the same area as the

4

first; and, like the first man, he began to struggle. Agent Felton and I continued to throw out water jugs to no avail. I saw two or three men from the Mexican side of the riverbank jump in the river in an attempt to rescue the man, but they suddenly retreated back to the riverbank. I never talked to these men, but I suspect–based upon my experience with working along the Rio Grande River-- that there was a whirlpool or strong river current that scared them enough to cause them to end their rescue attempt. The second man then went under and never re-surfaced.

16. Both drownings occurred very quickly and without warning. I really do not know what I or anyone else could have done to prevent these drownings. The individuals we had detained on the riverbank were obviously distressed at what they witnessed, however, I do not recall any of the persons in the group we detained attempting to make any effort to try to rescue the men. If they had, I probably would not have allowed them to re-enter the river for their own safety.

17. In their Amended Complaint, the Plaintiffs allege that I detained persons at gunpoint. This is not true. At no time during the actions described herein did I ever draw, level, or aim my side arm. At no time did I observe Agent Felton or Agent McDermott draw or aim their firearms. Agent McDermott was also carrying a shotgun, but at no time did I observe him level or aim it at anyone during the course of events at issue in this case.

18. Plaintiffs' Amended Complaint also states that Mssrs. Vargas and Acosta-Zamora were in our custody when the incident occurred. This is not true. At no time did I or Agent Felton have these individuals within our control. Agent McDermott did not arrive on the scene until after the men had drowned. Mssrs. Vargas and Acosta-Zamora were never a part of the group of individuals that Agent Felton and I detained.

19. If it were possible for me to save the lives of Mssrs. Vargas and Acosta-Zamora, I would have done so. In my opinion, these gentlemen drowned as a result of their own actions and their own decisions and not as the result of any actions taken-or not taken-on my part or the part of Agents Felton or McDermott.

Pursuant to 28 U.S.C. § 1746, I, Daniel E. Zaehringer, declare under penalty of perjury that the foregoing is true and correct.

DEC 10, 2003
DATE

_____
DANIEL E. ZAEHRINGER

1

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ESTATE OF JOSE VARGAS, by and through MARIA H. COVARRUBIAS, *etc.* Plaintiffs, | * * * * | |
| v. | * * | CIVIL ACTION No. B-02-132 |
| GEORGE F. FELTON, III., DANIEL ZAEHRINGER, PATRICK B. McDERMOTT, TWO UNKNOWN INS/BORDER PATROL AGENTS; UNITED STATES DEPT. OF IMMIGRATION and NATURALIZATION; UNITED STATES BORDER PATROL; UNITED STATES OF AMERICA, and DOE Defendants 1-10, inclusive, Defendants. | * * * * * * * * * * * | |

## DECLARATION OF GEORGE "TRIP" FELTON, III.

I, GEORGE "TRIP" FELTON, III., DO HEREBY VERIFY, SWEAR AND AFFIRM AS FOLLOWS:

1. I served as a Border Patrol Agent with the United States from April 1999 to February 2001. Since February of 2001, I have been employed as Criminal Investigator, Special Agent with the United States Department of Treasury, Internal Revenue Service. I have been named as a defendant in the lawsuit referenced above and submit the following, under oath, in order to advise the Court of the factual circumstances regarding the incident at issue. I have personal knowledge of the events described herein.

2. On July 1, 2000, I was on duty in my official capacity as Border Patrol Agent with the United States Border Patrol. In July 2000, the Border Patrol was an agency of the United States Department of Justice. In March of 2003, the Border Patrol became an agency of the newly formed Department of Homeland Security.

3. At paragraph 9, the Plaintiffs' Amended Complaint states that the drownings of Jose Guadalupe Vargas and Guillermo Acosta Zamora took place on June 30, 2000 at or near Brownsville, Texas. This is not correct; the drownings of Mssrs. Vargas and Acosta-Zamora occurred on July 1, 2000, at the Anacua Wildlife Refuge near Santa Maria, Texas–some 20



2

miles northwest of Brownsville.

    4.    On July 1, 2000, I was assigned to work line watch duties in the area of Santa Maria, Texas. "Line watch duties" requires that we patrol the area along the Rio Grande River and its levees for illegal immigrant/alien activities. At about 3:45 p.m., I responded to a radio dispatch that indicated that there was seismic sensor activity at an area of the Rio Grande River located in the Anacua Wildlife Refuge. This particular area where the sensor was located is known to be a regularly used "landing" area for illegal aliens crossing the river as well as an area used by individuals crossing narcotics into the country. Since this location was within my assigned area for patrol, I responded to the sensor. I did not have a partner assigned to work with me that day, so I went alone.

    5.    I drove up the levee. When I arrived at intersection with River Drive (a.k.a. Anacua Road), I got out and, using my binoculars, began to scan the area for illegal aliens. Soon thereafter, Border Patrol Agents, Pat McDermott and Daniel Zaehringer arrived.

    6.    We waited and observed the area for several minutes. Usually, at this particular "landing" area, persons coming into the country illegally would eventually come up out of the brush and cross over the levee road. The terrain is extremely rough and hazardous in the Anacua Wildlife Refuge. Between the levee road and the landing area by the river it is overgrown with tropical foliage–much like a jungle. There was no way any of us could see the river–much less, people in the river from this vantage point. All we knew was that the sensor had recorded several "hits" at this location. When no one appeared, we decided to split up and take two different trails leading to the landing area to determine what or who set off the sensor.

    7.    Agent Zaehringer and I started walking south down the road. Just south of the levee the road begins to curve upriver (west) forming something like a semi-circle where the other end comes out on the levee about a quarter of a mile west from where we entered. This particular part of the River Road is referred to as "The Horseshoe". It curves down toward the landing area. Once we got about half way through "The Horseshoe" we came to one of at least three trails that had been created by illegal aliens over the past several months. We started making our way down to the landing area using one of these trails. The trail sloped very steeply at some places in a downward angle toward the river. Although there are a number of landing areas along the river bank, we decided to investigate this particular one because it was known to us to be used by aliens that trip this particular sensor. From there, we planned to walk north up a trail from the landing area. At the same time, Agent McDermott would enter one of the trails leading southward to the landing from the levee road. It was our hope that this approach would put us in a better position to apprehend any individuals walking up any one of the trails

3

leading from the landing area.

8. When Agent Zaehringer and I arrived at the trail that leads southward toward the landing area, we stopped to look and listen for activity. We detected no activity so we continued down this trail to the landing. Several yards from the landing the trail split into two. Agent Zaehringer took the right path and I took the left path.

9. Soon after we split up, I heard Agent Zaehringer shouting out commands in Spanish. I quickly went to his location and when I got there, I saw that he had detained around six individuals. Looking upriver, we saw more people attempting to hide in the foliage along the river as well as about four individuals in the water. We both called out to them to come back and they just laughed. None of these people were in distress and none of these people indicated to me that they could not swim. However, I was able to detain two people. When I initially detained these two individuals, one of them abruptly reached toward his waist area. I reacted to this by unsnapping my holster and lifting my sidearm partially out of the holster. The man stopped and I did a quick pat down search on him. He did not have any weapons on him. This was the only time I used my sidearm that day. As we continued back to Agent Zaehringer's location, I came across one more person hiding in the bushes along the river's edge. Once I reached Agent Zaehringer's location, I had the three individuals I detained sit on the ground with the persons that Agent Zaehringer detained.

10. Around this time, I recall seeing a couple of inner tubes sticking out from under some kind of plant or tree root near the river's edge. I did not take custody of the inner tubes.

11. I took a position behind the group we had detained, and Agent Zaehringer took a position at the front of the group. Agent Zaehringer asked to borrow my knife. I took it down to him and as I was headed back to my position behind the group of detained aliens, I heard air escaping from what I assume were the inner tubes I saw earlier near the river's edge. This did not surprise me. It was a common practice and procedure for Border Patrol Agents to destroy the inner tubes we found so they could not be used again for future illegal crossings. Often times these inner-tubes were in such poor condition that they-in all likelihood-would not be safe to use anyway.

12. The Plaintiffs' Amended Complaint states that there was a rope strung up that spanned the river from the United States side to the Mexican side of the river. The Plaintiffs' complaint stated that this rope was being used by the illegal aliens and Mssrs. Vargas and Acosta-Zamora to aid in crossing the river. While it was a common practice for aliens to use a rope in this manner to aid in crossing the river, I did not see a rope being used by any individuals at this location on July 1, 2000. I do recall seeing what appeared to be old and

4

frayed baling twine lying in the mud in a tangled ball. It was not tied to anything when I saw it and it certainly wasn't being used by anyone at the time I saw it. However, I don't recall whether I first observed this before or after Agent Zaehringer borrowed my knife. It was always our practice to cut any ropes strung across the river so they could not be used again for future illegal crossings.

13.   Not too long after I loaned Agent Zaehringer my knife, I heard some splashes in the water. Agent Zaehringer went over to check out the location of the splashes. I looked over and saw two people swimming in the river. They did not appear to be in distress. There were no ropes spanning the river that I could see and none of these people were using a rope to help them cross the river. We shouted to these two men as well as some others we saw upriver from that location to come back; however, they ignored us and continued on their way back to Mexico.

14.   Agent Zaehringer returned back to the group that we had detained. Shortly thereafter I heard shouting from the Mexican side of the riverbank. About half way across the river, I saw two men struggling in the water. Agent Zaehringer and I started throwing empty and partially empty water jugs out to the men but they didn't get out far enough. I thought of possibly grabbing the twine I had seen lying in the mud to tie to the jugs together in an effort to help pull the men out of the water. However, I concluded that this would not work. Even if we had enough time to untangle the twine, I doubted that the twine would be long enough–or strong enough–to be of any use. I saw one man go under and not re-surface. Then, a short time later, the second man drifted into the same location as the first man; and, like the first man, he went under. This man did not re-surface.

15.   I do not know if these two men were the two men I saw a few seconds before or members of the other group I saw swimming up-river. However, I can state with absolute certainty that Mssrs. Vargas and Acosta-Zamora were never in my custody and were never a part of the group of individuals that Agent Zaehringer and I detained and had sitting on the ground.

16.   I also recall seeing a man who was on the Mexican side of the river, jump into the river in an attempt to rescue the first man that drowned. However, just as he got close to the location where the men disappeared, something seemed to scare him and he quickly returned back to the Mexican river bank. At no time did I ever instruct anyone to not attempt a rescue or to stop any possible rescue attempt. I did not observe or hear Agent Zaehringer threaten or otherwise instruct anyone not to attempt a rescue or to stop any rescue attempt. I did try to call Agent McDermott on our hand held radio--who had not yet reached our location.

5

Unfortunately, due to the terrain and dense vegetation, I was unsuccessful in reaching Agent McDermott. When Agent McDermott reached the scene, he made several failed attempts at contacting our Sector Station. Once he contacted Sector, he asked for emergency personnel to be sent to our location.

17. Both drownings occurred very quickly and without warning. I really do not know what I or anyone else could have done to prevent these drownings. The individuals we had detained on the riverbank were obviously distressed at what they witnessed. At one point some of the people we detained stood up to see what was happening, and I instructed them to sit down. It did not appear as though any of the persons in the group we detained wanted to attempt a rescue. If they had, I would not have allowed them to re-enter the river for their own safety. Other than the one time I unsnapped my holster earlier in the day (described at paragraph 9 herein), I never drew my gun from its holster. I never saw Agent Zaehringer or Agent McDermott draw their guns from their holsters. Agent McDermott, who was carrying a shotgun, never leveled the shotgun in any manner toward any individual before, during, or after the course of the events described herein.

18. Plaintiffs' Amended Complaint also states that Mssrs. Vargas and Acosta-Zamora were in our custody when the incident occurred. This is not true. At no time, did Agent Zaehringer or I have these individuals within our custody and control.

19. If it were possible for me to save the lives of Mssrs. Vargas and Acosta-Zamora, I would have done so. In my opinion, these gentlemen drowned as a result of their own actions and their own decisions and not as the result of any actions taken-or not taken-on my part or the part of Agents Zaehringer or McDermott.

**Pursuant to 28 U.S.C. § 1746, I, GEORGE FELTON, III, declare under penalty of perjury that the foregoing is true and correct.**

01/29/04
DATE

GEORGE FELTON, III