United States District Court
Southern District of Texas
ENTERED

JUL 2 1 2004

Michael N. Milby, Clerk of Court
By Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
-BROWNSVILLE DIVISION-

| | | |
|---|---|---|
| MARIA H. COVARRUBIAS, Individually | § | |
| and as Successor in interest for the Estate | § | |
| of Joe Vargas, Deceased and as Guardian | § | |
| for Ricardo Vargas, a minor, et al., | § | |
| Plaintiffs, | § | CIVIL ACTION NO. B-02-132 |
| | § | |
| VS. | § | |
| | § | |
| FIVE UNKNOWN INS/BORDER | § | |
| PATROL AGENTS, et al., | § | |
| Defendants. | § | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Pending before the Court are three separate Motions to Dismiss and Alternative Motions for Summary Judgment filed by the three remaining Defendants in this case.[1] For the reasons set forth below, it is recommended that these motions be granted.

### I. Background

Plaintiffs are the family members and familial relatives of two deceased Mexican citizens, some of whom reside in Mexico. Plaintiffs[2] filed an action (Docket No. 1) pursuant to 28 U.S.C. § 1331 and *Bivens v. Six Unkown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed. 2d 619 (1971) against several defendants[3] claiming violations of the

---

[1]Docket No. 44-1and 44-2, filed by Defendant, George F. Felton ("Felton") on February 5, 2004.
Docket No. 46-1 and 46-2, filed by Defendant, Daniel Zaehringer ("Zaehringer") on February 5, 2004.
Docket No. 48-1 and 48-2, filed by Defendant, Patrick B. McDermott ("McDermott") on February 5, 2004.

[2]Estate of Jose Vargas (by and through Maria Covarrubias), Ricardo Vargas (a minor by and through Maria Covarrubias), Maria H. Covarrubias, Jose Vargas Mendoza, Angelina Valencia Morales, Estate of Guillermo Acosta Zamora (by and through Maria Teresa Alvarado Mendez), Maria Teresa Alvarado Mendez, Victor Acosta Alvarado, Ronald Acosta Alvarado, and Luis Acosta Alvarado.

[3]George Felton III, Daniel Zaehringer, Patrick McDermott, Two Unknown INS/Border Patrol Agents, INS, U.S. Border Patrol, United States of America, and Doe Defendants 1-10.

Fourth, Fifth, and Fourteenth Amendments. Under *Bivens*, a victim who has suffered a constitutional violation at the hands of a federal actor can recover damages in federal court. The incident giving rise to the cause of action was the drowning deaths of two illegal aliens, Jose Vargas ("Vargas") and Guillermo Acosta Zamora ("Acosta") in the Rio Grande River in 2000.

Plaintiffs allege that Vargas and Acosta crossed the river and arrived on U.S. soil with the aid of inner-tubes and a rope strung between the banks of the river. Plaintiffs further allege that U.S. government agents briefly detained Vargas and Acosta and took custody of the inner-tubes. Vargas and Acosta then re-entered the river and attempted to return to Mexico. Plaintiffs contend that the agents knew Vargas and Acosta could not swim, but nonetheless cut the rope strung between the banks. Plaintiffs also allege that when other illegal aliens attempted to help Vargas and Acosta by retrieving the inner-tubes, the agents punctured and deflated them.

The INS and the U.S. Border Patrol filed a Motion to Dismiss (Docket No. 38) pursuant to FED. R. CIV. P. 12(b) (1), (2), and (6) claiming that they were not proper defendants. Plaintiffs filed a Notice of Non-Opposition to the Motion to Dismiss (Docket No. 41). On August 5th, 2003, United States District Judge Andrew S. Hanen signed on order granting the Motion to Dismiss as to these defendants. The remaining defendants in the case are U.S. Border Patrol Agents George Felton III ("Felton"), Daniel Zaehringer ("Zaehringer"), and Patrick McDermott ("McDermott").

## II. Claims of the Parties

### A. Fourteenth Amendment

Defendants collectively argue that plaintiffs' Fourteenth Amendment claim should be dismissed pursuant to FED. R. CIV. P. 12(b)(6) as they have failed to state a claim upon which relief could be granted. Plaintiffs' factual allegations, taken as true, do not constitute a claim

under the Fourteenth Amendment, as it applies only to persons acting under color of state authority. Defendants in this case were federal employees taking action as federal employees.

Plaintiffs do not refute defendants' argument.

### B. Fourth and Fifth Amendment

Defendants collectively argue that under the heightened pleading requirement in suits against government officials in their individual capacities, plaintiffs have failed to set forth sufficient facts, even when taken as true, which pertain to the specific conduct of each of the defendants which allegedly caused the injury and gave rise to the constitutional causes of action.

A violation of the Fourth Amendment requires a showing of an "unreasonable" seizure, while the Fifth Amendment prevents depriving a "person" of life, liberty, or property, without due process of law. In addition, liability of a *Bivens* defendant can only be predicated on the defendant's actual "knowing participation" in unconstitutional conduct. Defendants contend that the cumulative facts, taken as true and construed in a light most favorable to the plaintiff, fail to present the essential elements.

In addition, defendants argue that if the court finds a constitutional violation, defendants are entitled to qualified immunity as decedents have not shown defendants violated a clearly established right, which a reasonable person would have known.

Plaintiffs argue that "[c]learly, Defendants' acts and omissions were committed with the requisite intentional mental state. In doing so they deprived Decedents of their lives without the due process of law, hence making them liable under 42 U.S.C. Section 1983." (Docket No. 52, p. 8, lines 13-15).

It appears that plaintiffs have presented arguments which are clearly outside the scope of their complaint. Plaintiffs allege causes of action under constitutional amendments, but

arbitrarily refer to various other federal and state statutory provisions which are not apposite given the alleged facts.

### III. Deemed Admissions

Defendants argue that on July 15, 2003, United States of America's First Set of Interrogatories and Requests for Admissions were submitted to Plaintiffs via certified mail and received by plaintiffs on July 21, 2003.[4] As plaintiffs failed to answer within the thirty day limit as set forth in FED. R. CIV. P. 36(a), the Requests for Admissions should be deemed admitted. Defendants contend that based on the facts that have been established by way of plaintiffs' admissions, the case should be dismissed for failure to state a claim pursuant to FED. R. CIV. P. 12(b)(6). Defendants also note that they have not received responses to their requests for production of documents, which was served on plaintiffs in July 2003.

Plaintiffs filed their Response to Defendants' Request for Admissions on August 26, 2003. Plaintiffs first addressed their failure to timely respond on February 25, 2004, in plaintiffs' Opposition to Defendant's Motion to Dismiss (Docket Nos. 52-54). Plaintiffs argue that under *Pickens v. Equitable Life Assurance Society of the United States*, 413 F.2d 1390 (5th Cir. 1969) the admissions at issue are central facts that go beyond the scope of the rule and should not be deemed admitted. Plaintiffs also argue that defendants would not be prejudiced by allowing them to withdraw their admissions.

Subsection (b) of Rule 36 provides a procedural mechanism by which a party may file a motion to have the admission withdrawn or amended.

> "Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission." "...the court may permit withdrawal or amendment when the presentation of the merits of the action will be

---

[4]See Defendant's Exhibit 1, Docket No. 50, "Defendant's Summary Judgment Motions' Exhibit Packet".

subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits."

Therefore, Rule 36(b) requires that a trial court find that withdrawal or amendment: (1) would serve the presentation of the case on its merits, but (2) would not prejudice the party that obtained the admissions in its presentation of the case." *In Re Carney*, 258 F.3d 415, 419 (5th Cir. 2001). Even when the above two factors are established, a district court still has discretion to deny a request for leave to withdraw or amend an admission. *Id.*

Although plaintiffs argue that the admissions are central facts which are beyond the scope of the rule, "Rule 36 allows litigants to request admissions as to a broad range of matters, including ultimate facts, as well as applications of law to fact." "Such breadth allows litigants to winnow down issues prior to trial and thus focus their energy and resources on disputed matters." "For Rule 36 to be effective in this regard, litigants must be able to rely on the fact that matters admitted will not later be subject to challenge." *Id.*

Plaintiffs in this case did not file such motion, nor did they contact the defendants to secure an extension of the time period. Plaintiffs responded to the Request for Admissions on August 26, 2003. However, it was not until February 25, 2004, that plaintiffs first acknowledged their failure to respond within the prescribed time period, but never filed a motion with the court, pursuant to Rule 36, making the necessary showing as set forth *In Re Carney*. Defendants, in preparing their defense, would be prejudiced if plaintiffs were now allowed to withdraw the admissions.

For instance, plaintiffs' complaint states that the drownings took place on June 30, 2000, at or near Brownsville, Texas, and named "Five Unknown Border Patrol Agents." Defendants

maintain that although a drowning did take place on the 30th of June, the deaths of Vargas and Acosta took place on July 1, 2000, at the Anacua Wildlife Refuge near Santa Maria, Texas. In accordance with defendants' obligations, they submitted information in their Initial Disclosures indicating that Felton, Zaehringer, and McDermott were witnesses to two drownings that occurred on July 1, 2000. Armed with that information, plaintiffs then amended their complaint and named these defendants. However, plaintiffs' complaint, untimely responses to the Request for Admissions, and various briefs state that the drownings occurred June 30, 2000.

As part of their defense, defendants need to establish the date and location of the deaths at issue, in order to determine whether Felton, Zaehringer, and McDermott were in fact the officers on duty during Vargas' and Acosta's drowning. Defendants contend that several drownings occur off the banks of the Rio Grande River every year in the McAllen Sector region. (Docket No. 58, p. 3, n.2). Plaintiffs' witnesses' declarations indicate there were "five" "white" officers and "three" men drowned in the river, while defendants maintain that there were three officers and two drownings.

The trial date in this case was originally set for May 6, 2004, which was essentially two months from the time when plaintiffs first acknowledged their failure to respond. If plaintiffs would have admitted that the date of the incident was June 30, 2000, defendants would have likely moved for dismissal based on the on the ground that plaintiffs were suing the wrong agents and prepared their defense accordingly. The matters at issue in defendants' request for admissions should be deemed admitted.

### IV. Heightened Pleading Requirement

Defendants argue that a heightened pleading requirements exists when a plaintiff makes a claim against a government official in his individual capacity, citing *Oliver v. Scott*, 276 F.3d

736, 740 (5th Cir. 1999) (Plaintiffs suing government official in their individual capacities, however, must allege specific conduct giving rise to a constitutional violation). Defendants contend that plaintiffs did not allege specific facts showing that each defendants' individual conduct caused plaintiffs' constitutional injury.

Plaintiffs argue that defendants are being sued in their official capacity, not as a private individual and therefore the heightened pleading standard is inapplicable. (Docket No. 52 p. 6).

Plaintiffs are incorrect. It has been established that official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035, n. 55, 56 L.Ed.2d 611 (1978). It is not considered a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his individual capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself. *Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).[5] Therefore, no heightened pleading is required in actions against individual defendants in their official capacities, because "official-capacity lawsuits are typically an alternative means of pleading an action against the governmental entity involved[.]" *Anderson v. Pasadena Independent School Dist.* 184 F.3d 439 (5th Cir. 1999) quoting *Baker v. Putnal*, 75 F.3d 190, 195 (5th Cir. 1996).

In this case, plaintiffs brought constitutional claims under *Bivens*, as well as claims under FTCA, against the INS, U.S. Border Patrol, and its agents. The claims against the INS and the

---

[5]In *Graham*, the respondents asserted causes of action under 42 U.S.C. §§ 1983, 1985, 1986, and 1988, as well as the Fourth, Fifth, Sixth, Eleventh, and Fourteenth Amendments.

U.S. Border Patrol were dismissed because plaintiffs' exclusive remedy under FTCA lies solely against the United States. In addition, plaintiffs' constitutional claims against the same federal agencies were dismissed under the doctrine of sovereign immunity. (Docket No. 42). Under *Bivens*, persons may sue federal officials as individuals, but may not bring claims against federal agencies. *FDIC v. Meyer*, 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994).

Plaintiffs' statement that defendant agents are being sued in their official capacity precludes recovery as a matter of law and is contraindicated by their assertion that their cause of action arises under *Bivens*. As plaintiffs apparently do not understand the distinctions drawn by the Supreme Court, this Court will construe plaintiffs' claims as being brought against the agents in their individual capacities under *Bivens* and will apply the heightened pleading requirement.

## V. Article III Standing

In this case, plaintiffs, in their Original Complaint, under the heading "FIRST CAUSE OF ACTION - VIOLATION OF PLAINTIFFS' PROCEDURAL AND SUBSTANTIVE DUE PROCESS RIGHTS" citing *Bivens,* as well as the Fourth, Fifth and Fourteenth Amendments, state that Acosta and Vargas "were made to lose their lives in violation of their procedural and substantive due process rights." (Docket No. 1 p. 7). Next, plaintiffs, under the heading "SECOND CAUSE OF ACTION - VIOLATION OF SUBSTANTIVE DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT" state that they have a cognizable substantive due process interest to be free from unwarranted interference in their familial relationship" with Acosta and Vargas. (Docket No. 1 p. 8).

As has already been determined, plaintiffs do not have a cause of action under the Fourteenth Amendment under the facts of this case. Therefore it appears that the only remaining cause of action is the claimed deprivation of Vargas' and Acosta's Fourth and Fifth Amendment

rights brought by and through their respective estates and family members. The court can only assume that is what plaintiffs' cause of action entails, as plaintiffs fail to distinguish whose rights are the subject of the suit. Plaintiffs state, as their first cause of action, a "violation of plaintiffs' due process rights," but subsequently proceed to explain that decedents'(Vargas and Acosta) due process rights were violated. It appears that plaintiffs (estates of the deceased and family members) haphazardly interchange their claims for those of the decedents.

Assuming that the subject of the first cause of action is the violation of the due process rights of the decedents, the next inquiry is whether the estate and family members have standing to litigate decedents' constitutional rights, assuming alien decedents were entitled to protection under the U.S. Constitution, which remains to be addressed.

Standing is jurisdictional under Article III of the Constitution and is a threshold issue in all cases. *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521 (5th Cir. 1996). It emanates from the case or controversy requirement of the Constitution and from general principles of judicial administration and seeks to insure that the plaintiff has alleged such as personal stake in the outcome of the controversy as to assure concrete adverseness. As standing to raise a constitutional issue is jurisdictional, it may be raised at any time. *Johnson v. City of Dallas*, 61 F.3d 442 (5th Cir. 1995).

It is a long settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record and it is the burden of the party who seeks the exercise of jurisdiction in his favor to clearly allege facts demonstrating that is proper to invoke judicial resolution of the dispute. *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990).

The general rule is that one may not claim standing to vindicate the constitutional rights

of some third party. *See Powers v. Ohio*, 499 U.S. 400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). When a person or entity seeks standing to advance the constitutional rights of others, we ask two questions: (1) has the litigant suffered some injury-in-fact, adequate to satisfy Article III's case-or-controversy requirement; and (2) do prudential considerations point to permitting the litigant to advance the claim.

Injury in fact requires the allegation of (1) an injury that is concrete, particularized and actual or imminent; (2) a causal connection between the alleged injury and the defendant's conduct; and (3) a likelihood that a favorable decision will redress the injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Prudential considerations address: (1) the relationship of the litigant to the person whose rights are being asserted; (2) the ability of the person to advance his own rights; and (3) the impact of the litigation on third-party interests. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623-24 n. 3, 109 S.Ct. 2646, 2651 n. 3, 105 L.Ed.2d 528 (1989).

In this case, it appears that plaintiffs have standing to bring a constitutional claim on behalf of Vargas and Acosta. Plaintiffs have suffered an injury-in-fact as evidenced by the loss of their family member. As well, prudential considerations seem to favor plaintiffs' standing. Plaintiffs are close family members of the deceased, including wives, children, and parents. Decedents are not able to bring a claim themselves for obvious reasons. The litigation will directly impact Vargas' and Acosta's interests.

### VI. Standard of Review

### A. Rule 12(b)(6) Standard

Motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) are viewed with disfavor and are rarely granted. *Southern Christian Leadership Conference v. Supreme Court of*

*the State of Louisiana*, 252 F.3d 781, 786 (5th Cir. 2001) (quoting *Tanglewood East Homowners v. Charles-Thomas, Inc.*, 849 f.2d 1568, 1572 (5th Cir. 1988)). The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of the statement of the claim for relief, not the facts that support it. *See Nevarez v. United States*, 957 F.Supp. 884, 889 (W.D. Tex. 1997). When ruling on a Rule 12(b)(6) motion, this Court must liberally construe the complaint in favor of the plaintiff and assume the truth of all well-pleaded facts. *See Oliver v. Scott*, 276 F.3d 736 (5th Cir. 2002). The court may not dismiss a plaintiff's action "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Southern Christian Leadership Conference*, 252 F.3d at 786 (quoting *Conley v. Gibson*, 355 U.S. 41 (1957)). A plaintiff's conclusory allegations or legal conclusions masquerading as factual assertions are insufficient to defeat a motion to dismiss. *See id.*

### B. Summary Judgment Standard

Summary judgment evidence is viewed in the light most favorable to the non-movant. *Eastman Kodak v. Image Technical Servs.*, 504 U.S. 451, 456-58 (1992). Summary judgment is proper only when it appears that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). An alleged factual dispute will not defeat a motion unless it is genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "material" if it involves a fact that might affect the outcome of the suit under governing law. *Douglass v. United Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996). Once the movant establishes the absence of a factual dispute, the burden shifts to the non-movant to show that summary judgment is inappropriate.

The nonmoving party may not rest upon the mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256. Instead, the non-movant must "make a showing sufficient to

establish the existence of each essential element of its case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). This evidence must do more than create a metaphysical doubt. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). Unsubstantiated or conclusory assertions that a fact issue exists will not suffice. *Anderson*, 477 U.S. at 256.

## VII. Decedents' Rights Under the Constitution

Assuming that plaintiffs have standing to bring a claim on behalf of decedents Vargas and Acosta, we must turn to the issue of whether these two illegal aliens established rights under the United States Constitution.

Before proceeding further, it is important to note that plaintiffs cite violations of the Fourth Amendment, but fail to provide any illumination of their claims. The court cannot extrapolate from the facts any unreasonable search or seizure in this case. Plaintiffs have failed to state a claim for which relief could be granted. It is not the role of the court to make plaintiffs' case for them. Taking plaintiffs' factual allegations as true, a claim under the Fourth Amendment has not been set forth. Key elements of a claim have not been addressed and facts applicable to those elements have not been presented. Plaintiffs were required, under the heightened pleading requirement, to set forth their claim with specificity. There is no information in the complaint as to which of the three defendants and their respective actions were violative of the Fourth Amendment. Plaintiffs' Fourth Amendment claim does not survive a 12(b)(6) analysis. As a result, the Fifth Amendment remains the central focus of this analysis.

The Fifth Amendment begins by designating the class of individuals to whom it extends protection. "No person shall... be deprived of life, liberty, or property...". There are numerous

cases[6] which hold that an alien, registered or illegal, who is physically present in the United States is considered a "person" in context of the Fifth Amendment. Even one whose presence in the United States is unlawful, involuntary, or transitory, is entitled to protection, under the Fifth Amendment. *Matthew v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). The importance of physical presence is discussed in *Johnson v. Eisentrager*, 339 U.S. 763, 770-71, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) in which the court pointed out "at least since 1886, we have extended to the person and property of resident aliens important constitutional guaranties..." but, "...in extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act."

In this case, plaintiffs and their witnesses state that decedents were detained at gunpoint, by agents, at the river's edge, but then claim that decedents jumped back into the river. Plaintiffs offer no explanation as to how decedents, who were allegedly detained by federal agents at gunpoint, were able to free themselves and jump back into the river. There are two are conflicting versions of the events that took place. According to the affidavits of Agent Zaehringer and Felton, there was apparently more than one group of aliens who were in the river, some of whom may have never reached the river bank, much less detained by the agents. Defendants state that decedents were not part of the group of aliens that were detained.

When comparing the declarations of plaintiffs' witnesses several irreconcilable inconsistencies emerge. One witness, Fernando Vargas Vargas, first states that, "my cousin Jose

---

[6]*Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 73 S. Ct. 472, 97 L.Ed. 576 (1953); *Matthews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *U.S. v. Husband R.(Roach)*, 453 F.2d 1054 (5th Cir. 1971); *Lynch v. Canatella*, 810 F.2d 1363 (5th Cir. 1987); *U.S. v. Alvarado - Machado*, 867 F.2d 209 (5th Cir. 1989).

Guadalupe Vargas was among those restrained by the Agents" and then immediately contradicts himself by stating, "I then observed many of the people, including my cousin, Decedent Jose Vargas, and Fernando's brother in law, Carmelo Abundis, jump back into the river *when they saw the Agents approach*." This witness statement is confusing because it portrays a sequence of events that is impossible, (i.e. first decedent was detained, but then jumps into the river as agents are approaching).

Similarly, Carmelo Abundis states that "upon being restrained by the Agents, I, along with many of the people in our group including Decedent Jose Vargas, jumped back into the river." It is not clear whether decedent was actually restrained. However, plaintiffs' complaint states that decedents " were detained and taken into custody." For purposes of plaintiffs' claim, there must be a clear statement of whether decedents were detained. Two of plaintiffs' witnesses state that there were thirty aliens who crossed the river and were detained, while the other witness states there were twenty aliens.

Agent Zaehringer, in his affidavit (Docket No. 50, Defendants' Exhibit 3, p. 3-4) stated that:

> "...I spotted three or four men down river from my location trying to hide in the brush that came right up to the river's edge. They looked at me, and I told them to come back. They ignored me and jumped into the river. At the same time, I heard splashed coming from individuals that must have been hiding up river from my location. I again called out for them to come back; all but one heeded my call."

> "As the people were swimming back to Mexico, I returned back to the group that we had detained. At about that time, I heard someone from the Mexico side of the river bank calling for help. I turned around and saw one man struggling in the water about fifteen feet from the Mexican riverbank. In less than thirty seconds, the man went under."

> "Then, just a few seconds later, a second man swam in the same areas as the first; and, like the first man, he began to struggle."

> "Mssrs. Vargas and Acosta-Zamora were never a part of the group of individuals that

    agent Felton and I detained."

Similarly, Agent Felton, in his affidavit (Docket No. 50, Defendants' Exhibit 4, p. 3-4) stated that:

    "Soon after we split up, I heard Agent Zaehringer shouting out commands in Spanish. I quickly went to his location and when I got there, I saw that he had detained around six individuals. Looking up river, we saw more people attempting to hide in the foliage along the river as well as about four individuals in the water. We both called out to them to come back and they just laughed. None of these people were in distress and none of the these people indicated to me that they could not swim. However, I was able to detain two people."

    "As we continued back to Agent Zaehringer's location, I came across one more person hiding in the brushes along the river's edge. Once I reached Agent Zaehringer's location, I had the three individuals I detained sit on the ground with the persons that Agent Zaehringer detained."

    "Not to long after I loaned Agent Zaehringer my knife, I heard some splashes in the water. Agent Zaehringer went over to check out the location of the splashes. I looked over and saw two people swimming in the river. They did not appear to be in distress. There were no ropes spanning the river that I could see and none of these people were using a rope to help them cross the river. We shouted to these two men as well as some others we saw upriver from that location to come back; however, they ignored us and continued on their way back to Mexico."

    "Agent Zaehringer returned back to the group that we had detained. Shortly thereafter I heard shouting from the Mexican side of the riverbank. About half way across the river, I saw two men struggling in the water."

    "I do not know if these two men were the two men I saw a few seconds before or the members of the other group I saw swimming up river. However, I can state with absolute certainly that Mssrs. Vargas and Acosta-Zamora were never in my custody and were never a part of the individuals that Agent Zaehringer and I detained and had sitting on the ground."

Conversely, plaintiffs' witnesses' declarations paint a different picture.

    Declaration of Roberto Vargas Vargas (Docket No's. 52-54, Exhibit 1):

    "On or about July 1, 2000, I was a member of a group of approximately thirty (30) undocumented immigrants who crossed the Rio Grande at Brownsville, Texas. I was accompanied by my cousin and decedent, Jose Guadalupe Vargas, my cousin Fernando Del Rio Vargas, and his brother in law, Carmelo Abundis. In the late afternoon, all

members of our group successfully crossed the river through the use of the referenced inner tubes. Upon crossing the river, said inner tubes were placed on the ground at our gathering site."

"Once all the group member were on U.S. territory, we quickly changed into dry clothes which were carried in plastic water resistant bags. Almost immediately after the group changed clothes, approximately 5 White Immigration and Naturalization Service (INS) Agents suddenly appeared, yelling at us in broken Spanish, ordering that we freeze and put our hands up."

"As soon as I observed the Agents approaching, my cousin Fernando Vargas and I, ran and hid in the neighboring bushes. We were positioned approximately 5 to 6 feet from where the agents were standing, and therefore could see and hear what was done and said. My cousin Jose Guadalupe Vargas was among those restrained by the Agents."

"I then observed many of the people, including my cousin, Decedent Jose Vargas, and Fernando's brother in law, Carmelo Abundis, jump back into the river when they saw the Agents approach. Carmelo Abunids successfully reached the Mexican bank. However, my cousin Jose Guadalupe Vargas who was a poor swimmer began to struggle in the water and call for help. I also observed two other men who had jumped in the river begin to struggle and yell for assistance."


Declaration of Carmelo Abundis ((Docket No's. 52-54, Exhibit 2):

"On or about July 1, 2000, I was a member of a group of approximately thirty (30) undocumented immigrants who crossed the Rio Grande at Brownsville, Texas. I was accompanied by my brother in law Fernando Del Rio Vargas, his cousin, Roberto Vargas Vargas and Decedent, Jose Guadalupe Vargas. In the late afternoon, all members of our group successfully crossed the river through the use of the referenced inner tubes. Upon crossing the river, said inner tubes were placed on the ground at our gathering site."

"Once all the group member were on U.S. territory, we quickly changed into dry clothes which were carried in plastic water resistant bags. Almost immediately after the group changed clothes, approximately 5 White Immigration and Naturalization Service (INS) Agents suddenly appeared, yelling at us in broken Spanish, ordering that we freeze and put our hands up."

"As soon as the Agents approached, my brother in law, Fernando Vargas and his cousin Roberto Vargas, ran and hid in the bushes. Upon being restrained by the Agents, I, along with many of the people in our group including Decedent Jose Vargas, jumped back into the river. I was able to successfully reach the Mexican bank. Once I reached the Mexican river bank, I turned back and observed Jose Vargas who was poor swimmer begin to struggle in the water and call for help. I also observed two other men who had jumped in the river begin to struggle and yell for assistance."

Declaration of Fernando Del Rio Vargas (Docket No's. 52-54, Exhibit 3):

"On or about July 1, 2000, I was a member of a group of approximately twenty (20) undocumented immigrants who crossed the Rio Grande at Brownsville, Texas. I was accompanied by my cousin and decedent, Jose Vargas, my cousin Roberto Vargas Vargas, and my brother in law, Carmelo Abundis. In the late afternoon hours, all members of our group successfully crossed the river through the use of the referenced inner tubes. Upon crossing the river, said inner tubes were placed on the ground at our gathering site."

"Once all the group member were on U.S. territory, we quickly changed into dry clothes which were carried in plastic water resistant bags. Almost immediately after the group changed clothes, approximately 5 White Immigration and Naturalization Service (INS) Agents suddenly appeared, with guns unholstered and pointed at the individuals in our group."

"As soon as I observed the Agents approaching, my cousin Roberto Vargas Vargas and I, ran and hid in the neighboring bushes. We ere positioned approximately 5 to 6 feet from where the agents were standing , and therefore could see and hear what was done and said. My cousin Jose Guadalupe Vargas was among those restrained by the Agents threat of gunfire. I then observed many of the people, including my cousin, Decedent Jose Guadalupe Vargas, and my brother in law, Carmelo Abunids, jump back into the river. I also observed two other men who had jumped in the river begin to struggle and yell for assistance."

There is a material issue of fact as to whether decedents reached U.S. soil and were subsequently detained by defendants. Plaintiffs state in their complaint that decedents were on U.S. soil. Defendants have not made any statement with regard to Vargas' and Acosta's presence on the river bank.

Assuming that decedents were on U.S. soil, their physical presence would have allowed them to come under the protection of the constitution. In order for plaintiffs to survive a motion to dismiss on their Fifth Amendment claim, decedents would have to have been detained and taken into custody by defendants. In addition, defendants would have had to prevent the rescue of decedents. However, because plaintiffs failed to respond to defendants' request for

admissions, the facts at issue were deemed admitted. *See Simien v. Chemical Waste Management, Inc.*, 30 F.Supp.2d 939 (W.D.La.1998) (where neither plaintiff nor his counsel answered defendant's request for admissions within 30 days and plaintiff's counsel did not file a motion for withdrawal or amendment of admissions, matters at issue would be deemed admitted for purposes of defendant's summary judgment motion). *See also Burdick v. Koerner*, 179 F.R.D. 573 (E.D.Wis.1998), *An-Port, Inc. v. MBR Industries, Inc.*, 772 F.Supp. 1301 (D.C.P.R.1991), *U.S. v. DiFonzo*, 654 F.Supp. 263 (D.Mass.1986), *Gardner v. Borden, Inc.*, 110 F.R.D. 696 (S.D.W.Va.1986), *Donovan v. Porter*, 584 F.Supp. 202 (D.Md. 1984).

Defendants' Requests for Admissions Numbers 5-10 establish that decedents were not detained and defendants did not prevent their rescue thereby eliminating plaintiffs' claim as a matter of law under the Fifth Amendment.

## VIII. Recommendation

Plaintiffs have alleged a violation of the Fourteenth Amendment by federal agents. Plaintiffs have failed to allege facts which state a claim thereunder. Therefore, plaintiffs' Fourteenth Amendment claim should be dismissed pursuant to Rule 12(b)(6).

Plaintiffs have also alleged a violation of what is assumed to be "decedents" Fourth Amendment rights. Plaintiffs, required to plead claims against federal agents with greater specificity, have failed to allege facts which state an unreasonable search or seizure. Therefore, plaintiffs' Fourth Amendment claim should be dismissed pursuant to Rule 12(b)(6).

Plaintiffs have alleged a violation of decedents' Fifth Amendment rights. As plaintiffs failed to respond to defendants' request for admissions, pursuant to FED. R. CIV. P. 36, the matters therein have been deemed admitted and facts conclusively established for purposes of a

summary judgment motion. Therefore, defendants have established that there is no genuine issue of material fact as to decedents' detention and defendants' rescue attempts. Defendants are entitled to judgment as a matter of law.

IT IS therefore RECOMMENDED that Defendants' Motions to Dismiss and Alternative Motions for Summary Judgment (Docket No's. 44-1, 44-2, 46-1, 46-2, 48-1, 48-2) be GRANTED.

DONE at Brownsville, Texas, this 20th day of July, 2004.

John Wm. Black
United States Magistrate Judge