GREGORY W. MORENO, ESQ., SBN 57844
ARNOLDO CASILLAS, ESQ., State Bar No. 158159
MORENO, BECERRA, GUERRERO & CASILLAS
A Professional Law Corporation
3500 West Beverly Boulevard
Montebello, CA 90640-1541
Tel: (323) 725-0917
Fax: (323) 725-0350

Attorneys for Plaintiffs
Estate of Jose Vargas, by and through Maria
H. Covarrubias, Administrator and Successor in
Interest; Ricardo Vargas, a minor, by and through
his guardian Maria H. Covarrubias; Maria H.
Covarrubias; Jose G. Vargas Mendoza; Angelina
Valencia Morales;Estate of Guillermo Acosta Zamora,
by and through Maria Teresa Alvarado Mendez,
Administrator and Successor In Interest; Maria
Teresa Alvarado Mendez; Victor H. Acosta
Alvarado; Ronald Acosta Alvarado; and, Luis
Alberto Acosta Alvarado

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF TEXAS**

**BROWNSVILLE DIVISION**

| | |
|---|---|
| Estate of Jose Vargas, by and through Maria H. Covarrubias; Administrator and Successor in interest;  Ricardo Vargas, a minor, by and through his guardian Maria H. Covarrubias; Maria H. Covarrubias; Jose G. Vargas Mendoza; Angelina Valencia Morales; Estate of Guillermo Acosta Zamora, by and through Maria Teresa Alvarado Mendez, Administrator and Successor in Interest; Maria Teresa Alvarado Mendez; Victor H. Acosta Alvarado; Ronald Acosta Alvarado; and, Luis Alberto Acosta Alvarado, | CASE NO: CASE NO: B-02-132 |
| Plaintiffs, | **PLAINTIFFS' OPPOSED FED.R.CIV.P. 36(b) MOTION TO WITHDRAW OR AMEND ADMISSIONS; MEMORANDUM OF POINTS AND AUTHORITIES; EXHIBITS; DECLARATIONS OF ARNOLDO CASILLAS AND DANILO J. BECERRA IN SUPPORT THEREOF** |
| v. | |
| Five Unknown INS/Border Patrol Agents; U.S. Department of Immigration and Naturalization; United States Border Patrol; United States of America, and DOE defendants 1-10, inclusive, | |
| Defendants. | |

United States District Court
Southern District of Texas
FILED

AUG 0 9 2004

Michael N. Milby
Clerk of Court

1       COME NOW PLAINTIFFS Estate of Jose Vargas, by and through Maria H.

2  Covarrubias; Administrator and Successor in interest;  Ricardo Vargas, a minor, by and

3  through his guardian Maria H. Covarrubias; Maria H. Covarrubias; Jose G. Vargas

4  Mendoza; Angelina Valencia Morales; Estate of Guillermo Acosta Zamora, by and

5  through Maria Teresa Alvarado Mendez, Administrator and Successor in Interest, Maria

6  Teresa Alvarado Mendez, Victor H. Acosta Alvarado, Ronald Acosta Alvarado, and, Luis

7  Alberto Acosta Alvarado, and submit their opposed motion to withdraw or amend an

8  admission pursuant to Fed.R.Civ.P. 36 (b).

9       For the following reasons, PLAINTIFFS submit that the present motion should be

10  granted:

11     1.     The presentation of the merits of this action will be subserved should the

12              Court not permit withdrawal or amendment of the subject admissions;

13     2.     Defendants have not and will not suffer any prejudice, nor have they ever

14              argued that any prejudice has or will occur, in maintaining their defense on

15              the merits should the subject admissions be withdrawn;

16     3.     Plaintiffs have clearly established the facts of this case in their amended

17              complaint, and have identified, therein, all parties presently known to be

18              involved;

19     4.     The allegations plead in the amended complaint, which allege actions and

20              failures to act committed by certain defendant INS agents sufficient to hold

21              Defendants liable to Plaintiffs, have been sufficiently supported by witness

22              declarations;

23     5.     The request for admissions at issue involve central facts in dispute and

24              therefore are beyond the scope of rule 36 (a) providing that requested

25              admissions shall be deemed admitted if not answered; and

26     6.     The service of Plaintiffs' responses to the underlying requests for

27              admissions nine (9) days late was the result of excusable inadvertence on

28              the part of Plaintiffs' counsel related to having to find witnesses in this

1    case.

2    This motion is based on this motion, the attached Memorandum of Points and

3    Authorities and related exhibits, the Declarations of Arnoldo Casillas and Danilo J.

4    Becerra, the Court's file and records in this matter, and upon such oral and evidentiary

5    evidence presented at the hearing of this Motion.

6                                           Respectfully submitted,

7                                           MORENO, BECERRA, GUERRERO & CASILLAS
                                            A Professional Law Corporation
8

9
     DATED: August 5, 2004    By:
10                                          GREGORY W. MORENO
                                            ARNOLDO CASILLAS
11                                          Attorneys for Plaintiffs
                                            Estate of Jose Vargas, by and through Maria H.
12                                          Covarrubias; Administrator and Successor in
                                            interest;  Ricardo Vargas, a minor, by and
13                                          through his guardian Maria H. Covarrubias;
                                            Maria H. Covarrubias; Jose G. Vargas
14                                          Mendoza; Angelina Valencia Morales; Estate of
                                            Guillermo Acosta Zamora, by and through
15                                          Maria Teresa Alvarado Mendez, Administrator
                                            and Successor in Interest; Maria Teresa
16                                          Alvarado Mendez; Victor H. Acosta Alvarado;
                                            Ronald Acosta Alvarado; and, Luis Alberto
17                                          Acosta Alvarado

18

19

20

21

22

23

24

25

26

27

28

- 1 -

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.**

3    **INTRODUCTION**

4        This case involves the tragic drowning deaths of Plaintiffs' decedents Jose

5    Guadalupe Vargas and Guillermo Acosta. Plaintiffs have alleged substantive and

6    procedural due process rights violations under the fourth, fifth and fourteenth

7    amendments against Defendants, including defendant UNITED STATES OF AMERICA

8    and defendant INS agents GEORGE F. FELTON III, DANIEL ZAEHRINGER and

9    PATRICK B. MCDERMOTT, for said agents' actions and failures to act causing the

10   death of Plaintiffs' decedents, thus making defendants liable for such deaths.

11       On July 15, 2003, defendant UNITED STATES OF AMERICA served its first set

12   of Requests for Admissions on Plaintiffs. See, Exhibit 1, copy of Request for

13   Admissions. On August 26, 2003, nine (9) days after the thirty day limit as set forth in

14   Fed.R.Civ.P. 36(a), Plaintiffs served their Response. See, Exhibit 2, copy of Response

15   and Proof of Service. Plaintiffs' counsel later became aware that, according to

16   Fed.R.Civ.P. 36 (a), a failure to respond to requests for admissions in a timely fashion

17   may deem the matters contained therein admitted. See, Declaration of Arnoldo Casillas at

18   ¶ 2. Plaintiffs bring the instant motion requesting the Court to permit them to withdraw

19   or amend the matters that may have been deemed admitted due to their late service of

20   their Response to Defendants' July 15ᵗʰ Request for Admissions.

21       On August 5, 2004, Plaintiffs' counsel called Defendants' counsel, Nancy Masso,

22   to meet and confer regarding Plaintiffs' filing of the instant motion. Defendants' counsel

23   made known therein that Defendants would have to oppose said motion. See, Declaration

24   of Danilo J. Becerra at ¶ 2.

25   ////

26   ////

27   ////

28   ////

## II.

## STATEMENT OF RELEVANT FACTS

Plaintiffs originally filed their complaint in this action on or about June 27, 2002. See, originally file Complaint. At the time, Plaintiffs had not determined the true names and identities of the particular INS/Border Patrol Agents that were involved in the incident. Therefore, Plaintiffs fictiously named "Five Unknown INS/Border Patrol Agents" in the complaint among other defendants whom Plaintiffs believed the unknown agent defendants to be working for at the time of the incident, including defendants United States of America, U.S. Department of Immigration and Naturalization and United States Border Patrol. See, Decl. of Arnoldo Casillas at ¶ 3. Plaintiffs intended on amending the complaint to add the true names of the unknown agents involved upon learning their identities through further investigation, discovery and/or communication with counsel for Defendants. See, Decl. of Arnoldo Casillas at ¶ 4.

Sometime thereafter, through the disclosure of documents by Defendants, Plaintiffs learned of the true names and identities of three of the unknown agents fictiously named in the complaint as defendants. See, Decl. of Arnoldo Casillas at ¶ 5. Based on such knowledge, Plaintiffs' counsel spoke with Defendants' counsel, Assistant U.S. Attorney, Nancy Masso, regarding a stipulation to amend the complaint to include the names of the "newly learned" INS agents involved in the incident. See, Declaration of Arnoldo Casillas at ¶ 6.

On or about January 31, 2003, Plaintiffs' counsel then sent a letter to Ms. Masso regarding amending the complaint. With that letter, counsel also forwarded a copy of the

- 3 -

proposed stipulation regarding amending the complaint, the related proposed order, and a copy of the amended complaint.[1] See, Exhibit 3, copy of Counsel's Letter to Nancy Masso and proposed stipulation to amend complaint. See, Decl. of Arnoldo Casillas at ¶ 7.

In the letter, Plaintiffs' counsel indicated to Ms. Masso that the amended complaint now contained the names of the three Border Patrol agents whom they both agreed were present and somehow involved in the subject drowning incident. Counsel's letter requested that Ms. Masso review each of the documents he had forwarded to her, including the amended complaint, for any changes that should be made. In the alternative, if no changes were necessary, and the documents met with her approval, counsel's letter requested that Ms. Masso file the originals upon receiving them from Plaintiffs' counsel via overnight delivery. See, Decl. Arnoldo Casillas at ¶ 8.

Defendants' counsel never communicated to Plaintiffs' counsel any problems with the mentioned documents or that any changes were necessary. Therefore, on or about February 13, 2003, Plaintiffs' amended complaint was filed, adding the names of defendant INS/Border Patrol agents George F. Felton III, Daniel Zaehringer and Patrick B. McDermott. See, Decl. Arnoldo Casillas at ¶ 9.

As a result of the filing of Plaintiffs' amended complaint, and Plaintiffs' service of the same on all parties, the pertinent facts, parties involved and allegations of this case became clearly established and known to all parties involved. See, Exhibit 4, copy of the

---

[1]As this Court is aware, counsel for the parties ultimately agreed that Plaintiffs' counsel would file an unopposed motion to amend the complaint instead of stipulation.

sections entitled "Parties" and "Facts Common To All Actions," contained in First

Amended Complaint. The allegations have since been sufficiently supported by the

declarations of three percipient witnesses – Fernando Del Rio Vargas, Carmelo Abundis

and Roberto Vargas Vargas – whom Plaintiffs tracked down subsequent to filing the

amended complaint.[2] See, Decl. Arnoldo Casillas at ¶ 10.

As is relevant here, the Request for Admissions at issue propounded by defendant

United States of America went to the core of the allegations of Plaintiffs' complaint.

Specifically, the admissions that were sought (i.e. whether the decedents were in the

custody of Defendants, whether the Defendants ever unholstered and drew their weapons,

and whether the Defendants prevented a rescue) are crucial to the determination of the

merits of Plaintiffs' case, and constitute central facts in dispute.    See, Decl. Arnoldo

Casillas at ¶ 11.

These Requests were not questions that Plaintiffs could readily answer since the

Plaintiffs' are heirs and not percipient to the events that occurred at the time of the deaths.

Plaintiffs' answering these Requests nine (9) days late was not deliberate, but rather

resulted from excusable inadvertence on the part of Plaintiffs' counsel who was still in the

process of locating witnesses at the time the responses to the requests came due. See,

Decl. Arnoldo Casillas at ¶ 12.

////

---

[2] Plaintiffs previously attached the declarations of the above-mentioned witnesses to their Opposition to Defendants' motion to dismiss the complaint. However, for the Court's convenience, Plaintiffs have re-attached copies of said declarations to this motion as Exhibits 5-7.

- 5 -

Defendants were not possibly prejudiced by Plaintiffs' late responses to the requests for admissions at issue. Defendants knew of Plaintiffs' allegations that the conduct of the named INS agent defendants involved, in assuming custody of the decedents by pointing their guns at them and then cutting off the escape for such misdemeanor aliens, did not justify their failure to allow rescue attempts. That was and has always been the essence of the complaint. See, Decl. Arnoldo Casillas at ¶ 13. Through the amendment to the complaint, Plaintiffs made known which particular defendant INS agents were involved. The amended complaint was fairly well set out and Defendants were always aware of these contentions.

Defendants have the correct INS agents involved. They have always had the correct date and location of the incident and parties involved based on the facts and allegations set forth in Plaintiffs' complaint. See, Exhibits 8-10, copy of Declaration of Patrick B. McDermott at ¶ 3, Decl. of Daniel Zaehringer at¶ 3, and Decl. of George F. Felton III at ¶ 3 of each's declaration. Based on the complaint, and on Defendants' ability to identify therefrom the defendant INS agents involved, defendants have always been in a position to refute any of Plaintiffs' allegations.

The identified INS agent defendants were actually at the scene at the time the subject incident occurred. Thus, unlike Plaintiffs, Defendants have always been better situated to determine the exact date and location of the deaths at issue, as well as the identities of any percipient witnesses, or of any evidence, that may exist. Presently, there is no new evidence that Defendants must now somehow attempt to refute. See, Decl. Arnoldo Casillas at ¶ 14.

1

2     If Plaintiffs are not allowed to set aside their admissions, they will be denied a jury

3     determination of whether or not the INS agent defendants in fact denied the rescue

4     attempts in these tragic drowning deaths of Plaintiffs' decedents. The Defendants could

5     not have really believed that the Plaintiffs would admit the untruthfulness of their core

6     allegations. Plaintiffs should not now be denied their day in Court based upon a nine-day

7     delay in submitting their Response to Requests for Admissions.  This nine-day delay

8     could not have prejudiced the Defendants in their preparation of their defense.

9

10                                    **III.**

11

12    **THE COURT MAY PERMIT WITHDRAWAL OR AMENDMENT
      OF ANY MATTER ADMITTED UNDER FEDERAL RULE OF
13    CIVIL PROCEDURE 36.**

14         Fed.R.Civ.P. 36 (a) provides in pertinent part that matters set forth in a written

15    request for admissions will be admitted unless, within 30 days after service of the request,

16

17    or within such shorter or longer time as the court may allow or as the parties may agree to

18    in writing, subject to Rule 29, the party to whom the request is directed serves upon the

19    party requesting the admission a written answer or objection addressed to the matter.

20         Fed.R.Civ.P. 36 (a) further provides:

21

22              "If the court determines that an answer does not comply with the
                requirements of this rule, it may order either that the matter is admitted or
23              that an amended answer be served."

24         Fed.R.Civ.P. 36 (b) provides in pertinent part:

25

26    (b)     "Any matter admitted under this rule is conclusively established unless the
              court on motion permits withdrawal or amendment of the admission.
27            Subject to the provision of Rule 16 governing amendment of a pre-trial
              order, the court may permit withdrawal or amendment when the
28            presentation of the merits of the action will be subserved thereby and the

                                       - 7 -

1
2
3

party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits.

4

As is relevant to this case, the Court of Appeals in In re Carney, (2001, 5th Cir.)

5

258 F.3d 415, stated in its ruling: "Since Rule 36 admissions, whether express or by

6
7

default, are conclusive as to the matters admitted, they cannot be overcome at the

8

summary judgement stage by contradictory affidavit testimony or other evidence in the

9

summary judgment record.  Instead, the proper course for a litigant that wishes to avoid

10

the consequences of failing to timely respond to Rule 36 requests for admission is to

11
12

move the court to amend or withdraw the default admissions in accordance with the

13

standard outlined in Rule 36 (b)."   Id., at 420.  See also, Perez v. Miami-Dade County,

14

(11th Cir. 2002) 297 F.3d 1255, 1265 (*a district court abuses its discretion in denying a*

15
16

*motion to withdraw or amend when it applies some other criteria beyond the two-part test*

17

*– or grossly misapplies the two-part test – in making its ruling*).

18

### IV.

19
20

**THE PRESENTATION OF THE MERITS OF PLAINTIFFS' CASE WILL BE SUBSERVED IF WITHDRAWAL OR AMENDMENT OF THE SUBJECT ADMISSIONS IS NOT PERMITTED.**

21
22

The law on Rule 36 (a) is quite clear when deemed admissions involve facts

23

central to the case, and therefore determine its merits.   In Pickens v. Equitable Life

24
25

Assurance Society of the United States, 413 F. 2d 1390 (1969), the court made clear that

26

Requests for Admissions as to central facts in dispute have consistently been held

27

improper and are beyond the scope of the rule providing that requested admissions shall

28

be deemed admitted if not answered.  In Pickens, the issue of suicide was crucial to a

- 8 -

determination of the case, and the court held that the plaintiff's failure to reply to the request did not fall within the ambit of Rule 36 (a) and did not constitute an admission of suicide. <u>Pickens</u>, 413 F. 2d at 1393. <u>See also</u>, <u>Rohman v. Chemical Leaman Tank Lines</u>, (S.D.N.Y. 1996) 923 F.Supp 42, 46 (*holding that although party failed to respond and failed to provide an explanation for not responding to a request for admission, the subject of the request was too important to the merits of the case not to be presented*).

In <u>Kosta v. Connolly</u>, (1989) 709 F.Supp. 592, the district court found it appropriate and necessary to permit withdrawal of a plaintiff's default admissions under Rule 36 (b) based on the fact that the admissions were central to the plaintiff's case. The court in that case made clear the purpose of Rule 36 (a):

> "The purpose of F.R.Civ.P 36 (a) is to expedite trial by eliminating the necessity of proving undisputed and peripheral issues. We should not employ the rule to establish facts which are obviously in dispute or to answer questions of law. In the case at bar, the question whether the plaintiffs violated the statute is neither undisputed nor peripheral. The plaintiffs not only contested their guilt throughout the state proceedings, but they also prevailed on appeal. Moreover, the question of plaintiffs' guilt is central to this case. If plaintiffs admitted to violating the statute, they would effectively resolve the disputed issues . . . . Clearly, that is not the plaintiffs' position, and Rule 36 is not intended to make it so."

<u>Id</u>., at 594-595.

In a similar appellate court decision finding that the district court abused its discretion in not permitting a party's withdrawal or amendment of default admissions, the

appellate court, in its analysis of Rule 36 (b)'s two-part test, emphasized the importance

of having an action resolved on the merits and distinguished cases in which a request for

admissions and Rule 36 (a) function <u>improperly</u>:

> "We conclude with a comment on Rule 36 and Perez's use of requests for
>
> admissions in this case. Essentially, Rule 36 is a time-saver, designed 'to expedite
>
> the trial and to relieve the parties of the cost of proving *facts that will not be*
>
> *disputed at trial.*' That is, when a party uses the rule to establish uncontested facts
>
> and to narrow the issues for trial, then the rule functions properly. When a party
>
> like Perez, however, uses the rule to harass the other side or, as in this case, with
>
> the wild-eyed hope that the other side will fail to answer and therefore admit
>
> essential elements (that the party has already denied in its answer), the rule's time-
>
> saving function ceases; the rule instead becomes a weapon, dragging out the
>
> litigation and wasting valuable resources." <u>Perez v. Miami-Dade County</u>, (2002,
>
> Eleventh Cir.) 297 F.3d 1255, 1268.

Here, as in the above-referenced cases, the admissions at issue, requested in

Defendants' July 15, 2003 Request for Admissions, clearly go to the core of Plaintiffs'

case. Those requests sought admissions to central facts alleged in Plaintiffs' complaint:

particularly, whether the decedents were in the custody of Defendants at the time this

incident occurred, whether the Defendants unholstered and drew their weapons, and

whether the Defendants prevented a rescue. These central facts go to the core of

Defendants' liability for the deaths of Plaintiffs' decedents. As such, as characterized in

<u>Perez</u>, those requests could only be meant to harass Plaintiffs, with the wild-eyed hope

- 10 -

1  that they would fail to answer and therefore admit essential elements of their case.

2  Clearly, Plaintiffs' instant motion falls within the ambit of relief provided for under

3

4  Fed.R.Civ.P. 36 (b).

5      The above established federal case law is directly on point.  That law makes clear

6  that the discretion afforded to a court under subsection (b) of Rule 36 was promulgated

7

8  precisely for instances such as the present, where there was <u>only</u> a nine-day delay in

9  service of the Responses caused by Plaintiffs' counsel's excusable inadvertence, and the

10 merits of Plaintiff's action will not only be subserved, but will be obliterated as the issue

11

12 of Defendants' liability will be effectively decided should relief not be granted.  The

13 applicable case law warrants and necessitates permitting Plaintiffs to withdraw or amend

14 the subject admissions to preserve the presentation of their case on the merits.  To find

15

16 otherwise would be grossly unjust.

17                                              V.

18

19 **DEFENDANTS HAVE NOT SHOWN AND CANNOT SHOW THAT
   WITHDRAWAL OF THE SUBJECT ADMISSIONS WILL IN ANY
20 WAY PREJUDICE THEM IN  MAINTAINING THEIR DEFENSE ON
21 THE MERITS.**

22     This motion should be granted because Defendants have not shown, and cannot

23 show, that the Court's permitting withdrawal of the subject default admissions will in any

24

25 way prejudice them in maintaining their defense of this case.

26     Under subsection (b) of Fed.R.Civ.P. 36, it is Defendants' burden to convince the

27

28 Court that it will be prejudiced by the withdrawal.  <u>Fed.R.Civ.P.</u> 36 (b); <u>See generally</u>,

- 11 -

Pickens, supra; ADM Agri-Industries, Ltd. v. Harvey, (M.D.Ala.2001) 200 F.R.D 467.

Applicable federal case law has made clear that the prejudice Defendants must show must be significantly greater than that merely without the admissions, Defendants will have to move forward with their defense of this case on the merits and/or will be unable to escape liability based on a trivial discovery technicality. Specifically, in describing the prejudice that must be shown, the court in Harvey stated: "This prejudice is not, of course, the simple fact that ADM's case is worse off without the admissions. The prejudice contemplated by the Rule is not simply that the party who initially obtained the admission will now have to convince the fact finder of its truth. Rather, it relates to the difficulty a party may face in proving its case, *e.g.*, caused by the unavailability of key witnesses, because of the sudden need to obtain evidence with respect to the questions previously answered by the admissions. Thus, ADM's burden is to show it will unfairly face proof problems related to the process of having and then losing the admissions." Harvey, at 471. (Emphasis added.) See also, Perez, supra at 1266-1267; Gallegos v. City of Los Angeles, (9th Cir. 2002) 308 F.3d 987, 993; Sonada v. Cabrera, (9th Cir. 2001) 255 F.3d 1035, 1039.

In Perez, the appellate court found the arguments of the plaintiff (who carried the burden of proving prejudice there) unconvincing where he asserted that he had relied upon the default admissions in his preparation for trial, but where the defendants in denying the allegations of the complaint (which mirrored the bulk of the admissions), maintained from the beginning that they would contest plaintiff's core allegations. The court in Perez also found significant that prior to the issue of the default admissions

- 12 -

arising, defendants had also provided several statements in documents other than their answer which contested the plaintiff's allegations. See, Perez, supra at 1267.

On the contrary, the court in Harvey found that the plaintiff had met its burden of proving prejudice. However, there, unlike in this case, the court held that the past discovery non-compliance of the defendant was so egregious that the plaintiff would be unduly prejudiced without the admissions because without their deterrent value, it would face a heightened and unfair risk of having to prosecute its case without knowing if the defendant would comply with any further discovery requests. Harvey, supra at 471-472. The court found that the uncertainty and delay caused by the defendant's actions prevented the plaintiff from knowing for sure whether its prima-facie case would be contested. Id. Importantly, the defendant in that case had failed to reply to repeated requests for admissions and discovery, had never given the court any plausible explanation for its discovery noncompliance, and had even evinced a willingness to ignore a direct order from the Magistrate Judge concerning compliance to the discovery. Id.

Here, Plaintiffs answered the Request for Admissions at issue, albeit nine days late. No discovery orders were ever issued by the Court with respect to those requests, or for any other discovery requests for that matter. At no time other than in Defendants' recent motion to dismiss the complaint, filed approximately seven (7) months after the subject Request for Admissions were served on Plaintiffs, and approximately six (6) months after Plaintiffs' served their Responses, have Defendants ever communicated to Plaintiffs that there was a problem with respect to Plaintiffs' Response, or, that they had

- 13 -

not received Plaintiffs' Response, as they so alleged in their referenced motion to dismiss the complaint. Moreover, Defendants never even argued in any prejudice resulting from the untimely responses in their recent motion to dismiss to the complaint.

In addition, subsequent to Defendants' counsel having indicated to Plaintiffs' counsel which INS agents they agreed had been involved in the subject incident for purposes of Plaintiffs amending their complaint, as referenced earlier, Defendants' counsel never communicated to Plaintiffs any "uncertainty" as to Plaintiffs' prima-facie case, or the facts or parties involved. Plaintiffs have never attempted to mislead or confuse the defense to their prejudice in the prosecution of this case. As proof of their desire to be on all four corners with Defendants, Plaintiffs' counsel actually submitted to Defendants' counsel a copy of the amended complaint before it was filed so that they could review it and make any suggestions regarding its propriety. Only after it was reviewed by Defendants' counsel was it filed.

None of Plaintiffs' actions serve to prejudice or confuse the defense of this action. Had Defendants communicated any such uncertainties with the amended complaint, or a problem with Plaintiffs' Response to their subject Request for Admission, such as their non-receipt of the Responses, Plaintiffs could have immediately made efforts to clear up any such ambiguities, or simply forwarded Defendants another copy of their Response.

Notwithstanding Defendants' claim that they never received the Responses, Plaintiffs maintained in the Responses served that each central fact contained therein had occurred as alleged in their complaint. Because the admissions requested went to Plaintiffs' core allegations of the complaint, Defendants cannot now realistically claim

- 14 -

that they expected any different answers from Plaintiffs in their Response to the Request

for Admissions. Defendants have also always known that Plaintiffs' were contending that

decedents were in the custody of Defendants at the time of the incident, that said custody

was effectuated on decedents through the defendant INS agents' having unholstered their

weapons and pointed them at decedents, ordering them to freeze and put up their hands,

and, that upon the decedents reentering the river, said defendants prevented their rescue.

Thus, not only were Defendants' subject Request for Admissions improper as

established by the above-referenced case law, but said Request did nothing to enhance

Defendants' knowledge of the facts in this case, or assist in their preparation of a defense.

It is unequivocal that the central issues contained in Defendants' Request for Admissions

have always been in dispute between the parties and were not going to be resolved

through admissions.

More importantly, however, regardless of the untimeliness of the service of the

Responses, or Defendants' claim that they never received them, Defendants have always

been informed, at least since the filing of Plaintiffs' amended complaint, who the parties

involved in this case are and what Plaintiffs' contentions are. Dispositively, in the

declarations of the INS agent defendants, which Defendants attached to their motion to

dismiss, Defendants even admit to having always known the date and location of the

subject incident and which INS agents were involved based on the names of Plaintiffs'

decedents as indicated in their original complaint.

As such, Defendants cannot assert in good faith that they will suffer any prejudice

whatsoever, aside from having to proceed with this case on the merits, should this court

- 15 -

grant the instant motion. Therefore, the Court should grant the instant motion permitting

Plaintiffs to withdraw the subject admissions so they may proceed with their case on the

merits.

## VI.

**PLAINTIFFS' MOTION SHOULD BE GRANTED TO ALLOW THIS CASE TO BE DECIDED ON THE MERITS SINCE PLAINTIFFS' UNTIMELY RESPONSE TO THE UNDERLYING REQUESTS FOR ADMISSIONS WAS THE RESULT OF COUNSEL'S EXCUSABLE INADVERTENCE.**

This motion should be granted to allow final disposition of this case to be decided

on the merits rather than on mere, relatively minor, discovery noncompliance.

Applicable case law makes clear that courts generally disfavor final disposition of

a case based merely on discovery noncompliance; and normally, changed circumstances

or honest error will be valid grounds to grant a motion to withdraw or amend under Rule

36 (b):

"Both the case law and the Advisory Committee Note to Rule 36 suggest that the

courts should be reluctant to deny motions to withdraw or amend when final disposition

of the case may result from mere discovery noncompliance rather than the merits."

Harvey, supra at 471. *See*, e.g. Smith v. First National, (1988, Eleventh Cir.) 837 F.2d

1575, 1577 ("*It would be manifestly unfair and grossly unjust to permit plaintiff to obtain*

*a judgment of the magnitude she is seeking due to the inadvertence of the defendant*

*which is at most excusable neglect.*").

"In a proper case . . . such as when an admission has been made inadvertently,

Rule 36 (b) might well require the district court to permit withdrawal." Harvey, supra at

- 16 -

471.

In addition, in a case very similar to the present, an appellate court upheld the trial court's decision to excuse a party's one-day late filing of its response to a request for admissions, holding: "Accordingly, the district court was left to consider whether CNA's response was permissibly filed one day late based upon the circumstances. Because the late response was so minimal in time and work on the date for responding was slowed by the snow storm, we conclude that the district court did not abuse its discretion in refusing to consider the requests for admissions as admitted." Nguyen v. CNA Corporation, (1995, Fourth Cir.) 44 F.3d 234, 243.

As in Nguyen, Plaintiffs' Response to the underlying Requests for Admissions here was served only nine days late. While Plaintiffs do not wish to indulge the Court in a barrage of excuses in an attempt to justify their late response, Plaintiffs have candidly informed the Court that the late service of the Response was the result of inadvertence on the part of Plaintiffs' counsel, or at most "excusable neglect," as counsel had still been in the process of tracking down witnesses involved in this case at the time the Response came due. As the Court is aware, none of the plaintiffs in this case were percipient witnesses, and tracking down percipient witnesses has been a difficult task based on the facts and circumstances of this case. By no means was the untimely Response deliberate or meant to somehow prejudice Defendants, or to communicate an unwillingness on Plaintiffs' part to comply with discovery or cooperate with Defendants in this case. See, Declaration of Arnoldo Casillas at ¶ 15.

////

Plaintiffs should not now have their case decided based on what essentially amounts to a very minor noncompliance to discovery. As illustrated above, Defendants have not been, nor will be, prejudiced by Plaintiffs' nine-day late Response or by the Court's granting Plaintiffs permission to withdraw the default admissions. Therefore, in the utmost interest of justice, and as is consistent with applicable federal case law relating to Rule 36, the Court should grant Plaintiffs' instant motion so that Plaintiffs will be allowed to proceed with having their case determined on the merits.

## VII.

## CONCLUSION

Based on the above, and in the upmost interest of justice, Plaintiffs respectfully request that the Court grant the instant motion and permit Plaintiffs to withdraw the matters deemed admitted due to their untimely response to Defendants' July 15, 2003, Request for Admissions. To the extent that this Court is inclined to deny withdrawal of said admissions in their entirety, Plaintiffs respectfully request this Court to allow Plaintiffs to amend said admissions.

## REQUEST FOR HEARING/ORAL ARGUMENT:

Plaintiffs respectfully request that the present court set this matter for hearing and oral argument with respect to the matters raised herein.

Respectfully submitted,
DATED: August 5, 2004   MORENO, BECERRA, GUERRERO & CASILLAS

BY:

GREGORY W. MORENO
ARNOLDO CASILLAS
Attorneys for Plaintiffs

- 18 -

CERTIFICATE OF SERVICE

I hereby certify that a copy of the true and foregoing copy of **PLAINTIFFS' OPPOSED FED.R.CIV.P. 36(b) MOTION TO WITHDRAW OR AMEND ADMISSIONS; MEMORANDUM OF POINTS AND AUTHORITIES; EXHIBITS; DECLARATIONS OF ARNOLDO CASILLAS AND DANILO J. BECERRA,** was mailed on August 5, 2004 via overnight delivery Federal Express to defendants' counsel, as follows:

Ms. Nancy Masso, AUSA
United States Attorney's Office
Southern District of Texas, Brownsville Division
600 E. Harrison St., Suite #201
Brownsville, TX 78520.

Said document was also mailed to her via US Mail on the same date.

DATED: August 5, 2004    By: _____
                                    ARNOLDO CASILLAS

- 19 -

1

## DECLARATION OF ARNOLDO CASILLAS

2

I, ARNOLDO CASILLAS, declare as follows:

3

4   1.   I am an attorney duly licensed to practice before the present court.  I am a partner

5        with the law offices of Moreno, Becerra, Guerrero & Casillas, attorneys of record

6        for Plaintiffs herein.  I have personal knowledge of the facts contained herein and

7        if called upon to do so could and would competently testify thereto.

8

9   2.   Subsequent to serving Plaintiffs' Response to Defendants' Request for Admissions

10       on August 26, 2003, Plaintiffs' counsel became aware that, according to

11       Fed.R.Civ.P. 36 (a), a failure to respond to requests for admissions in a timely

12       fashion may deem the matters contained therein admitted.

13

14  3.   At the time Plaintiffs filed the original complaint on or about June 27, 2002,

15       Plaintiffs had not determined the true names and identities of the particular

16       INS/Border Patrol Agents that were involved in the incident.  Therefore, Plaintiffs

17       fictitiously named "Five Unknown INS/Border Patrol Agents" in the complaint

18

19       among other defendants whom Plaintiffs believed the unknown agent defendants

20       to be working for at the time of the incident, including defendants United States of

21       America, U.S. Department of Immigration and Naturalization and United States

22       Border Patrol.

23

24  4.   Plaintiffs intended on amending the complaint to add the true names of the

25       unknown agents involved upon learning their identities through further

26       investigation, discovery and/or communication with counsel for Defendants.

27

28  ////

- 20 -

5.  Thereafter, through the disclosure of documents by Defendants, Plaintiffs learned of the true names and identities of three of the unknown agents fictitiously named in the complaint as defendants.

6.  Based on such knowledge, Plaintiffs' counsel spoke with Defendants' counsel, Assistant U.S. Attorney, Nancy Masso, regarding a stipulation to amend the complaint to include the names of "newly learned" INS agents involved in the incident.

7.  On January 31, 2003, I forwarded a copy of the stipulation regarding amending the complaint, the related proposed order, and a copy of the amended complaint along with a letter to Defendants' counsel Nancy Masso.

8.  In the letter, I indicated to Ms. Masso that the amended complaint now contained the names of the three Border Patrol agents whom we both agreed were present and somehow involved in the subject drowning incident.  I also requested that Ms. Masso review each of the documents I had forwarded to her, including the amended complaint, for any changes that should be made.  In the alternative, if no changes were necessary, and the documents met with her approval, I requested that Ms. Masso file the originals upon receiving them from my office via overnight delivery.

9.  Defendants' counsel never communicated to this office any problems with the mentioned documents or that any changes were necessary.  Therefore, on or about February 13, 2003, Plaintiffs' amended complaint was filed, adding the names of defendant INS/Border Patrol agents George F. Felton III, Daniel Zaehringer and

Patrick B. McDermott.

10. The allegations of the amended complaint have since been sufficiently supported by the declarations of three percipient witnesses – Fernando Del Rio Vargas, Carmelo Abundis and Roberto Vargas Vargas – whom Plaintiffs tracked down subsequent to filing the amended complaint.

11. The Request for Admissions at issue propounded by defendant United States of America go to the core of the allegations of Plaintiffs' complaint. Specifically, the admissions that were sought (i.e. whether the decedents were in the custody of Defendants, whether the Defendants ever unholstered and drew their weapons, and whether the Defendants prevented a rescue) are crucial to the determination of the merits of Plaintiffs' case, and constitute central facts in dispute.

12. These Requests were not questions that Plaintiffs could readily answer since the Plaintiffs' are heirs and not percipient to the events that occurred at the time of the deaths. Plaintiffs' answering these Requests nine (9) days late was not deliberate, but rather resulted from excusable inadvertence on the part of Plaintiffs' counsel who was still in the process of locating witnesses at the time the responses to the requests came due.

13. Defendants were not possibly prejudiced by Plaintiffs' late responses to the requests for admissions at issue. Defendants knew of Plaintiffs' allegations that the conduct of the named INS agent defendants involved, in assuming custody of the decedents by pointing their guns at them and then cutting off the escape for such misdemeanor aliens, did not justify their failure to allow rescue attempts.

- 22 -

That was and has always been the essence of the complaint.

14.   The identified INS agent defendants were actually at the scene at the time the subject incident occurred. Thus, unlike Plaintiffs, Defendants have always been better situated to determine the exact date and location of the deaths at issue, as well as the identities of any percipient witnesses, or of any evidence, that may exist. Presently, there is no new evidence that Defendants must now somehow attempt to refute.

15.   Tracking down percipient witnesses has been a difficult task based on the facts and circumstances of this case. By no means was the untimely Response deliberate or meant to somehow prejudice Defendants, or to communicate an unwillingness on Plaintiffs' part to comply with discovery or cooperate with Defendants in this case.

16.   That attached to the present motion are true and correct copies of the following exhibits:

Exhibit 1, Defendants' July 15, 2003 Request for Admissions;

Exhibit 2, Plaintiffs' August 26, 2003 Response and Proof of Service;

Exhibit 3, Arnoldo Casillas' Letter to Nancy Masso and proposed stipulation to amend complaint;

Exhibit 4, Sections of amended complaint entitled "Parties" and "Facts Common To All Actions;"

Exhibit 5, Declaration of Fernando Del Rio Vargas;

Exhibit 6, Declarations of Carmelo Abundis;

Exhibit 7, Declarations of Roberto Vargas Vargas;

- 23 -

1

2

3

4

          Exhibit 8, Declaration of Patrick B. McDermott;

          Exhibit 9, Declaration of Daniel Zaehringer;

          Exhibit 10, Declaration of George F. Felton III.

5   17.    I declare under penalty of perjury that the foregoing is true and correct.  Executed

6        on August 5, 2004, in Montebello, California.

7

8                     ARNOLDO CASILLAS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF DANILO J. BECERRA

I, DANILO J. BECERRA, declare as follows:

1.    I am an attorney duly licensed to practice before the present court. I am a partner with the law offices of Moreno, Becerra, Guerrero & Casillas, attorneys of record for Plaintiffs herein. I have personal knowledge of the facts contained herein and if called upon to do so could and would competently testify thereto.

2.    On August 5, 2004, I called Defendants' counsel, Nancy Masso, to meet and confer regarding Plaintiffs' filing of the instant motion. Defendants' counsel made known therein that Defendants would have to oppose said motion.

3.    I declare under penalty of perjury that the foregoing is true and correct. Executed on August 5, 2004, in Montebello, California.

DANILO J. BECERRA

- 25 -

# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ESTATE OF JOSE VARGAS, by and through MARIA H. COVARRUBIAS, *etc.* Plaintiffs, | * * * * | |
| v. | * * | CIVIL ACTION No. B-02-132 |
| GEORGE FELTON, III., DANIEL ZAEHRINGER, PATRICK B. McDERMOTT, TWO UNKNOWN INS BORDER PATROL AGENTS; U.S. DEPARTMENT OF IMMIGRATION and NATURALIZATION; UNITED STATES BORDER PATROL; UNITED STATES OF AMERICA; and DOE Defendants 1-10, inclusive, Defendants. | * * * * * * * * * | |

### UNITED STATES OF AMERICA'S REQUESTS FOR ADMISSIONS TO PLAINTIFFS

TO:    Estate of Jose Vargas, through Maria H. Covarrubias, etc. by and through their attorney of record, Arnoldo Casillas, Attorney at Law, MORENO, BECERRA, GUERRERO & CASILLAS, 3500 West Beverly Boulevard, Montebello, CA 90640.

In accordance with Rule 36, Federal Rules of Civil Procedure, the United States of America requests that Plaintiffs herein, respond to the attached Requests for Admission in accordance with Rule 36(a) to the undersigned attorney for the United States of America at the offices of the United States Attorney, 600 East Harrison, No. 201, Brownsville, Texas 78520, no later than thirty (30) days from the date of service of this request.

Respectfully submitted,
MICHAEL T. SHELBY
UNITED STATES ATTORNEY

NANCY L. MASSO
Assistant United States Attorney
600 East Harrison, No. 201
Brownsville, Texas 78520
Tel: 956-548-2554
Fax: 956-548-2549
State Bar No. 00800490
Fed. I.D. No. 10263

## REQUESTS FOR ADMISSIONS

1.    The incident at issue in this lawsuit occurred on July 1, 2000.

**ANSWER:**

2.    The incident at issue in this lawsuit occurred at the Anacua Wildlife Refuge located near the town of Santa Maria, Texas.

**ANSWER:**

3.    Jose Vargas died on July 1, 2000.

**ANSWER:**

4.    Guillermo Acosta Zamora died on July 1, 2000.

**ANSWER:**

5.    Jose Vargas had not been detained by United States Border Patrol agents at any time on July 1, 2000.

**ANSWER:**

6.    Guillermo Acosta Zamora had not been detained by United States Border Patrol Agents at any time on July 1, 2000.

**ANSWER:**

7.    None of the Border Patrol Agents present immediately before, during, or after the incident involving Jose Vargas drew their weapons on Jose Vargas.

**ANSWER:**

8.    None of the Border Patrol Agents present immediately before, during, or after the incident involving Jose Vargas drew their weapons on Guillermo Acosta Zamora.

**ANSWER:**

9.    None of the Border Patrol Agents present immediately before, during, or after the incident involving Jose Vargas drew their weapons on any of the persons detained at the scene of the drownings of Jose Vargas and Guillermo Acosta Zamora.

**ANSWER:**

10.    The United States, nor any of its employees or agents, did anything to prevent the possible rescue of Jose Vargas.

**ANSWER:**

11.    The United States, nor any of its employees or agents, did anything to prevent  the

possible rescue of Guillermo Acosta Zamora.

**ANSWER:**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "United States of America's Requests For Admissions to Plaintiffs" was mailed via certified mail, return-receipt requested to Plaintiffs' counsel:

        Arnoldo Casillas
        Attorney at Law
        MORENO, BECERRA, GUERRERO & CASILLAS
        3500 West Beverly Boulevard, Montebello, CA 90640

on this the ___ day of July, 2003.

                    NANCY L. MASSO, AUSA

# Exhibit 2

1  GREGORY W. MORENO, ESQ., SBN 57844
   ARNOLDO CASILLAS, ESQ., SBN 158519
2  MORENO, BECERRA, GUERRERO & CASILLAS
   A Professional Law Corporation
3  3500 West Beverly Boulevard
   Montebello, CA 90640-1541
4  Tel:(323) 725-0917
   Fax:(323) 725-0350
5
   Attorneys for Plaintiffs
6  Estate of Jose Vargas, by and through Maria
   H. Covarrubias, Administrator and Successor in
7  Interest; Ricardo Vargas, a minor, by and through
   his guardian Maria H. Covarrubias; Maria H.
8  Covarrubias; Jose G. Vargas Mendoza; Angelina
   Valencia Morales;Estate of Guillermo Acosta Zamora,
9  by and through Maria Teresa Alvarado Mendez,
   Administrator and Successor In Interest; Maria
10 Teresa Alvarado Mendez; Victor H. Acosta
   Alvarado; Ronald Acosta Alvarado; and, Luis
11 Alberto Acosta Alvarado

12
                  **UNITED STATES DISTRICT COURT**
13
                 **FOR THE SOUTHERN DISTRICT OF TEXAS**
14

15 Estate of Jose Vargas, by and through Maria H.   ) **CASE NO: B-02-132**
   Covarrubias; Administrator and Successor in      )
16 interest; Ricardo Vargas, a minor, by and        ) **PLAINTIFFS' RESPONSE TO**
   through his guardian Maria H. Covarrubias;        ) **DEFENDANT UNITED STATES OF**
17 Maria H. Covarrubias; Jose G. Vargas Mendoza;    ) **AMERICA'S REQUESTS FOR**
   Angelina Valencia Morales; Estate of Guillermo   ) **ADMISSIONS**
18 Acosta Zamora, by and through Maria Teresa       )
   Alvarado Mendez, Administrator and Successor     )
19 in Interest; Maria Teresa Alvarado Mendez;       ) **SET NO. ONE**
   Victor H. Acosta Alvarado; Ronald Acosta        )
20 Alvarado; and, Luis Alberto Acosta Alvarado,     )
                                                    )
21               Plaintiffs,                        )
         v.                                         )
22                                                  )
   George F. Felton III, Daniel Zaehringer, Patrick )
23 B. McDermott, Two Unknown INS/Border            )
   Patrol Agents; U.S. Department of Immigration    )
24 and Naturalization; United States Border Patrol; )
   United States of America and DOE defendants 1-)
25 10, inclusive,                                   )
                 Defendants.                        )
26 _____)

27

28

                                        1
_____
**PLAINTIFFS' RESPONSES TO DEFENDANT UNITED STATES OF AMERICA'S**
              **REQUESTS FOR ADMISSIONS**

1  **PROPOUNDING PARTY:**          **DEFENDANT UNITED STATES OF AMERICA**

2  **RESPONDING PARTY:**           **PLAINTIFFS ESTATE OF JOSE VARGAS, BY AND**

3                                  **THROUGH MARIA H. COVARRUBIAS, ET AL.**

4  **SET NUMBER:**                 **ONE**

5          Pursuant to FRCP 36, Plaintiffs ESTATE OF JOSE VARGAS, BY AND THROUGH

6  MARIA TERESA ALVARADO MENDEZ, ET AL., hereby respond and answer Defendant

7  UNITED STATES OF AMERICA'S Requests for Admissions:

8                          **PRELIMINARY STATEMENT**

9          These responses are made solely for the purpose of, and in relation to, this action.  Each

10 answer is given subject to all appropriate objections (including but not limited to objections

11 concerning competency, relevancy, materiality, propriety and admissibility) which would require

12 the exclusion of any statement contained herein if the request were asked of or any statement

13 contained herein were made by a witness present or testifying in court.  All such objections and

14 grounds therefore are reserved and may be interposed at the time of trial.

15         The party on whose behalf the responses are given has not yet completed its investigation

16 of the facts relating to this action, has not yet completed its preparation for trial.  Consequently,

17 the following responses are given without prejudice to the answering party's right to produce, at

18 the time of trial, subsequently discovered evidence relating to the proof of any material facts, and

19 to produce all evidence, whenever discovered, relating to the proof of facts subsequently

20 discovered to be material.

21         Except for facts explicitly admitted herein, no admissions of any nature whatsoever are to

22 be implied or inferred.  The facts that any interrogatory and/or request herein has been answered

23 should not be taken as an admission, or concession of the existence of any fact thus set forth or

24 assumed.  All responses must be of construed as given on the basis of present recollection.

25 **REQUEST FOR ADMISSION NUMBER 1:**

26         The incident at issue in this lawsuit occurred on July 1, 2000.

27 **RESPONSE TO REQUEST FOR ADMISSION NUMBER 1:**

28         Deny.  The incident at issue in this lawsuit occurred on June 30, 2003.

**PLAINTIFFS' RESPONSES TO DEFENDANT UNITED STATES OF AMERICA'S
REQUESTS FOR ADMISSIONS**

**REQUEST FOR ADMISSION NUMBER 2:**

The incident at issue in this lawsuit occurred at the Anacua Wildlife Refuge located near the town of Santa Maria, Texas.

**RESPONSE TO REQUEST FOR ADMISSION NUMBER 2:**

Deny in part. The incident at issue in this lawsuit occurred on the bank of the Rio Grande

**REQUEST FOR ADMISSION NUMBER 3:**

Jose Vargas died on July 1, 2000.

**RESPONSE TO REQUEST FOR ADMISSION NUMBER 3:**

Deny. Jose Vargas died on June 30, 2000.

**REQUEST FOR ADMISSION NUMBER 4:**

Guillermo Acosta Zamora died on July 1, 2000.

**RESPONSE TO REQUEST FOR ADMISSION NUMBER 4:**

Deny. Guillermo Acosta Zamora died on June 30, 2000.

**REQUEST FOR ADMISSION NUMBER 5:**

Jose Vargas had not been detained by United States Border Patrol agents at anytime on July 1, 2000.

**RESPONSE TO REQUEST FOR ADMISSION NUMBER 5:**

Plaintiffs have undertaken a diligent search and reasonable inquiry in an effort to respond to this request, but is unable to admit or deny because of lack of information. Plaintiffs believe that all of the agents drew their weapons and ordered the persons they encountered on the river bank to remain.

**REQUEST FOR ADMISSION NUMBER 6:**

Guillermo Acosta Zamora had not been detained by United States Border Patrol Agents at any time on July 1, 2000.

////
////
////
////

**PLAINTIFFS' RESPONSES TO DEFENDANT UNITED STATES OF AMERICA'S REQUESTS FOR ADMISSIONS**

1  **RESPONSE TO REQUEST FOR ADMISSION NUMBER 6:**

2        Plaintiffs have undertaken a diligent search and reasonable inquiry in an effort to respond to

3  this request, but is unable to admit or deny because of lack of information.  Plaintiffs believe

4  that all of the agents drew their weapons and ordered the persons they encountered on the

5  river bank to remain.

6  **REQUEST FOR ADMISSION NUMBER 7:**

7        None of the Border Patrol Agents present immediately before, during, or after the incident

8  involving Jose Vargas drew their weapons on Jose Vargas.

9  **RESPONSE TO REQUEST FOR ADMISSION NUMBER 7:**

10        Deny.  Plaintiffs believe that all of the agents drew their weapons and ordered the persons they

11  encountered on the river bank to remain.

12  **REQUEST FOR ADMISSION NUMBER 8:**

13        None of the Border Patrol Agents present immediately before, during, or after the incident

14  involving Jose Vargas drew their weapons on Guillermo Acosta Zamora.

15  **RESPONSE TO REQUEST FOR ADMISSION NUMBER 8:**

16        Deny.  Plaintiffs believe that all of the agents drew their weapons and ordered the persons they

17        encountered on the river bank to remain.

18  **REQUEST FOR ADMISSION NUMBER 9:**

19        None of the Border Patrol Agents present immediately before, during, or after the incident

20  involving Jose Vargas drew their weapons on any of the persons detained at the scene of the

21  drownings of Jose Vargas and Guillermo Acosta Zamora.

22  **RESPONSE TO REQUEST FOR ADMISSION NUMBER 9:**

23        Deny.  Plaintiffs believe that all of the agents drew their weapons and ordered the persons they

24  encountered on the river bank to remain.

25  ////

26  ////

27  ////

28  ////

**PLAINTIFFS' RESPONSES TO DEFENDANT UNITED STATES OF AMERICA'S
REQUESTS FOR ADMISSIONS**

1  **REQUEST FOR ADMISSION NUMBER 10:**

2      The United States, nor any of its employees or agents, did anything to prevent the possible

3  rescue of Jose Vargas.

4  **RESPONSE TO REQUEST FOR ADMISSION NUMBER 10:**

5      Deny.  The border patrol agents punctured the inner tubes as persons attempted to use them

6      to save the persons who were drowning in the river.

7

8  **REQUEST FOR ADMISSION NUMBER 11:**

9      The United States, nor any of its employees or agents, did anything to prevent the possible

10  rescue of Guillermo Acosta Zamora.

11  **RESPONSE TO REQUEST FOR ADMISSION NUMBER 11:**

12      Deny.  The border patrol agents punctured the inner tubes as persons attempted to use them

13      to save the persons who were drowning in the river.

14

15  DATED: August 26, 2003        MORENO, BECERRA, GUERRERO, & CASILLAS
                                     A Professional Law Corporation

16

17

18                By:                                   
                                 ARNOLDO CASILLAS

19                                     Attorney for Plaintiffs,
                                   Estate of Jose Vargas, by and through Maria

20                                     H. Covarrubias, Administrator and Successor in
                                   Interest; Ricardo Vargas, a minor, by and through

21                                     his guardian Maria H. Covarrubias; Maria H.
                                   Covarrubias; Jose G. Vargas Mendoza; Angelina

22                                     Valencia Morales;Estate of Guillermo Acosta Zamora,
                                   by and through Maria Teresa Alvarado Mendez,

23                                     Administrator and Successor In Interest; Maria
                                   Teresa Alvarado Mendez; Victor H. Acosta

24                                     Alvarado; Ronald Acosta Alvarado; and, Luis
                                   Alberto Acosta Alvarado

25

26

27

28

**PLAINTIFFS' RESPONSES TO DEFENDANT UNITED STATES OF AMERICA'S
REQUESTS FOR ADMISSIONS**

# Exhibit 3

Law Offices of

## MORENO, BECERRA, GUERRERO & CASILLAS

**A Professional Law Corporation**
3500 West Beverly Boulevard
Montebello, California 90640
Telephone (323) 725-0917
Facsimile (323) 725-0350

GREGORY W. MORENO
DANILO J. BECERRA
MICHAEL A. GUERRERO*
ARNOLDO CASILLAS
FRANK PEREZ

*Certified Specialist – Family Law*
*The State of California*
*Board of Legal Specialization*

January 31, 2003

*Via Federal Express*

Nancy Masso, AUSA
United States Attorney's Office
Southern District of Texas, Brownsville Division
600 E. Harrison St., Suite #201
Brownsville, TX 78520

> **Re:**   **Covarrubias v. Five Unknown Border Patrol Agents**
> **Stipulation regarding First Amended Complaint**

Dear Ms. Masso:

  With this letter I am forwarding a copy of the stipulation regarding the First Amended Complaint.  I am also forwarding a proposed order as well as a copy of the First Amended Complaint.

  As you should find, the complaint now states the names of the three Border Patrol agents which appear to have been the agents who first contacted plaintiffs' decedents and who were present during their drowning.

  Please review the stipulation, order and complaint.   My lack of familiarity with the preferred format in the Southern District for orders and stipulations may be apparent in the documents.  Please let me know if they should be changed in any way.  On the other hand, if they meet with your approval, I will send them to you via overnight delivery for your signature on the originals.  Again, I would ask that you file the originals.

  Please contact me, or my assistant Leah Moreno, should you have changes or any questions.  The deadline for the filing of the documents is February 14, 2003.

  Again, thank you for your courtesy and cooperation as to this matter.

  Very Truly Yours,

  MORENO, BECERRA, GUERRERO & CASILLAS
  A Professional Law Corporation

  ARNOLDO CASILLAS

1  GREGORY W. MORENO, ESQ., SBN 57844
   ARNOLDO CASILLAS, ESQ., SBN 158519
2  MORENO, BECERRA, GUERRERO & CASILLAS
   3500 West Beverly Boulevard
3  Montebello, CA 9064
   (323) 725-0917
4
   Attorneys for Plaintiffs
5  Estate of Jose Vargas, by and through Maria
   H. Covarrubias, Administrator and Successor in
6  Interest; Ricardo Vargas, a minor, by and through
   his guardian Maria H. Covarrubias; Maria H.
7  Covarrubias; Jose G. Vargas Mendoza; Angelina
   Valencia Morales;Estate of Guillermo Acosta Zamora,
8  by and through Maria Teresa Alvarado Mendez,
   Administrator and Successor In Interest; Maria
9  Teresa Alvarado Mendez; Victor H. Acosta
   Alvarado; Ronald Acosta Alvarado; and, Luis
10 Alberto Acosta Alvarado

11
                **UNITED STATES DISTRICT COURT**
12
           **FOR THE SOUTHERN DISTRICT OF TEXAS**
13

14 Estate of Jose Vargas, et.al.,              )   **CASE NO: B-02-132**
                                                )
15              Plaintiffs,                     )   **STIPULATION OF PARTIES RE**
                                                )   **AMENDMENT OF COMPLAINT**
16         v.                                   )   **TO IDENTIFY FICTITIOUSLY**
                                                )   **NAMED DEFENDANTS**
17                                              )
   George F. Felton III, Daniel Zaehringer,     )
18 Patrick B. McDermott, Two Unknown            )
   INS/Border Patrol Agents; U.S. Department    )
19 of Immigration and Naturalization; United    )
   States Border Patrol; United States of       )
20 America, and DOE defendants 1-10,            )
   inclusive,                                   )
21                                              )
                Defendants.                     )
22 _____ )

23              <u>**STIPULATION OF THE PARTIES**</u>

24    **COME NOW THE PARTIES TO THE PRESENT ACTION**, through their

25 attorneys of record, and stipulate to the amendment of plaintiffs' complaint pursuant to

26 Rule 15 (a) of the Federal Rules of Civil Procedure to insert the names of certain

27 defendant Border Patrol Agents who were fictitiously named in the complaint and whose

28 true and correct identities have been discovered by Plaintiffs.

1    Plaintiffs were ignorant of the true name of these defendants and designated said

2    defendants in the complaint by a fictitious name; e.g., "Five Unknown INS/Border Patrol

3    Agents."  Through the disclosure of documents, Plaintiffs' counsel has learned of the true

4    names and identities of three (3) of the five defendants that were fictitiously named in the

5    complaint as defendants.

6    The parties to the present action having agreed, they respectfully request that this

7    court issue the attached order correctly identifying these defendants in the complaint.

8    The newly identified defendants are as follows:

9    As to all causes of action:

10   1.    One of "Five Unknown INS/Border Patrol Agents": George F. Felton III;

11   2.    Two of "Five Unknown INS/Border Patrol Agents": Daniel Zaehringer;

12   3.    Three of "Five Unknown INS/Border Patrol Agents":Patrick B.

13         McDermott.

14   The parties respectfully request this court issue the attached order replacing the

15   fictitious names of three (3) of the "Five Unknown INS/Border Patrol Agents" that have

16   been identified with their true names as indicated above.

17   Said stipulation is made pursuant to Rule 15(a) of the Federal Rules of Civil

18   Procedure.  Nothing in this stipulation obviates the requirement to personally serve the

19   newly added parties.

20   Date:   February 12, 2003        MORENO, BECERRA, GUERRERO & CASILLAS

21

22                                   By: _____
                                         GREGORY W. MORENO
                                         ARNOLDO CASILLAS
23                                   Attorneys for PLAINTIFFS

24   Date: _____, 2003      OFFICE OF THE UNITED STATES ATTORNEY
25   s
                                     By: _____
26                                       NANCY MASSO
                                         Assistant United States Attorney
27                                       United States Attorney's Office
                                         Southern District of Texas, Brownsville Division
28                                   Attorney for Defendant United States Of America

# Exhibit 4

1  | GREGORY W. MORENO, ESQ., SBN 57844
   | ARNOLDO CASILLAS, ESQ., SBN 158519
2  | MORENO, BECERRA, GUERRERO & CASILLAS
   | 3500 West Beverly Boulevard
3  | Montebello, CA 9064
   | (323) 725-0917
4  |
   | Attorneys for Plaintiffs
5  | Estate of Jose Vargas, by and through Maria
   | H. Covarrubias, Administrator and Successor in
6  | Interest; Ricardo Vargas, a minor, by and through
   | his guardian Maria H. Covarrubias; Maria H.
7  | Covarrubias; Jose G. Vargas Mendoza; Angelina
   | Valencia Morales;Estate of Guillermo Acosta Zamora,
8  | by and through Maria Teresa Alvarado Mendez,
   | Administrator and Successor In Interest; Maria
9  | Teresa Alvarado Mendez; Victor H. Acosta
   | Alvarado; Ronald Acosta Alvarado; and, Luis
10 | Alberto Acosta Alvarado

11

12                  **UNITED STATES DISTRICT COURT**

13              **FOR THE SOUTHERN DISTRICT OF TEXAS**

14 | Estate of Jose Vargas, by and through Maria  )    **CASE NO: B-02-132**
   | H. Covarrubias; Administrator and Successor )
15 | in interest;  Ricardo Vargas, a minor, by and )    **FIRST AMENDED COMPLAINT**
   | through his guardian Maria H. Covarrubias;   )    **FOR CIVIL RIGHTS**
16 | Maria H. Covarrubias; Jose G. Vargas         )    **VIOLATIONS**
   | Mendoza; Angelina Valencia Morales; Estate )
17 | of Guillermo Acosta Zamora, by and through )     **[Pursuant  28 U.S.C. §1331 Et Seq.,**
   | Maria Teresa Alvarado Mendez,               )    **Bivens v. Six Unknown Named**
18 | Administrator and Successor in Interest;     )    **Agents of Federal Bureau of**
   | Maria Teresa Alvarado Mendez; Victor H.     )    **Narcotics, 403 U.S. 388, 29 L.Ed.2d**
19 | Acosta Alvarado; Ronald Acosta Alvarado;    )    **619, 91 S.Ct 1999)]**
   | and, Luis Alberto Acosta Alvarado,          )
20 |                                             )
   |                   Plaintiffs,               )    **DEMAND FOR JURY TRIAL**
21 |                                             )
   |            v.                               )
22 |                                             )
   |                                             )
23 | George F. Felton III, Daniel Zaehringer,    )
   | Patrick B. McDermott, Two Unknown           )
24 | INS/Border Patrol Agents; U.S. Department   )
   | of Immigration and Naturalization; United   )
25 | States Border Patrol; United States of      )
   | America, and DOE defendants 1-10,           )
26 | inclusive,                                  )
   |                                             )
27 |                   Defendants.               )
   |  _____   )
28

1     **COME NOW PLAINTIFFS** Estate of Jose Vargas, by and through Maria H.

2 Covarrubias; Administrator and Successor in interest; Ricardo Vargas, a minor, by and

3 through his guardian Maria H. Covarrubias; Maria H. Covarrubias; Jose G. Vargas

4 Mendoza; Angelina Valencia Morales; Estate of Guillermo Acosta Zamora, by and

5 through Maria Teresa Alvarado Mendez, Administrator and Successor in Interest, Maria

6 Teresa Alvarado Mendez, Victor H. Acosta Alvarado, Ronald Acosta Alvarado, and, Luis

7 Alberto Acosta Alvarado, complaining of defendants and allege as follows:

8                  **I.**

9          **JURISDICTION**

10 1.     This action is brought pursuant to 28 U.S.C. §1331 Et Seq., <u>Bivens v. Six</u>

11 <u>Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388, 29 L.Ed. 2d 619,

12 91 S.Ct 1999), as well as the Fourth, Fourteenth and Fifth Amendment of the U.S.

13 Constitution.

14                  **II.**

15            **VENUE**

16 2.     Venue is proper in the Southern District of Texas. The injury occurred in

17 Brownsville, Texas, which is within the present judicial district.

18                 **III.**

19          **PARTIES**

20 3.     Plaintiffs Ricardo Vargas and Maria H. Covarrubias are and at all relevant times

21 were residents of Ventura County, California, and were at all times relevant, the natural

22 son and lawful wife - respectively - of Jose Guadalupe Vargas.

23 4.     Plaintiffs Jose G. Vargas Mendoza and Angelina Valencia Morales are and at all

24 relevant times were residents of the State of Michoacan, Mexico, and said plaintiffs are

25 and were the natural parents of Jose Guadalupe Vargas.

26 5.     Plaintiffs Maria Teresa Alvarado Mendez, Victor H. Acosta Alvarado, Ronald

27 Acosta Alvarado, and, Luis Alberto Acosta Alvarado are and at all relevant times were

28 ////

1   residents of Houston, Texas, and were at all times relevant, the lawful wife and natural

2   sons of Guillermo Acosta Zamora.

3   6.     At all times relevant herein, defendants George F. Felton III, Daniel Zaehringer

4   and Patrick B. McDermott were agents of the U.S. Department of Immigration and

5   Naturalization and/or U.S. Border Patrol and in doing all things and committing all

6   omissions described herein were acting under the color of law; to wit, the laws, statutes,

7   regulations, orders and policies of the United States of America, U.S. Department of

8   Immigration and Naturalization and U.S. Border Patrol, and within the course and scope

9   of their employment with defendants U.S. Department of Immigration and Naturalization,

10   United States Border Patrol and United States of America which are liable for the acts

11   and omissions of said defendant INS/Border Patrol Agents.  The present plaintiffs are

12   informed and believe and thereon allege that defendants George F. Felton III, Daniel

13   Zaehringer and Patrick B. McDermott are responsible in some manner for the occurrences

14   herein alleged, and that these plaintiffs' injuries as herein alleged were proximately

15   caused by the acts and/or omissions of said defendants.

16   7.     At all times relevant herein, defendants identified as "Two Unknown INS/Border

17   Patrol Agents" were employees, officers, agents and representatives of the U.S.

18   Department of Immigration and Naturalization and/or U.S. Border Patrol and in doing all

19   things and committing all omissions described herein were acting under the color of law;

20   to wit, the laws, statutes, regulations, orders and policies of the United States of America,

21   U.S. Department of Immigration and Naturalization and U.S. Border Patrol, and within

22   the course and scope of their employment with defendants U.S. Department of

23   Immigration and Naturalization, United States Border Patrol and United States of

24   America which are liable for the acts and omissions of said defendant INS/Border Patrol

25   Agents.   After having made reasonable attempts to discern their identities, the present

26   plaintiffs are ignorant of the true name and capacity of defendants sued herein as  "Two

27   Unknown INS/Border Patrol Agents" and therefore sue these defendants by such

28   fictitious name.  These plaintiffs will amend this complaint to allege their true name and

1  capacity when ascertained.  The present plaintiffs are informed and believe and thereon

2  allege that the fictitiously named defendants are responsible in some manner for the

3  occurrences herein alleged, and that these plaintiffs' injuries as herein alleged were

4  proximately caused by the acts and/or omissions of said fictitiously named defendants.

5  8.      The present plaintiffs are ignorant of the true names and capacities of defendants

6  sued herein as DOE defendants 1 through 10, inclusive, and therefore sue these

7  defendants by such fictitious names.  The present plaintiffs will amend this complaint to

8  allege their true names and capacities when ascertained.  The present plaintiffs are

9  informed and believe and thereon allege that each of the fictitiously named defendants is

10  responsible in some manner for the occurrences herein alleged, and that the present

11  plaintiffs' injuries as herein alleged were proximately caused by the acts and/or omissions

12  of said fictitiously named defendants.

13                                    **IV.**

14                    **FACTS COMMON TO ALL ACTIONS**

15  9.      On June 30, 2000, George F. Felton III, Daniel Zaehringer, Patrick B. McDermott,

16  Two Unknown INS/Border Patrol Agents and DOE defendants 1-10, inclusive, while

17  engaged in the regular course of their duties in patrolling and observing the US/Mexico

18  border, observed a group of persons crossing the Rio Grande in the general location of

19  Brownsville, Texas, from the Mexican bank of that river to the U.S. bank of the river.

20  10.     Said defendants observed that the group consisted of both men and women of

21  various ages and that the group of persons was utilizing a makeshift rafts consisting of

22  several rubber inner-tubes.  Said defendants observed the persons crossing the river also

23  using a rope which was strung between the banks of the river and tied to trees on each

24  side of the river.

25  11.     It was apparent to said defendants that the persons crossing the river could not

26  swim as the persons clutched to the inner-tubes and based upon the statements which the

27  persons made as they crossed indicating that they could not swim.

28  ////

12.     After the persons reached the U.S. Bank of the Rio Grande, said defendants - who had hidden their presence from said persons - approached and detained said persons on the bank of the river.  In doing so, said defendants had drawn their firearms and had identified themselves in English and in Spanish as officers of the U.S. Department of Immigration and Naturalization and/or as officers of the U.S. Border patrol.

13.     Jose Guadalupe Vargas and Guillermo Acosta Zamora were among the persons crossing the river who were detained and taken into custody by said defendants.  Jose Guadalupe Vargas and Guillermo Acosta Zamora were among the persons who said defendants concluded did not know how to swim.

14.     After having detaining the persons, said defendants took custody of the inner-tubes which the persons had used to cross the river so as to prevent said persons from returning to the Mexico bank of the river.

15.     Once said defendants had taken the inner-tubes from these persons, three of the persons, including Jose Guadalupe Vargas and Guillermo Acosta Zamora returned back into the river and attempted to return to the Mexico side of the river.

16.     Said defendants then cut the rope strung between the banks and thereby prevented Jose Guadalupe Vargas and Guillermo Acosta Zamora from using the ropes to cross safely.  Jose Guadalupe Vargas and Guillermo Acosta Zamora began to struggle and drown and the other persons attempted to help them by attempting to retrieve the inner tubes and get them to Jose Guadalupe Vargas and Guillermo Acosta Zamora.  Upon seeing this, said defendants ordered Jose Guadalupe Vargas and Guillermo Acosta Zamora out of the water and punctured the inner-tubes, deflating them and making them unusable to save Jose Guadalupe Vargas and Guillermo Acosta Zamora from drowning.

17.     Shortly thereafter, Jose Guadalupe Vargas and Guillermo Acosta Zamora drowned in the river, and but for the cutting of the rope and the puncturing of the inner-tubes, they would have survived.

////

////

1     **DEMAND FOR JURY TRIAL**

2     **COME NOW PLAINTIFFS** Estate of Jose Vargas, by and through Maria H.

3 Covarrubias; Administrator and Successor in interest; Ricardo Vargas, a minor, by and

4 through his guardian Maria H. Covarrubias; Maria H. Covarrubias; Jose G. Vargas

5 Mendoza; Angelina Valencia Morales; Estate of Guillermo Acosta Zamora, by and

6 through Maria Teresa Alvarado Mendez, Administrator and Successor in Interest, Maria

7 Teresa Alvarado Mendez, Victor H. Acosta Alvarado, Ronald Acosta Alvarado, and, Luis

8 Alberto Acosta Alvarado and respectfully demand that the present matter be set for a jury

9 trail.

10

11 Dated: February 12, 2003       MORENO, BECERRA, GUERRERO & CASILLAS

12

13                        By: _____
                            GREGORY W. MORENO

14                           ARNOLDO CASILLAS
                       Attorneys for PLAINTIFFS

15                        Estate of Jose Vargas, by and through Maria H.
                       Covarrubias; Administrator and Successor in interest;

16                        Ricardo Vargas, a minor, by and through his guardian
                       Maria H. Covarrubias; Maria H. Covarrubias; Jose G.

17                        Vargas Mendoza; Angelina Valencia Morales; Estate
                       of Guillermo Acosta Zamora, by and through Maria

18                        Teresa Alvarado Mendez, Administrator and Successor
                       in Interest, Maria Teresa Alvarado Mendez, Victor H.

19                        Acosta Alvarado, Ronald Acosta Alvarado, and, Luis
                       Alberto Acosta Alvarado

20

21

22

23

24

25

26

27

28

1    **<u>CERTIFICATE OF SERVICE</u>**

2    STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3         I am employed in the County of Los Angeles, State of California.

4         I am over the age of 18 and not a party to the within action; my business address is 3500
5    West Beverly Boulevard, Montebello, CA 90640-1541.

6         On February 12, 2003, I served the foregoing documents described as:

7    FIRST AMENDED COMPLAINT

8    on the interested parties in this action by placing the true copies thereof enclosed in sealed
     envelopes addressed as follows:
9
     Nancy Masso, Esq.
10   Assistant U.S. Attorney
     600 E. Harrison Street, No. 201
11   Brownsville, TX 78520

12

13   ( )    BY FACSIMILE:  caused such document to be transmitted via facsimile to the offices of
14          the addressee(s).  (C.C.P. § 1013(a)(e)(f)).

15   ( ) (BY MAIL)
         I caused such envelope to be deposited in the mail at Montebello, California.  The envelope
16   was mailed with postages thereon fully prepaid.
         I am "readily familiar" with firm's practice of collection and processing correspondence for
17   mailing.  It is deposited with U.S. postal service on that same day in the ordinary course of
     business. I am aware that on motion of party served, service is presumed invalid if postal
18   cancellation date or postage meter date is more than 1 day after date of deposit for mailing in
     affidavit.
19
      __X__  BY FEDERAL EXPRESS: I caused such envelopes to be delivered by air courier, with
20          next day service, to the offices of the addressee(s). (C.C.P. §1013(c)(d)).

21

22   (    ) (BY PERSONAL SERVICE)
         I delivered such envelope by hand to the addressee.

23         Executed on February 12, 2003, at Montebello, California.

24         I declare that I am employed in the office of a member of the bar of this court at whose
     direction the service was made.
25

26                                      _Leah A. Moreno_
                                        LEAH A. MORENO
27

28

# Exhibit 5

1  GREGORY W. MORENO, ESQ., CA. SBN 57844
   ARNOLDO CASILLAS, ESQ., CA. SBN 158519
2  MORENO, BECERRA, GUERRERO & CASILLAS
   3500 West Beverly Boulevard
3  Montebello, CA 90640
   Tel:   (323) 725-0917
4  Fax:   (323) 725-0350

5  Attorneys for Plaintiffs
   Estate of Jose Vargas, by and through Maria
6  H. Covarrubias, Administrator and Successor in
   Interest; Ricardo Vargas, a minor, by and through
7  his guardian Maria H. Covarrubias; Maria H.
   Covarrubias; Jose G. Vargas Mendoza; Angelina
8  Valencia Morales;Estate of Guillermo Acosta Zamora,
   by and through Maria Teresa Alvarado Mendez,
9  Administrator and Successor In Interest; Maria
   Teresa Alvarado Mendez; Victor H. Acosta
10 Alvarado; Ronald Acosta Alvarado; and, Luis
   Alberto Acosta Alvarado

11

12              UNITED STATES DISTRICT COURT

13          FOR THE SOUTHERN DISTRICT OF TEXAS

14                   BROWNSVILLE DIVISION

15

16 Estate of Jose Vargas, by and through      )   CASE NO: B-02-132
   Maria H. Covarrubias; Administrator and    )
17 Successor in interest;  Ricardo Vargas, a  )
   minor, by and through his guardian Maria   )
18 H. Covarrubias; Maria H. Covarrubias;      )
   Jose G. Vargas Mendoza; Angelina           )   DECLARATION OF
19 Valencia Morales; Estate of Guillermo      )   FERNANDO DEL RIO VARGAS
   Acosta Zamora, by and through Maria        )
20 Teresa Alvarado Mendez, Administrator      )
   and Successor in Interest; Maria Teresa    )
21 Alvarado Mendez; Victor H. Acosta          )
   Alvarado; Ronald Acosta Alvarado; and,     )
22 Luis Alberto Acosta Alvarado,              )

23              Plaintiffs,                    )

24        v.                                   )

25 Five Unknown INS/Border Patrol             )
   Agents; U.S. Department of Immigration     )
26 and Naturalization; United States Border   )
   Patrol; United States of America, and      )
27 DOE defendants 1-10, inclusive,            )

28              Defendants.                    )

## DECLARATION OF FERNANDO DEL RIO VARGAS

I, FERNANDO DEL RIO VARGAS, declare:

1. The matters contained in this declaration are true of my own personal knowledge, and if called upon I could testify competently thereto;

2. I am the cousin of Decedent Jose Guadalupe Vargas, whose death is the subject of this litigation.

3. On or about July 1, 2000, I was a member of a group of approximately twenty (20) undocumented immigrants who crossed the Rio Grande at Brownsville, Texas.

4. I was accompanied by my cousin and decedent, Jose Vargas, my cousin Roberto Vargas Vargas, and my brother-in-law, Carmelo Abundis.

5. The instrumentality used to cross the River were large rubber inner tubes secured to a rope which spanned the entire width of the river, connecting the U.S. and Mexican river banks.

6. In the late afternoon hours, all members of our group successfully crossed the river through the use of the referenced inner tubes. Upon crossing the river, said inner tubes were placed on the ground at our gathering site.

7. Once all the group members were on U.S. territory, we quickly changed into dry clothes which were carried in plastic, water resistant bags.

8. Almost immediately after the group had changed clothes, approximately 5 White Immigration and Naturalization Service (INS) Agents suddenly appeared, with guns unholstered and pointed at the individuals in our group.

- 2 -

9.   As soon as I observed the Agents approaching, my cousin Roberto
     Vargas Vargas and I, ran and hid in the neighboring bushes.

10.  We were positioned approximately 5 to 6 feet from where the agents
     were standing, and therefore could see and hear what was done and
     said.

11.  My cousin Jose Guadalupe Vargas was among those restrained by the
     Agents threat of gunfire.

12.  I then observed many of the people, including my cousin, Decedent
     Jose Guadalupe Vargas, and my brother-in-law, Carmelo Abundis,
     jump back into the river.

13.  Carmelo Abundis successfully reached the Mexican bank. However,
     my cousin Jose Guadalupe Vargas who was a poor swimmer began to
     struggle in the water and call for help.

14.  I also observed two other men who had jumped in the river begin to
     struggle and yell for assistance.

15.  The INS Agents simply observed in amusement doing nothing as the
     men struggled, drowned and yelled for help in the river.

16.  I then saw Carmelo Abundis who was on the Mexican bank, quickly
     grab and begin to pull at the rope we had used to cross the river so as
     to force the attached inner tubes on the U.S. river bank to fall back
     into the river and thus allow the drowning men to grab on.

17.  When one of the Agents saw that an inner tube on the ground began
     to move from Carmelo's tugging, the Agents immediately took out a
     knife and stabbed the tube numerous time so as to prevent the rescue
     and similarly punctured the remaining tubes. One of the Agents then
     grabbed hold of the rope which was connected to the inner tube and
     cut it as well.

18.  Carmelo and others on the Mexican river bank then tried throwing

-3-

1    plastic garment bags left there in hopes that the drowning men could

2    use them as floatation devices, however, this attempt was

3    unsuccessful and all three men drowned.

4    19.   The Agents never attempted to radio for assistance, nor did they ever

5    attempt to personally assist the drowning men even after they had

6    prevented rescue efforts.

7    20.   Once the men had drowned, the Agents gathered the remaining

8    immigrants and left the area.

9

10    I declare under penalty of perjury under the laws of the State of California

11    that the foregoing is true and correct.

12    Executed this 23rd day of February 2004 at Michoacan, Mexico.

13

14    *Fernando del Rio-Vargas.*

15    FERNANDO DEL RIO VARGAS

16

17

18

19

20

21

22

23

24

25

26

27

28

- 4 -

# Exhibit 6

1 | GREGORY W. MORENO, ESQ., CA. SBN 57844
   | ARNOLDO CASILLAS, ESQ., CA. SBN 158519
2 | MORENO, BECERRA, GUERRERO & CASILLAS
   | 3500 West Beverly Boulevard
3 | Montebello, CA 90640
   | Tel:   (323) 725-0917
4 | Fax:   (323) 725-0350

5 | Attorneys for Plaintiffs
   | Estate of Jose Vargas, by and through Maria
6 | H. Covarrubias, Administrator and Successor in
   | Interest; Ricardo Vargas, a minor, by and through
7 | his guardian Maria H. Covarrubias; Maria H.
   | Covarrubias; Jose G. Vargas Mendoza; Angelina
8 | Valencia Morales;Estate of Guillermo Acosta Zamora,
   | by and through Maria Teresa Alvarado Mendez,
9 | Administrator and Successor In Interest; Maria
   | Teresa Alvarado Mendez; Victor H. Acosta
10 | Alvarado; Ronald Acosta Alvarado; and, Luis
   | Alberto Acosta Alvarado

11

12 | UNITED STATES DISTRICT COURT

13 | FOR THE SOUTHERN DISTRICT OF TEXAS

14 | BROWNSVILLE DIVISION

15

16 | Estate of Jose Vargas, by and through          )   CASE NO: B-02-132
   | Maria H. Covarrubias; Administrator and        )
17 | Successor in interest; Ricardo Vargas, a       )
   | minor, by and through his guardian Maria       )
   | H. Covarrubias; Maria H. Covarrubias;          )
18 | Jose G. Vargas Mendoza; Angelina               )   DECLARATION OF CARMELO
   | Valencia Morales; Estate of Guillermo          )   ABUNDIS
19 | Acosta Zamora, by and through Maria            )
   | Teresa Alvarado Mendez, Administrator          )
20 | and Successor in Interest; Maria Teresa        )
   | Alvarado Mendez; Victor H. Acosta              )
21 | Alvarado; Ronald Acosta Alvarado; and,         )
   | Luis Alberto Acosta Alvarado,                  )
22 |                                                )
   |                     Plaintiffs,                )
23 |                                                )
   |          v.                                    )
24 |                                                )
25 | Five Unknown INS/Border Patrol                 )
   | Agents; U.S. Department of Immigration         )
26 | and Naturalization; United States Border       )
   | Patrol; United States of America, and          )
27 | DOE defendants 1-10, inclusive,                )
   |                                                )
28 |                     Defendants.                )

## DECLARATION OF CARMELO ABUNDIS

I, CARMELO ABUNDIS, declare:

1.  The matters contained in this declaration are true of my own personal knowledge, and if called upon I could testify competently thereto;

2.  I am the brother-in-law of Fernando Del Rio Vargas whose cousin's, Decedent Jose Guadalupe Vargas, death is the subject of this litigation.

3.  On or about July 1, 2000, I was a member of a group of approximately thirty (30) undocumented immigrants who crossed the Rio Grande at Brownsville, Texas.

4.  I was accompanied by my brother-in-law Fernando Del Rio Vargas, his cousin, Roberto Vargas Vargas and Decedent, Jose Guadalupe Vargas.

5.  The instrumentality used to cross the River were large rubber inner tubes secured to a rope which spanned the entire width of the river, connecting the U.S. and Mexican river banks.

6.  In the late afternoon hours, all members of our group successfully crossed the river through the use of the referenced inner tubes. Upon crossing the river, said inner tubes were placed on the ground at our gathering site.

7.  Once all the group members were on U.S. territory, we quickly changed into dry clothes which were carried in plastic, water resistant bags.

8.  Almost immediately after the group had changed clothes, approximately 5 White Immigration and Naturalization Service (INS) Agents suddenly appeared, yelling at us in broken Spanish ordering that we freeze and put our hands up.

9.    As soon as the Agents approached, my brother-in-law Fernando Vargas and his cousin Roberto Vargas, ran and hid in the neighboring bushes.

10.   Upon being restrained by the Agents, I, along with many of the people in our group including Decedent Jose Vargas, jumped back into the river.

11.   I was able to successfully reach the Mexican bank. Once I reached the Mexican river bank, I turned back and observed Jose Vargas who was a poor swimmer begin to struggle in the water and call for help.

12.   I also observed two other men who had jumped in the river begin to struggle and yell for assistance.

13.   The INS Agents simply observed in amusement doing nothing as the men struggled, drowned and yelled for help in the river.

14.   Since I realized the Agents were not going to attempt a rescue of the drowning men, I immediately grabbed and began to pull at the rope we had used to cross the river so as to force the attached inner tubes on the U.S. river bank to fall back into the river and thus allow the drowning men to grab on.

15.   As soon as the Agents saw that an inner tube on the ground began to move from my pulling and tugging, the Agents immediately took out a knife and stabbed the tube numerous time so as to prevent me from rescuing the drowning men. The Agents also punctured the remaining tubes. One of the Agents then grabbed hold of the rope which was connected to the inner tubes and cut it as well.

16.   Had the Agents not popped the inner tubes or cut the rope, I know I would have been able to rescue the drowning men. However, since this mechanism of rescue was eliminated by the Agents, I tried throwing plastic garment bags at them which were left on the

Mexican bank in hopes that the drowning men could use them as a floatation devices, however, this attempt was unsuccessful and all three men drowned.

17. I never saw the Agents attempt to radio for assistance, nor did they ever attempt to personally assist the drowning men even after they had prevented rescue efforts.

18. Once the men had drowned, the Agents gathered the remaining immigrants and left the area.

19. I then proceeded down the river bank, combing the waters to see if Jose Vargas' body resurfaced, however, I was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 23rd day of February 2004 at Michoacan, Mexico.



CARMELO ABUNDIS

# Exhibit 7

1  GREGORY W. MORENO, ESQ., CA. SBN 57844
   ARNOLDO CASILLAS, ESQ., CA. SBN 158519
2  MORENO, BECERRA, GUERRERO & CASILLAS
   3500 West Beverly Boulevard
3  Montebello, CA 90640
   Tel:    (323) 725-0917
4  Fax:    (323) 725-0350

5  Attorneys for Plaintiffs
   Estate of Jose Vargas, by and through Maria
6  H. Covarrubias, Administrator and Successor in
   Interest; Ricardo Vargas, a minor, by and through
7  his guardian Maria H. Covarrubias; Maria H.
   Covarrubias; Jose G. Vargas Mendoza; Angelina
8  Valencia Morales; Estate of Guillermo Acosta Zamora,
   by and through Maria Teresa Alvarado Mendez,
9  Administrator and Successor In Interest; Maria
   Teresa Alvarado Mendez; Victor H. Acosta
10 Alvarado; Ronald Acosta Alvarado; and, Luis
   Alberto Acosta Alvarado

11

12               UNITED STATES DISTRICT COURT

13           FOR THE SOUTHERN DISTRICT OF TEXAS

14                   BROWNSVILLE DIVISION

15

16 | Estate of Jose Vargas, by and through      ) | CASE NO: B-02-132
   | Maria H. Covarrubias; Administrator and    )
17 | Successor in interest; Ricardo Vargas, a   )
   | minor, by and through his guardian Maria   )
   | H. Covarrubias; Maria H. Covarrubias;      )
18 | Jose G. Vargas Mendoza; Angelina           ) | DECLARATION OF ROBERTO
   | Valencia Morales; Estate of Guillermo      ) | VARGAS VARGAS
19 | Acosta Zamora, by and through Maria        )
   | Teresa Alvarado Mendez, Administrator      )
20 | and Successor in Interest; Maria Teresa    )
   | Alvarado Mendez; Victor H. Acosta          )
21 | Alvarado; Ronald Acosta Alvarado; and,     )
   | Luis Alberto Acosta Alvarado,              )

22                                              )
                    Plaintiffs,                 )
23                                              )
            v.                                  )
24                                              )
                                                )
25 Five Unknown INS/Border Patrol              )
   Agents; U.S. Department of Immigration       )
26 and Naturalization; United States Border     )
   Patrol; United States of America, and        )
27 DOE defendants 1-10, inclusive,              )
                                                )
28                  Defendants.                 )
                                                )

## DECLARATION OF ROBERTO VARGAS VARGAS

I, ROBERTO VARGAS VARGAS, declare:

1. The matters contained in this declaration are true of my own personal knowledge, and if called upon I could testify competently thereto;

2. I am the cousin of Decedent Jose Guadalupe Vargas, whose death is the subject of this litigation.

3. On or about July 1, 2000, I was a member of a group of approximately thirty (30) undocumented immigrants who crossed the Rio Grande at Brownsville, Texas.

4. I was accompanied by my cousin and decedent, Jose Guadalupe Vargas, my cousin Fernando Del Rio Vargas, and his brother-in-law, Carmelo Abundis.

5. The instrumentality used to cross the River were large rubber inner tubes secured to a rope which spanned the entire width of the river, connecting the U.S. and Mexican river banks.

6. In the late afternoon hours, all members of our group successfully crossed the river through the use of the referenced inner tubes. Upon crossing the river, said inner tubes were placed on the ground at our gathering site.

7. Once all the group members were on U.S. territory, we quickly changed into dry clothes which were carried in plastic, water resistant bags.

8. Almost immediately after the group had changed clothes, approximately 5 White Immigration and Naturalization Service (INS) Agents suddenly appeared, yelling at us in broken Spanish ordering that we freeze and put our hands up.

9.  As soon as I observed the Agents approaching, my cousin Fernando Vargas and I, ran and hid in the neighboring bushes.

10. We were positioned approximately 5 to 6 feet from where the agents were standing, and therefore could see and hear what was done and said.

11. My cousin Jose Guadalupe Vargas was among those restrained by the Agents.

12. I then observed many of the people, including my cousin, Decedent Jose Vargas, and Fernando's brother-in-law, Carmelo Abundis, jump back into the river when they saw the Agents approach.

13. Carmelo Abundis successfully reached the Mexican bank. However, my cousin Jose Guadalupe Vargas who was a poor swimmer began to struggle in the water and call for help.

14. I also observed two other men who had jumped in the river begin to struggle and yell for assistance.

15. The INS Agents simply observed in amusement doing nothing as the men struggled, drowned and yelled for help in the river. I observed one of the INS Agents laughing out loud at the drowning men's plight, then spit on the floor and yell "mother fuckers".

16. I then saw Carmelo Abundis who was on the Mexican bank, quickly grabb and begin to pull at the rope we had used to cross the river so as to force the attached inner tubes on the U.S. river bank to fall back into the river and thus allow the drowning men to grab on.

17. When one of the Agents saw that an inner tube on the ground began to move from Carmelo's tugging, the Agents immediately took out a knife and stabbed the tube numerous time so as to prevent the rescue and similarly punctured the remaining tubes. One of the Agents then grabbed hold of the rope which was connected to the inner tubes and

1    cut it as well.

2    18.    Carmelo and others on the Mexican river bank then tried throwing

3    plastic garment bags left there in hopes that the drowning men could

4    use them as floatation devices; however, this attempt was

5    unsuccessful and all three men drowned.

6    19.    The Agents never attempted to radio for assistance, nor did they ever

7    attempt to personally assist the drowning men even after they had

8    prevented rescue efforts.

9    20.    Once the men had drowned, the Agents gathered the remaining

10    immigrants and left the area.

11

12    I declare under penalty of perjury under the laws of the State of California

13    that the foregoing is true and correct.

14    Executed this 23rd day of February 2004 at Michoacan, Mexico.

15

16                    Roberto Vargas Vargas

17                    ROBERTO VARGAS VARGAS

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ESTATE OF JOSE VARGAS, by and &ast;
through MARIA H. COVARRUBIAS, *etc.* &ast;
Plaintiffs, &ast;
&ast;
v. &ast;  CIVIL ACTION No. B-02-132
&ast;
GEORGE F. FELTON, III., &ast;
DANIEL ZAEHRINGER, PATRICK B. &ast;
McDERMOTT, TWO UNKNOWN &ast;
INS/BORDER PATROL AGENTS; UNITED &ast;
SATES DEPT. OF IMMIGRATION and &ast;
NATURALIZATION; UNITED STATES &ast;
BORDER PATROL; UNITED STATES OF &ast;
AMERICA, and DOE &ast;
Defendants 1-10, inclusive, &ast;
Defendants. &ast;

## DECLARATION OF PATRICK B. McDERMOTT

I, PATRICK B. McDERMOTT, DO HEREBY VERIFY, SWEAR AND AFFIRM AS

FOLLOWS:

1.      I have served as a Border Patrol Agent with the United States since November 1998.
I have been named as a defendant in the lawsuit referenced above and submit the following, under
oath, in order to advise the Court of the factual circumstances regarding the incident at issue. I
have personal knowledge of the events described herein.

2.      On July 1, 2000, I was on duty in my official capacity as Border Patrol Agent with the
United States Border Patrol. In July 2000, the Border Patrol was an agency of the United States
Department of Justice. In March of 2003, the Border Patrol became an agency of the newly formed
Department of Homeland Security

3.      At paragraph 9, the Plaintiff's Amended Complaint states that the drownings of Jose
Guadalupe Vargas and Guillermo Acosta Zamora took place on June 30, 2000 at or near
Brownsville, Texas. While it is true that a drowning occurred at or near Brownsville, Texas, on June
30, 2000, the drownings of Mssrs. Vargas and Acosta-Zamora occurred on July 1, 2000, at the
Anacua Wildlife Refuge near Santa Maria, Texas—some 20 miles northwest of Brownsville.



4.    On July 1, 2000, Border Patrol Agent Dan Zaehringer and I were working line watch duties in the area of Santa Maria, Texas. "Line watch duties" requires that we patrol the area along the Rio Grande River and its levees for illegal immigrant/alien activities. At about 3:30 p.m., Agent Zaehringer and I were advised by dispatcher that there was seismic sensor activity at an area of the Rio Grande River located in the Anacua Wildlife Refuge. This particular area where the sensor was located was known to us to be a regularly used "landing" area for illegal aliens crossing the river as well as an area used by individuals crossing narcotics into the country. Since this location was within our assigned area for patrol, we responded to the sensor.

5.    We drove up Cobarubias Road (aka Anacua Road) to where the road met the river levee service road. When we arrived, Border Patrol Agent George "Trip" Felton was already there scanning the levee for alien traffic using a pair of binoculars. Agent Felton, who was working alone that day, also heard the dispatch on the sensor and came to assist.

6.    Between the levee service road and the river itself the terrain slopes in a downward projectory—pretty steep at some places.   The terrain is very rough and densely overgrown with all kinds of vegetation native to this area of South Texas. It was impossible to see the river, much less anyone that might be crossing it, from the levee service road. We waited a few minutes to see if any illegal aliens would try to sneak out of the vegetation to cross the levee service road.

7.    Seeing no activity, we decided to split up to determine what set off the sensor. It was decided that Agents Zaehringer and Felton would walk directly to the landing area known to us to be used by aliens that trip this particular sensor, and walk north up a trail from the landing area; at the same time, I would enter one of the trails leading southward to the landing from the levee road. It was our hope that this approach would allow us to better apprehend any individuals walking up any one of the trails leading from the landing area. Since this area was also well known for its illegal drug activity, I was carrying a government issued Remington 870 -12 Gauge shotgun, using a shoulder strap for added protection.

8.    The distance from the levee road to the landing area was about half a mile. When I was about half way to the landing, I heard Agent Felton on the radio saying that he saw suspected aliens moving down river.  I quickened my pace down the trail, however, as I got closer to their position, I heard Agents Felton and Zaehringer instructing the subjects to stop and sit down. I could not see anyone at this point; however, it sounded as if they had everything under control so I slowed my pace.

**Page 3**

9.    As I got closer, I heard frantic shouting from both sides of the river. When I reached the landing, I saw several water jugs floating in the river and a man climbing up the riverbank on the Mexican side of the river.    Agent Felton then advised me that two other men who were swimming in the river had gone under and not resurfaced. He advised that he tried to reach me on my radio to call for assistance, but I did not hear his call. This is not too surprising; radio communications in this area are tremendously hindered by the terrain and vegetation.

10.    I, along with Agents Zaehringer and Felton, scanned the river looking for the men. I took off my gun belt, bullet proof vest, and handed my shotgun to Agent Felton in preparation of jumping in to attempt a rescue, but neither one of them re-surfaced. I unsuccessfully tried to call the Harlingen Border Patrol Station for assistance using my cell phone. After several attempts on the hand held radio, I was able to get a message out for EMS. I requested a helicopter too but was advised that none were in the area.   There was a time or two when one of the detained alines that were sitting on the ground would get up in what appeared to be an attempt to search for the victims. When this happened, we instructed them to sit back down. We did this for their own safety and to hopefully prevent yet another drowning from occurring. After about an hour, we decided that there was nothing more that could be done.

11.    We transferred the aliens, some of whom I recognized as having been apprehended and voluntarily returned to Mexico–without incident– just the night before, back to the Harlingen Station for processing.

12.    At no time during the actions described herein did I ever draw, level, or aim my side arm or shotgun.   At no time did I observe Agent Felton or Agent Zaehringer draw or aim their firearms. If it were possible for me to save the lives of Mssrs. Vargas and Acosta-Zamora, I would have done so. In my opinion, these gentlemen drowned as a result of their own actions and their own decisions and not as the result of any actions taken-or not taken-on my part or the part of Agents Felton or Zaehringer.

Pursuant to 28 U.S.C. § 1746, I, Patrick B. McDermott, declare under penalty of perjury that the foregoing is true and correct.

_01/29/2004_
          DATE                                  PATRICK B. McDERMOTT

# Exhibit 9

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| ESTATE OF JOSE VARGAS, by and | * |
| through MARIA H. COVARRUBIAS, *etc.* | * |
| Plaintiffs, | * |
| | * |
| v. | * |
| | * |
| GEORGE F. FELTON, III., | * |
| DANIEL ZAEHRINGER, PATRICK B. | * |
| McDERMOTT, TWO UNKNOWN | * |
| INS/BORDER PATROL AGENTS; UNITED | * |
| SATES DEPT. OF IMMIGRATION and | * |
| NATURALIZATION; UNITED STATES | * |
| BORDER PATROL; UNITED STATES OF | * |
| AMERICA, and DOE | * |
| Defendants 1-10, inclusive, | * |
| Defendants. | * |

CIVIL ACTION No. B-02-132

## <u>DECLARATION OF DANIEL ZAEHRINGER</u>

I, DANIEL ZAEHRINGER, DO HEREBY VERIFY, SWEAR AND AFFIRM AS
FOLLOWS:

1.    I served as a Border Patrol Agent with the United States from July 1999 to July
2002.  Since August of 2002 I have been employed as an Immigration Inspector with the
Bureau of Customs and Border Protection.  I have been named as a defendant in the lawsuit
referenced above and submit the following, under oath, in order  to advise the Court of the
factual circumstances regarding the incident at issue.  I have personal knowledge of the events
described herein.

2.    On July 1, 2000, I was on duty in my official capacity as Border Patrol Agent with
the United States Border Patrol.  In July 2000, the Border Patrol was an agency of the United
States Department of Justice.  In March of 2003, the Border Patrol became an agency of the
newly formed Department of Homeland Security

3.    At paragraph 9, the Plaintiff's Amended Complaint states that the drownings of
Jose Guadalupe Vargas and Guillermo Acosta Zamora took place on June 30, 2000 at or near
Brownsville, Texas.  While it is true that a drowning occurred at or near Brownsville, Texas, on
June 30, 2000, the drownings of Mssrs. Vargas and Acosta-Zamora occurred on July 1, 2000,
at the Anacua Wildlife Refuge near Santa Maria, Texas—some 20 miles northwest of



2

Brownsville.  I did not learn the names of the two drowning victims until I was served with this lawsuit.

4.     On July 1, 2000, Border Patrol Agent Patrick McDermott and I were working line watch duties in the area of Santa Maria, Texas.  "Line watch duties" requires that we patrol the area along the Rio Grande River and its levees for illegal immigrant/alien activities.  At about 3:30 p.m., Agent McDermott  and I were advised by radio dispatch that there was seismic sensor activity at an area of the Rio Grande River located in the Anacua Wildlife Refuge.  This particular area where the sensor was located was known to us to be a regularly used "landing" area for illegal aliens crossing the river as well as an area used by individuals crossing narcotics into the country.  Since this location was within our assigned area for patrol, we responded to the sensor.

5.     We drove up Cobarubias Road (aka Anacua Road) to where the road met the river levee service road.  When we arrived, Border Patrol Agent George "Trip" Felton was already there scanning the levee for alien traffic using a pair of binoculars.  Agent Felton, who was working alone that day, also heard the dispatch on the sensor and came to assist.

6.     Between the levee service road and the river itself the terrain is very rough and densely overgrown with all kinds of vegetation native to this area of South Texas.  In fact, this area was often referred to as "the jungle" due to its abundant tropical vegetation.  It was impossible to see the river, much less anyone that might be crossing it, from the levee service road.  We waited a while to see if any illegal aliens would try to sneak out of the vegetation to cross the levee service road.

7.     After several minutes had passed, and seeing no activity, we decided to split up to determine what set off the sensor.  It was decided that Agent Felton  and I  would walk directly to the landing area known to us to be used by aliens that trip this particular sensor.  From there, we planned to walk north up a trail from the landing area; at the same time, Agent McDermott would enter one of the trails leading southward to the landing  from the levee road. It was our hope that this approach would put us in a better position to apprehend any individuals walking up any one of the trails leading from the landing area.

8.     When Agent Felton and I arrived at the trail that eventually leads to the landing area, we stopped to look and listen for activity.  We detected no activity so we continued on our route to the landing.  Several  yards from the landing, the trail splits into two separate trails leading to the landing area.  Agent Felton took the left path and I took the right path.

9.     After taking a few steps down the path, I heard running movements in the brush and splashes in the water.  As I made my way to the landing I came upon several dressed

individuals who were undocumented aliens. I am fluent in Spanish. I instructed the individuals to sit down on the ground while I continued to look for anyone else who may have entered the country illegally.

10.    At this point I saw several people in the water and I called to them to come back to shore. They ignored me and began to swim back to the Mexican side of the river.

11.    I continued my search for more aliens likely hiding in the heavy brush along a rather steep river bank. As I was searching, I saw that Agent Felton had apprehended two aliens. He sent them over to me so I could have them sit with the group of aliens I initially detained.

12.    Agent Felton met me at my position. At that point, I thought we had apprehended all the aliens that were on our side of the river. I looked around and I saw a piece of twine tied at one end to what looked like a large tree root near the water's edge; the rest of the twine was lying in a bundle in the mud at the base of the root. I borrowed a knife from Agent Felton and cut the twine from the tree root. It was not uncommon to see pieces of rope strung from one side of the river bank to the other. It was, and as far as I know it continues to be, a common practice of illegal aliens to string a rope across the river to assist them in crossing the river. It was always the Border Patrol's procedure and practice to cut these ropes when we came across them so they could not be used for future illegal entries.

13.    Then I saw two inner tubes stashed in an "up/down" position in the undergrowth on the riverbank. As was our practice, I cut the inner tubes to release the air so they could not be used for future illegal entries into the country. As the tubes were deflating, I spotted three or four men down river from my location trying to hide in the brush that came right up to the river's edge. They looked at me, and I told them to come back. They ignored me and jumped into the river. At the same time I heard splashes coming from individuals that must have been hiding upriver from my location. I again called out for them to come back; all but one heeded my call.

14.    As the people were swimming back to Mexico, I returned back to the group that we had detained. At about that time, I heard someone from the Mexico side of the river bank calling for help. I turned around and saw one man struggling in the water about fifteen feet from the Mexican riverbank. In less than thirty seconds, the man went under. I started to throw empty water jugs that were lying on the ground near me out toward the area where the man went under, but I was unable to get them any where close enough that they could do any good.

15.    Then, just a few seconds later, a second man swam in the same area as the

4

first; and, like the first man, he began to struggle.  Agent Felton and I continued to throw out water jugs to no avail.  I saw two or three men from the Mexican side of the riverbank jump in the river in an attempt to rescue the man, but they suddenly retreated back to the riverbank.  I never talked to these men, but I suspect–based upon my experience with working along the Rio Grande River-- that there was a whirlpool or strong river current that scared them enough to cause them to end their rescue attempt.    The second man then went under and never re-surfaced.

16.    Both drownings occurred very quickly and without warning.  I really do not know what I or anyone else could have done to prevent these drownings.  The individuals we had detained on the riverbank were obviously distressed at what they witnessed, however, I do not recall any of the persons in the group we detained attempting to make any effort to try to rescue the men. If they had, I probably would not have allowed them to re-enter the river for their own safety.

17.    In their Amended Complaint, the Plaintiffs allege that I detained persons at gunpoint. This is not true.  At no time during the actions described herein did I ever draw, level, or aim my side arm.   At no time did I observe Agent Felton or Agent McDermott draw or aim their firearms.  Agent McDermott was also carrying a shotgun, but at no time did I observe him level or aim it at anyone during the course of events at issue in this case.

18.    Plaintiffs' Amended Complaint also states that Mssrs. Vargas and Acosta-Zamora were in our custody when the incident occurred.  This is not true.  At no time did I or Agent Felton have these individuals within our control.   Agent McDermott did not arrive on the scene until after the men had drowned. Mssrs. Vargas and Acosta-Zamora were never a part of the group of individuals that Agent Felton and I detained.

19.    If it were possible for me to save the lives of Mssrs. Vargas and Acosta-Zamora, I would have done so.  In my opinion,  these gentlemen drowned as a result of their own actions and their own decisions and not as the result of any actions taken-or not taken-on my part or the part of Agents Felton or McDermott.

Pursuant to 28 U.S.C. § 1746, I, Daniel E. Zaehringer, declare under penalty of perjury that the foregoing is true and correct.

DEC 10 2003
_____
DATE

_____
DANIEL E. ZAEHRINGER

# Exhibit 10

1

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

ESTATE OF JOSE VARGAS, by and     *
through MARIA H. COVARRUBIAS, *etc.*   *
Plaintiffs,     *
    *
v.     *     CIVIL ACTION No. B-02-132
    *
GEORGE F. FELTON, III.,     *
DANIEL ZAEHRINGER, PATRICK B.  *
McDERMOTT, TWO UNKNOWN   *
INS/BORDER PATROL AGENTS; UNITED *
STATES DEPT. OF IMMIGRATION and  *
NATURALIZATION; UNITED STATES  *
BORDER PATROL; UNITED STATES OF  *
AMERICA, and DOE     *
Defendants 1-10, inclusive,   *
Defendants.     *

## DECLARATION OF GEORGE "TRIP" FELTON, III.

I, GEORGE "TRIP" FELTON, III., DO HEREBY VERIFY, SWEAR AND AFFIRM AS FOLLOWS:

1.     I served as a Border Patrol Agent with the United States from April 1999 to February 2001. Since February of 2001, I have been employed as Criminal Investigator, Special Agent with the United States Department of Treasury, Internal Revenue Service. I have been named as a defendant in the lawsuit referenced above and submit the following, under oath, in order to advise the Court of the factual circumstances regarding the incident at issue. I have personal knowledge of the events described herein.

2.     On July 1, 2000, I was on duty in my official capacity as Border Patrol Agent with the United States Border Patrol. In July 2000, the Border Patrol was an agency of the United States Department of Justice. In March of 2003, the Border Patrol became an agency of the newly formed Department of Homeland Security.

3.     At paragraph 9, the Plaintiffs' Amended Complaint states that the drownings of Jose Guadalupe Vargas and Guillermo Acosta Zamora took place on June 30, 2000 at or near Brownsville, Texas. This is not correct; the drownings of Mssrs. Vargas and Acosta-Zamora occurred on July 1, 2000, at the Anacua Wildlife Refuge near Santa Maria, Texas—some 20



miles northwest of Brownsville.

4.    On July 1, 2000, I was assigned to work line watch duties in the area of Santa Maria, Texas. "Line watch duties" requires that we patrol the area along the Rio Grande River and its levees for illegal immigrant/alien activities. At about 3:45 p.m., I responded to a radio dispatch that indicated that there was seismic sensor activity at an area of the Rio Grande River located in the Anacua Wildlife Refuge. This particular area where the sensor was located is known to be a regularly used "landing" area for illegal aliens crossing the river as well as an area used by individuals crossing narcotics into the country. Since this location was within my assigned area for patrol, I responded to the sensor. I did not have a partner assigned to work with me that day, so I went alone.

5.    I drove up the levee. When I arrived at intersection with River Drive (a.k.a. Anacua Road), I got out and, using my binoculars, began to scan the area for illegal aliens. Soon thereafter, Border Patrol Agents, Pat McDermott and Daniel Zaehringer arrived.

6.    We waited and observed the area for several minutes. Usually, at this particular "landing" area, persons coming into the country illegally would eventually come up out of the brush and cross over the levee road. The terrain is extremely rough and hazardous in the Anacua Wildlife Refuge. Between the levee road and the landing area by the river it is overgrown with tropical foliage--much like a jungle. There was no way any of us could see the river--much less, people in the river from this vantage point. All we knew was that the sensor had recorded several "hits" at this location. When no one appeared, we decided to split up and take two different trails leading to the landing area to determine what or who set off the sensor.

7.    Agent Zaehringer and I started walking south down the road. Just south of the levee the road begins to curve upriver (west) forming something like a semi-circle where the other end comes out on the levee about a quarter of a mile west from where we entered. This particular part of the River Road is referred to as "The Horseshoe". It curves down toward the landing area. Once we got about half way through "The Horseshoe" we came to one of at least three trails that had been created by illegal aliens over the past several months. We started making our way down to the landing area using one of these trails. The trail sloped very steeply at some places in a downward angle toward the river. Although there are a number of landing areas along the river bank, we decided to investigate this particular one because it was known to us to be used by aliens that trip this particular sensor. From there, we planned to walk north up a trail from the landing area. At the same time, Agent McDermott would enter one of the trails leading southward to the landing from the levee road. It was our hope that this approach would put us in a better position to apprehend any individuals walking up any one of the trails

leading from the landing area.

8.     When Agent Zaehringer and I arrived at the trail that leads southward toward the landing area, we stopped to look and listen for activity.  We detected no activity so we continued down this trail to the landing.  Several yards from the landing the trail split into two. Agent Zaehringer took the right path and I took the left path.

9.     Soon after we split up, I heard Agent Zaehringer shouting out commands in Spanish. I quickly went to his location and when I got there, I saw that he had detained around six individuals.  Looking upriver, we saw  more people attempting to hide in the foliage along the river as well as about four individuals in the water.  We both called out to them to come back and they just laughed.  None of these people were in distress and none of these people indicated to me that they could not swim.  However, I was able to detain two people.  When I initially detained these two individuals,  one of them abruptly reached toward his waist area.  I reacted to this by unsnapping my holster and lifting my sidearm partially out of the holster.  The man stopped and I did a quick pat down search on him.  He did not have any weapons on him. This was the only time I used my sidearm that day.    As we continued back to Agent Zaehringer's location,  I came across one more person hiding in the bushes along the river's edge.  Once I reached Agent Zaehringer's location, I had the three individuals I detained sit on the ground with the persons that Agent Zaehringer detained.

10.     Around this time, I recall seeing a couple of inner tubes sticking out from under some kind of plant or tree root near the river's edge.  I did not take custody of the inner tubes.

11.     I took a position behind the group we had detained, and Agent Zaehringer took a position at the front of the group.    Agent Zaehringer asked to borrow my knife.  I took it down to him and as I was headed back to my position behind the group of detained aliens, I heard air escaping from what I assume were the inner tubes I saw earlier near the river's edge.  This did not surprise me.  It was a common practice and procedure for  Border Patrol Agents to destroy the inner tubes we found so they could not be used again for future illegal crossings.  Often times these inner-tubes were in such poor condition that they-in all likelihood-would not be safe to use anyway.

12.     The Plaintiffs' Amended Complaint states that there was a rope strung up that spanned the river from the United States side to the Mexican side of the river.  The Plaintiffs' complaint stated that this rope was being used by the illegal aliens and Mssrs. Vargas and Acosta-Zamora to aid in crossing the river.  While it was a common practice for aliens to use a rope in this manner to aid in crossing the river, I did not see a rope being used by any individuals at this location on July 1, 2000.  I do recall seeing  what appeared to be old and

4

frayed baling twine lying in the mud in a tangled ball. It was not tied to anything when I saw it and it certainly wasn't being used by anyone at the time I saw it. However, I don't recall whether I first observed this before or after Agent Zaehringer borrowed my knife. It was always our practice to cut any ropes strung across the river so they could not be used again for future illegal crossings.

13.    Not too long after I loaned Agent Zaehringer my knife, I heard some splashes in the water. Agent Zaehringer went over to check out the location of the splashes. I looked over and saw two people swimming in the river. They did not appear to be in distress. There were no ropes spanning the river that I could see and none of these people were using a rope to help them cross the river. We shouted to these two men as well as some others we saw upriver from that location to come back; however, they ignored us and continued on their way back to Mexico.

14.    Agent Zaehringer returned back to the group that we had detained. Shortly thereafter I heard shouting from the Mexican side of the riverbank. About half way across the river, I saw two men struggling in the water. Agent Zaehringer and I started throwing empty and partially empty water jugs out to the men but they didn't get out far enough. I thought of possibly grabbing the twine I had seen lying in the mud to tie to the jugs together in an effort to help pull the men out of the water. However, I concluded that this would not work. Even if we had enough time to untangle the twine, I doubted that the twine would be long enough—or strong enough—to be of any use. I saw one man go under and not re-surface. Then, a short time later, the second man drifted into the same location as the first man; and, like the first man, he went under. This man did not re-surface.

15.    I do not know if these two men were the two men I saw a few seconds before or members of the other group I saw swimming up-river. However, I can state with absolute certainty that Mssrs. Vargas and Acosta-Zamora were never in my custody and were never a part of the group of individuals that Agent Zaehringer and I detained and had sitting on the ground.

16.    I also recall seeing a man who was on the Mexican side of the river, jump into the river in an attempt to rescue the first man that drowned. However, just as he got close to the location where the men disappeared, something seemed to scare him and he quickly returned back to the Mexican river bank. At no time did I ever instruct anyone to not attempt a rescue or to stop any possible rescue attempt. I did not observe or hear Agent Zaehringer threaten or otherwise instruct anyone not to attempt a rescue or to stop any rescue attempt. I did try to call Agent McDermott on our hand held radio--who had not yet reached our location.

Unfortunately, due to the terrain and dense vegetation, I was unsuccessful in reaching Agent McDermott.  When Agent McDermott reached the scene, he made several failed attempts at contacting our Sector Station.  Once he contacted Sector, he asked for emergency personnel to be sent to our location.

17.     Both drownings occurred very quickly and without warning.  I really do not know what I or anyone else could have done to prevent these drownings.  The individuals we had detained on the riverbank were obviously distressed at what they witnessed.  At one point some of the people we detained stood up to see what was happening, and I instructed them to sit down.  It did not appear as though any of the persons in the group we detained wanted to attempt a rescue.  If they had, I would not have allowed them to re-enter the river for their own safety.   Other than the one time I unsnapped my holster earlier in the day (described at paragraph 9 herein), I never drew my gun from its holster.  I never saw Agent Zaehringer or Agent McDermott draw their guns from their holsters.  Agent McDermott, who was carrying a shotgun, never leveled the shotgun in any manner toward any individual before, during, or after the course of the events described herein.

18.     Plaintiffs' Amended Complaint also states that Mssrs. Vargas and Acosta-Zamora were in our custody when the incident occurred.  This is not true.  At no time, did Agent Zaehringer or I have these individuals within our custody and control.

19.     If it were possible for me to save the lives of Mssrs. Vargas and Acosta-Zamora, I would have done so.  In my opinion,  these gentlemen drowned as a result of their own actions and their own decisions and not as the result of any actions taken-or not taken-on my part or the part of Agents Zaehringer or McDermott.

**Pursuant to 28 U.S.C. § 1746, I, GEORGE FELTON, III, declare under penalty of perjury that the foregoing is true and correct.**

01/29/04
_____
DATE

CF _____
_____
GEORGE FELTON, III