# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

AUG 3 0 2004

Michael N. Milby
Clerk of Court

ESTATE OF JOSE VARGAS, by and   *
through MARIA H. COVARRUBIAS, *etc.*   *
Plaintiffs,   *
  *
v.   *   CIVIL ACTION No. B-02-132
  *
GEORGE F. FELTON, III.,   *
DANIEL ZAEHRINGER, PATRICK B.   *
McDERMOTT, ETC.   *
  *
Defendants.   *

## *DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO WITHDRAW OR AMEND ADMISSIONS*

*TO THE HONORABLE JUDGE OF SAID COURT:*

  Defendants, George F. Felton, III., Daniel Zaehringer, Patrick B. McDermott, and the United States of America oppose the Plaintiffs' Motion to Withdraw or Amend Admissions ("Plaintiffs' Motion"). Plaintiffs' Motion, filed more than four months after the expiration of the "non-dispositive motions" deadline set in this Court's February 28, 2003 Scheduling Order, should be denied. In support of this position, the Defendants submit the following for this Court's consideration.

## 1.   Procedural History of the Case

  On June 27, 2002, Plaintiffs filed this lawsuit alleging various constitutional violations and tort allegations against the defendants as the result of the drowning deaths of two men–Jose Vargas and Guillermo Acosta Zamora. (Docket No. 1) Originally, the lawsuit named the United States of America, the United States Department of Immigration and Naturalization, the United States Border Patrol and ten unnamed "John Doe" defendants. *Id.* For reasons unknown, Plaintiffs did not perfect service upon the United States, the INS and the Border Patrol until October 2002–some four months after filing their Original Complaint[1].

---

[1]When this case was filed, this Court issued an Order setting the case for an Initial Pre Trial Conference before the Magistrate Judge on September 19, 2002. (Docket No. 7). On September 19, 2002, when the case was called, no one appeared. (Docket No. 8) The Defendants did not know about the lawsuit because they had not yet been served. The Magistrate Judge issued an "Order to Show

On December 24, 2002, the United States filed its Answer wherein, at Paragraph No. 9, it notified the Plaintiffs that the incident at issue did not happen on June 30, 2000. (Docket No. 26) Rather, the United States advised that INS records reflected that the drowning deaths actually occurred on July 1, 2000, in the Harlingen/Santa Maria, Texas area–some twenty miles away from Brownsville. *Id.*

On January 6, 2003, the parties filed their Case Management Plan with the Court. (Docket No. 27) On or about January 7, 2003, the United States provided its initial disclosures to Plaintiffs pursuant to its obligations under Rule 26 of the Federal Rules of Civil Procedure. (See also, Declaration of Arnoldo Casillas at ¶ 4).

On January 21, 2003, an Initial Pre-Trial Conference was held before the Magistrate Judge. Plaintiffs' counsel advised the Court that they planned to add individually named Border Patrol Agents as Defendants in the case based upon information the United States provided to the Plaintiffs in its Rule 26 disclosures. Government's counsel indicated to the Court that it was anticipated that these Defendants may: (1) seek representation from the United States Department of Justice; and, (2) seek a motion for dismissal or summary judgement based on a qualified immunity defense.

Therefore, in an effort to get the case moving along, the Magistrate Judge ordered the Plaintiffs to amend their complaint no later than February 14, 2003 to name any additional parties. The Court also indicated that it wanted to resolve any potential qualified immunity issues as soon as practicable and suggested that such motions be filed by September 2003. (See Docket No. 28) In addition, the parties were instructed to prepare a proposed agreed scheduling order for the case. *Id.*

On February 13, 2003, Plaintiffs filed their Amended Complaint naming Border Patrol Agents George Felton, Patrick McDermott, and Daniel Zaehringer as Defendants in their individual capacities. (Docket No. 29) A month later, summons' were issued and eventually served upon Defendants Felton, McDermott and Zaehringer. (Docket Nos. 31, 32, and 33). Each of the Defendants filed an Answer to the Amended Complaint denying the allegations alleged against them - and specifically denying that Messrs. Vargas and Zamora drowned on June 30, 2000. (Docket Nos. 35, 36, and 37

---

Cause" to the Plaintiffs' attorneys. (Docket No. 9).    This hearing apparently never took place.

at ¶ 9).

On June 23, 2003, the INS and Border Patrol moved for a dismissal because they were not proper parties under the Federal Tort Claims Act. (Docket No. 38). The Plaintiffs agreed and the Court dismissed the INS and Border Patrol from the suit–leaving the United States, Felton, McDermott and Zaehringer as Defendants. (Docket Nos. 38, 41 and 42).

During this time, from March 2003 through June 2003, the United States received and responded to two sets of written discovery from the Plaintiffs. On July 15, 2003, the United States sent to Plaintiffs counsel its written discovery in the form of interrogatories, production requests, and requests for admissions. (See Defendants' Exhibit 1 attached hereto). Plaintiffs' counsel received this discovery on July 21, 2003. *Id.* Plaintiffs response was due on August 20, 2003.[2] Defendants did not receive any response to the requests for admissions[3]. (See Defendants' Exhibit 2). As such, in accordance with Rule 36(a) of the FRCP the admissions are deemed admitted. No additional discovery was conducted by any of the parties in the case.

On February 5, 2004, Defendants Felton, McDermott, and Zaehringer filed their motions to dismiss and alternative motions for summary judgement. (Docket Nos. 44-50). In their supporting briefs and exhibits, the Defendants argued, among other things, that- due to the admissions made in the case-Plaintiffs failed to state a claim upon which relief could be granted. On February 25, 2003, Plaintiffs' filed their responses to the summary judgement motions along with a copy of "Plaintiffs' Response to Defendant United States of America's Requests for Admissions" dated August 26, 2003. (Docket Nos. 52, 53, and 54). Plaintiffs asserted that they did submit a response

---

[2]Defendants' respective briefs filed in support of their summary judgement motions incorrectly state that the due date for the admissions and other discovery was July 1, 2003. This inadvertent typographical error, however, does nothing to alter or change the Defendants' position herein. Defendants assert that they did not see Plaintiffs' admission responses until they received the Plaintiffs' response opposing their summary judgement motions. However, even if the Plaintiffs did send out the responses on the date they contend–to wit, August 26, 2003–the responses are late and the Plaintiffs sole recourse for setting them aside would be to file a motion for relief under Rule 36(b), FRCP.

[3]The first time the Defendants saw Plaintiffs' belated responses to admissions was when the Plaintiffs submitted their opposition to the Defendants' summary judgement motions. In fact, Defendants did not receive an answer to their interrogatories and production requests until after they filed their summary judgement motions earlier this year.

to the Defendants' requests for admissions; however, Plaintiffs also conceded that this purported response was late.

On July 20, 2004, the Magistrate Judge herein issued a Report and Recommendation recommending that the defendants' motions to dismiss be granted. This recommendation was based, in part, on the Magistrate Judge's correct conclusion that the admissions in this case should be deemed admitted. (Docket No. 61).

Plaintiffs' filed a timely objection to the Magistrate Judge's Report and Recommendation. (Docket No. 63). At the same time, however, nearly twelve months after the admissions were due *and* over four months after this Court's "non-dispositive motion" deadline had lapsed, Plaintiffs filed their motion for relief under Rule 36(b) of the Federal Rules of Civil Procedure. (Docket No. 64; see also, Docket No. 30).

In their motion, Plaintiffs allege that the presentation of the case on the merits will be subserved if the admissions are not withdrawn. Plaintiffs further allege that the Defendants will not be prejudiced should the Court allow for the withdrawal or amendment of the admissions.

Defendants disagree and urge this Court to deny the Plaintiffs' Motion to Withdraw or Amend Admissions.

## 2.    **The Admissions At Issue**

1.    The incident at issue in this lawsuit occurred on July 1, 2000.

2.    The incident at issue in this lawsuit occurred at the Anacua Wildlife Refuge located near the town of Santa Maria, Texas.

3.    Jose Vargas died on July 1, 2000.

4.    Guillermo Acosta Zamora died on July 1, 2000.

5.    Jose Vargas had not been detained by United States Border Patrol agents at any time on July 1, 2000.

6.    Guillermo Acosta Zamora had not been detained by United States Border Patrol Agents at any time on July 1, 2000.

7.    None of the Border Patrol Agents present immediately before, during, or after the incident involving Jose Vargas drew their weapons on Jose Vargas.

8.    None of the Border Patrol Agents present immediately before, during, or

after the incident involving Jose Vargas drew their weapons on Guillermo Acosta Zamora.

9. None of the Border Patrol Agents present immediately before, during, or after the incident involving Jose Vargas drew their weapons on any of the persons detained at the scene of the drownings of Jose Vargas and Guillermo Acosta Zamora.

10. The United States, nor any of its employees or agents, did anything to prevent the possible rescue of Jose Vargas.

11. The United States, nor any of its employees or agents, did anything to prevent the possible rescue of Guillermo Acosta Zamora.

### 3. Counsel Communications

Plaintiffs' Motion begins with a section titled "Statement of Relevant Facts." Here, Plaintiffs suggest that Defendants failed to put Plaintiffs on notice that they had the incorrect date of the drowning deaths at issue. They support this contention by stating that on January 31, 2003:

> [c]ounsel's letter requested that Ms. Masso review each of the documents he had forwarded to her, including the amended complaint, for any changes to be made. In the alternative if no changes were necessary, and the documents met with her approval, counsel's letter requested that Ms. Masso file the originals upon receiving them from Plaintiffs' counsel via overnight delivery.

> *See page 4 of Plaintiffs' Motion to Withdraw Admissions.*

Plaintiffs then state that the undersigned "never communicated any problems with the mentioned documents or that any changes were necessary". *Id.* As a consequence, Plaintiffs suggest that "the pertinent facts, parties involved and allegations of this case became clearly established and known to all parties involved." *Id.*

This recitation of facts, however, is not accurate.

First, the United States of America filed an answer to the Original Complaint in this case on December 24, 2002–two months before the Amended Complaint was filed. (Docket No. 26) This Answer clearly states and puts the Plaintiffs on notice that the

-5-

United States believed that the incident occurred on July 1, 2000 and not on June 30, 2000.

This information was again communicated by the undersigned to Plaintiffs' counsel on January 7, 2003, *vis a vis*, the Defendants Initial Pre-Trial Disclosures. (See Defendants' Exhibit 2)   In fact, it was from these disclosures that Plaintiffs learned the names of Defendants Felton, McDermott and Zaehringer.

Next, the January 31, 2003, letter Plaintiffs' counsel refers to (located at Plaintiff's Exhibit 3 to their Motion) states "[m]y lack of familiarity with the preferred format in the Southern District for orders and stipulations may be apparent in the documents.  Please let me know if they should be changed in any way..." This request asks that the undersigned review the pleadings for form only—surely, Plaintiffs' counsel doesn't mean to suggest that the undersigned change the content of his clients' amended complaint or otherwise prepare the case for him.

In addition, Plaintiffs' counsel attaches to and references in his January 31, 2003, letter an *unsigned* stipulation.  Plaintiff asserts that the undersigned never communicated any problems with the documents, including the proposed stipulation. Again, Plaintiffs' counsel is incorrect.  The undersigned telephoned Plaintiffs' counsel's office on February 12, 2003.   Mr. Casillas was not available and the undersigned was referred to Mr. Casillas's assistant, Leah Moreno.  The undersigned advised Leah Moreno that the United States[4] would not agree to the stipulation forwarded by Mr. Casillas; hence, Mr. Casillas forwarded Plaintiffs' First Amended Complaint for filing with the Court without the attached "stipulation." (See Defendants' Ex. 3).

Finally, on more than one occasion, Plaintiffs' counsel was asked by the undersigned to correct the date and the location of the incident in his pleadings.  The reason for this was —that while the government was fairly confident that the incident occurred on July 1, 2000 at the Anacua Wildlife Refuge (some twenty or more miles away from Brownsville)-there was another drowning that occurred on or about June 30,

---

[4]The undersigned was not yet authorized to represent the individually named defendants in the case; as such, the undersigned was not empowered to speak on behalf of the other Defendants in the case at that time.

2000 in Brownsville.  (See the Declarations of Felton, McDermott, and Zaehringer attached as Plaintiffs' Exhibits 8 - 10 to their Motion).  As such, there remained the possibility that the government's information was incorrect or lacking.

Moreover, if the drowning deaths occurred in the Brownsville area, as alleged by the Plaintiffs in their Complaint and First Amended Complaint, Defendants Felton, McDermott, and Zaehringer would not have been on the scene since it is well outside the area of their patrol.  (See Defendants' Exhibit 4 attached hereto).

When Plaintiffs failed to correct this error in their amended complaint, the undersigned issued requests for admissions to the Plaintiffs in an effort to clarify these issues as well as other allegations made in their Amended Complaint.  It was hoped that these admissions would put to rest any concerns that the parties may not be talking about the same incident[5].  Likewise, the remaining admissions sought to clarify and identify which of the Plaintiffs' rambling (and sometimes confusing) allegations pertained to which decedent and/or Plaintiff.  The obvious goal for this was to help the Defendants determine what would be their best approach for the preparation of a strong, yet cost effective defense.

4.    **Legal Argument**

### *Two Part Test*

Defendants first raised this issue in their respective motions to dismiss filed in February of this year.  In the supporting briefs filed with Defendants' respective dismissal motions, Defendants asserted that the unanswered requests for admissions served on the Plaintiffs July 21, 2003, were deemed admitted under Rule 36(a) of the FRCP.

Defendants noted in their briefs that Fifth Circuit case law held that the only way a party could withdraw or amend deemed admissions was to file a motion for relief under Rule 36(b) of the FRCP.  Rule 36(b) requires that a trial court determine whether a withdrawal of a deemed admission *"would serve the presentation of the case on its*

---

[5]In fact, the admissions were framed in such a manner as to have an admission by default be that the incident at issue occurred on July 1, 2000, and that the incident occurred at the Anacua Wildlife Refuge. (See Plaintiffs' Exhibit 1 to Plaintiffs' Motion, Admissions 1 - 6).

*merits, but [ ] would not prejudice the party that obtained the admissions in its presentation of the case." In Re Carney, 258 F.3d 415, 419 (5th Cir. 2001), citing to American Auto Ass'n v. AAA Legal Clinic, 930 F.2d 1117, 1119 (5th Cir. 1991).*

I.

### Plaintiffs' Failure to Answer Any of the Admissions Posed Prevents Plaintiffs from Contesting the Case Against the Defendants.

Plaintiffs now argue--twelve months after the admissions were due, five months after the discovery deadline lapsed, five months after the Defendants filed their dismissal and summary judgement motions, and four months after the non-dispositive motion deadline lapsed--that the admissions should be withdrawn.

Plaintiffs allege that the Defendants have not suffered any prejudice from the Plaintiffs complete lack of interest in their case and that they would be unfairly deprived of the presentation of the merits of their case if the admissions are not withdrawn. Plaintiffs suggest that the admissions at issue were "meant to harass Plaintiffs, with the wild-eyed hope that they would fail to answer and therefore admit essential elements of their case." (Plaintiffs' Motion at pages 10 -11).

In making this allegation, Plaintiffs rely upon an Eleventh Circuit case, *Perez v. Miami-Dade County*, 297 F.3d 1255 (11th Cir. 2002). *Perez* was a civil rights case that involved a complicated procedural history wherein the Defendant, who was represented by an attorney that was apparently dealing with psychiatric problems at the time of the case's inception, failed to respond to Plaintiffs' requests for admissions. *Id.*, 297 F.3d at 1261.

In *Perez*, the Plaintiff served the Defendant with requests for admissions at the same time as he served the Defendant with his Complaint. This discovery tactic, as noted by the Court in *Perez*, runs contrary to Rule 26(d) of the FRCP which states that "unless the parties agree,'a party may not seek discovery from any source before the parties have conferred as required by Rule 26(f).'"*Id.*, 297 F.3d 1258 at fn.6. The requests for admissions in *Perez* mirrored the complaint and was "for the most part a verbatim copy of the complaint..." *Id.*, 297 F.3d at 1258. The Defendant in *Perez* filed

a timely, responsive answer to the complaint alleging a number of affirmative defenses clearly putting the Plaintiff on notice as to which specific facts were at issue. *Id.,* 297 F.3d at 1258 -1259. The Eleventh Circuit applied the test enunciated in *In Re Carney,* 258 F.3d 415, 419 (5th Cir. 2001), and in so doing, the Eleventh Circuit found that the admissions should have been withdrawn.

In the instant case, however, the Defendants did not prematurely serve the Plaintiffs with their requests for admissions. The admissions did not "mirror" the complaint or the Defendants' Answers herein. There is no confusing procedural history in the case at bar. The history of this case clearly shows the Plaintiffs complete failure to prosecute their case.   Plaintiffs admit that they were late with their admission responses in August of 2003[6], yet they never sought relief under Rule 36(b) of the FRCP until now.

In their Motion, Plaintiffs also rely, in part, on a 1969 case out of the Fifth Circuit, *Pickens v. Equitable Life Assurance Society of the United States,* 413 F.2d 1390 (5th Cir. 1969).

In *Pickens,* the Court was dealing with a very "bizarre" set of facts surrounding the death of a man for which there were no witnesses. *Pickens,* 413 F.2d at 1392. The man's widow filed a claim for his life insurance and the life insurance company resisted asserting *inter alia* that the widow's husband could have died from a suicide. The insurance company served the man's widow with requests for admissions prior to trial. She responded to all of the admissions (including four admissions that directly related to the suicide issue) except for the one asking her to admit that her husband committed suicide. *Pickens,* 413 F.2d at 1394. The insurance company argued that the widow's failure to respond to this one admission constituted a deemed admission. The district court, and subsequently the Fifth Circuit, disagreed with the insurance company and accepted the Plaintiff's explanation that her failure to respond to that particular admission was "inadvertent".

---

[6]Defendants allege and continue to allege that they never received responses to their requests for admissions.

In the instant case, however, Plaintiffs failed to answer *any* of the admissions posed to them. Unlike *Pickens*, there are witnesses to the drowning deaths at issue. Some of these witnesses were identified by Plaintiffs at the outset of their case through their initial disclosures. Plaintiffs had access to these witnesses[7] and were therefore in a position to provide prompt and accurate responses. Plaintiffs' counsel however, never contacted the undersigned to secure an extension or written agreement extending the time period for him to answer. Consequently, Plaintiffs should not now be allowed to withdraw their admissions twelve months after they were due.

As noted by the Magistrate Judge in this case:

> Although plaintiffs argue that the admissions are central facts which are beyond the scope of the rule, 'Rule 36 allows litigants to request admissions as to a broad range of matter, including ultimate facts, as well as applications of law to fact.' 'Such breadth allows litigants to winnow down issues prior to trial and thus focus their energy and resources on disputed matters.' 'For Rule 36 to be effective in this regard, litigants must be able to rely on the fact that matters admitted will not later be subject to challenge.'

Docket No. 61 at p. 5, quoting and citing to *In Re Carney*, 258 F.3d 415, 419 (5th Cir. 2001). Unlike *Pickens,* the admission of any one requested admission–standing alone-would not have deprived the Plaintiffs' in this case of their day in Court. Rather, it is the culmination of admissions resulting from the Plaintiffs complete failure to answer any of the admissions that act to prevent the presentation of their case. This possibility was anticipated by the Fifth Circuit:

> We recognize the potential harshness of this result. The failure to respond to admissions can effectively deprive a party of the opportunity to contest the merits of a case. This result, however, is necessary to insure the orderly disposition of cases....

*In Re Carney*, 258 F. 3d 415, 422, (5th Cir. 2001), citing to *Kasuboski*, 834 F.2d

---

[7]This assumption is based on the fact that all three witness declarations filed with the Plaintiffs' Opposition were related to the decedent, Jose Vargas.

-10-

1345 (7th Cir. 1987).

Although the situation in *Carney* was that the respondent never filed a motion for relief under Rule 36(b) of the FRCP, it is worthy to note that the Fifth Circuit indicated that "[e]ven when these two factors are established, a district court still has discretion to deny a request for leave to withdraw or amend and admission." *Id.* citing to *United States v. Kasuboski,* 834 F.2d 1345, 1350 n. 7 (7th Cir. 1987). Moreover the Court in *Carney* indicated that evidence of a party's dilatory conduct may provide some basis for denying a request to withdraw deemed admissions. *In Re Carney,* 258 F.3d 415, 420 n.5 (5th Cir. 2001).

In the case at bar, Plaintiffs have: failed to appear at the Initial Pre-Trial Conference scheduled on September 19, 2002; failed to answer requests for admissions; failed to timely answer and respond to interrogatories and requests for production; failed to timely file their motion for relief under Rule 36(b) of the FRCP; and they have failed to seek formal leave of Court to file the motion at bar out of time.

Plaintiffs have done nothing to prosecute their case and they should not be allowed to withdraw admissions at this point in time.

## II.

### *Defendants Will Be Irreparably Prejudiced if the Admissions are Withdrawn*

Defendants issued the admissions in this case in an effort to determine and clarify--early on in the litigation--what issues needed to be addressed. Defendants anticipated that it would not only be expensive, but also difficult to locate witnesses in this case. Other than the Defendants, the only fact witnesses in this case reside in Mexico. Given that these witnesses are located well beyond the jurisdictional limits of the Court, it was anticipated that a considerable amount of time, resources and financial expense would need to be incurred in order to locate and convince witnesses to make themselves available (voluntarily) for deposition and, if necessary, trial.

Since the outset of this case, the Defendants admitted that they witnessed the drowning of two men in the Rio Grande River on July 1, 2000, in the Anacua Wildlife Refuge located close to the Harlingen/Santa Maria, Texas area. The Plaintiffs,

-11-

however, in their Complaint and Amended Complaint insist that the drowning deaths at issue occurred in Brownsville, Texas, on June 30, 2000.

At first glance, Defendants looked upon this assertion as a typographical error that Plaintiffs inexplicably failed to correct in their First Amended Complaint. Accordingly, the admissions relating to the time and location of the incident at issue were framed in such a way that - should the Plaintiffs default in answering the admissions - the date and location would be consistent with the records and recollections of the Defendants.

Incredibly, however, Plaintiffs have submitted to the Court their proposed responses to admissions that continue to insist that the incident at issue occurred on June 30, 2000. (See Plaintiffs' Exhibit 2 to Plaintiffs' Motion, admission nos. 1 -6). Even though Plaintiffs insist that we must be talking about the same drowning incident, from the Defendants' perspective it now appears that the issue of date and location is much more important than initially believed. The reason for this is that Defendants Felton, McDermott and Zaehringer recall that another drowning incident did occur in the Brownsville area on June 30, 2000. (See Plaintiffs' Exhibits 8, 9, and 10). Clearly, this is a fact that the parties should resolve as soon as practicable for the obvious reasons of determining the identities of not just the proper parties involved, but the proper witnesses as well.

Likewise, Defendants sought admissions regarding the detention of the decedents, the use of weapons, and the alleged restrictions of potential avenues of rescue. Along these lines, a number of the allegations in Plaintiffs' First Amended Complaint did not make sense and at times seemed contradictory. For example, if the decedents were being detained under gun point and did not know how to swim, why would they jump back into the water? Were both decedents necessarily together when they were "detained and taken into custody"? The issue of whether both men were actually detained or whether Plaintiffs were talking about just one of the men being detained was later highlighted by the Plaintiffs' witness declarations. None of the witnesses identify decedent Guillermo Acosta Zamora by name and none of the witnesses attempt to describe actions or conduct taken with regard to Mr. Zamora. See

-12-

Plaintiffs' Exhibits 5, 6, and 7)

In the Plaintiffs' First Amended Complaint, Plaintiffs make broad sweeping allegations that the Defendants arrested and detained everybody that "reached the U.S.Bank of the Rio Grande" that day under gun point.  See Amended Complaint at ¶12.  Then, in the following paragraph, Plaintiffs state that the two decedents were a part of a group "crossing the river" who were detained by Defendants under gun point. See Amended Complaint at ¶13.   With regard to the issue of custody and control, Defendants desired to seek a clear admission as to each Decedent before progressing further with discovery.

From the Defendants perspective it should be noted that Defendants knew-as was acknowledged in their Answer and later corroborated by the decedents cousins and brother-in-law in their declarations-that several people had not yet successfully crossed the river when the Defendants arrived on the scene.  In fact, several individuals were hiding along the river's edge.  By asking the Plaintiffs commit to an allegation as it pertains to each decedent, it helps the Defendants decipher what facts they need to address in discovery as to which decedent.

Likewise, from the Defendants perspective, clarification and commitment is needed on the issue of rescue.  Defendants admit that a couple of inner tubes were destroyed by Agent Zaehringer - as was the Border Patrol practice when these types of items were discovered.  Plaintiffs' Exhibit 9 at ¶13.  However, Defendants know that these inner tubes were destroyed *before* either of the two men drowned.  Likewise, again in accordance with Border Patrol practice and procedure, Defendants agree that a piece of twine - *that was not strung across the river or otherwise being used by any individual* - had been cut from a tree root by Agent Zaehringer.  *Id.* at ¶ 12.   However, Defendants knew that this action took place before the drowning deaths occurred. Again, obtaining a commitment to these specific facts goes a long way in helping the Defendants determine which witnesses need to be located and what documentary type of evidence needs to be located and preserved.

When Plaintiffs failed to respond to these admissions, Defendants did not take further steps to locate witnesses last known to be located in Mexico since they would

-13-

not be necessary.

Assuming that the date and location of the incident is not at issue, this was going to be a difficult case for the Defendants to prepare. All of the non-party witnesses (the aliens that were detained on July 1, 2000 during the drowning incident) in this case were/are Mexican citizens and were returned to Mexico, well beyond the jurisdiction of this Court. Although the government has names, and partial addresses (i.e. the name of the City and/or State of residence) for these individuals, this information is now over four years old. Although Plaintiffs have obtained declarations from three persons who purportedly witnessed this incident[8], there were at least seven or eight other people (probably not related to either of the decedents) that may have been in a position to provide information helpful to the defense.

In the case at bar, the Plaintiffs will have an unfair advantage as a result of their dilatory conduct. Plaintiffs have easy access to their witnesses because they are related to the Vargas family Plaintiffs[9]. Admittedly, it is possible that the Defendants would not have been able to locate the other witnesses in this case if the admissions had been timely answered; however, the admissions were not timely answered and attempts to locate witnesses were suspended. Because the admissions were deemed admitted, Defendants chose not to expend its resources to locate these witnesses. Common sense tells us that witnesses do not necessarily stay in one place for long periods of time–especially witnesses that have attempted to cross into the United States illegally. Moreover, with the passage of time, memories dim and fade. Defendants have clearly been prejudiced by the Plaintiffs inaction in this case.

Six months after the admissions were due, when Defendants filed their motions

---

[8]The witnesses pur forward by the Plaintiffs are all related to the Decedent, Jose Vargas. Each of the statements speak of three people drowning during this incident, when all information available to date shows only two people drowned. Furthermore, the statements are contradictory. For example, Mr. Vargas's cousin, Roberto Vargas Vargas, states at paragraph 11 of his declaration that the decedent, Jose Vargas, was "restrained by the agents." Then, in the very next paragraph, Roberto Vargas Vargas states that he saw Jose Vargas "jump back into the river when they saw the Agents approach." Plaintiffs' Exhibit 7 to Plaintiffs' Motion.

[9]Notably, Plaintiffs witness declarations make no specific mention of the second decedent, Guillermo Acosta Zamora.

to dismiss, Plaintiffs were given the Fifth Circuit case law telling them that the only way to withdraw their deemed admissions was to file a motion for relief under Rule 36(b) of the FRCP. (See Docket Nos. 45, 47, and 49; see also, *In Re Carney*, 258 F.3d 415 [5[th] Cir. 2001]). Instead, however, Plaintiffs chose to wait another five months to file their motion for relief. This has been the Plaintiffs approach to this case from the outset; they should not be rewarded for it.

### Conclusion

Defendants Felton, McDermott, and Zaehringer have been sued in their individual capacities. These Defendants take this case seriously and have been maintaining their obligations under the Federal Rules of Civil Procedure and the Local Rules of this Court. They should not be punished because of the Plaintiffs failure to take this case seriously. Even if the Court accepts that the Plaintiffs mailed their responses to the admissions on August 26, 2003, they are, by Plaintiffs own admission, *late*. Presumably, Plaintiffs knew they were late with their responses as far back as August of 2003, yet they did nothing to correct the problem. Instead, Plaintiffs sat back and allowed all meaningful hope of locating in Mexico-who were not related to the Plaintiffs or their decedents-to dissipate to the Defendants' prejudice.

Plaintiffs had their opportunity to preserve their day in Court–but they instead chose to allow all the deadlines established by this Court to lapse before they even tried to address the issue of deemed admissions.

WHEREFORE, PREMISES CONSIDERED, Defendants' pray that this Court DENY Plaintiffs' Motion to Withdraw or Amend Admissions.

Respectfully submitted,
MICHAEL T. SHELBY
United States Attorney

NANCY L. MASSO
Assistant United States Attorney
600 E. Harrison St., No. 201
Brownsville, Texas 78520
Tel: (956) 548-2554  Fax: (956) 548-2549
State Bar No. 00800490
Federal I.D. No. 10263

-15-

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the true and foregoing copy of DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO WITHDRAW OR AMEND ADMISSIONS was mailed, via certified mail, return receipt requested, on August 30, 2004, to Plaintiffs' attorney, Gregory W. Moreno and Arnoldo Casillas at MORENO, BECERRA, GUERRERO & CASILLAS, 3500 West Beverly Blvd., Montebello, CA 90640. A copy of this Response (and corresponding exhibits) was also faxed to Plaintiffs' counsel on August 30, 2004, at : 323-725-0350.

NANCY L. MASSO
Assistant United States Attorney



**U.S. Department of Justice**

*United States Attorney*
*Southern District of Texas*

---

U.S. Courthouse                        Phone (956) 548-2554
600 E. Harrison Suite 201              Fax (956) 548-2549
Brownsville, TX 78520

July 15, 2003

Arnoldo Casillas
Attorney at Law
MORENO, BECERRA, GUERRERO & CASILLAS
3500 W. Beverly Blvd.
Montebello, CA 90640

In Re:  **ESTATE OF JOSE VARGAS et al v. FIVE UNKNOWN BORDER PATROL
AGENTS, ET AL**; In the United States District Court for the Southern District
of Texas; Brownsville Division; Civil Action No. B-02-132

Dear Mr. Casillas:

Please find enclosed the United States of America's First Set of Interrogatories to Plaintiff Estate of Guillermo Acosta Zamora Through Maria Teresa Alvarado Mendez; United States of America's First Set of Interrogatories to Plaintiff Estate of Jose Vargas Through Maria Covarrubias; and United States of America's Requests for Admissions to Plaintiffs submitted in the above-entitled and numbered cause.

Should you have any questions, please feel free to contact me.

Sincerely,

MICHAEL T. SHELBY
UNITED STATES ATTORNEY

NANCY L. MASSO
Assistant United States Attorney



U.S. Postal Service
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

O F F I C I A L   U S E

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Vargas
Postmark Here
7/15/03
Inters +
Req for Admissions

Sent To  ARNOLDO CASILLAS
Street, Apt. No.;  3500 W BEVERLY BLVD
or PO Box No.  MONTEBELLO CA  90640
City, State, ZIP+4

PS Form 3800, January 2001        See Reverse for Instructions





# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

ESTATE OF JOSE VARGAS, by and   *
through MARIA H. COVARRUBIAS, *etc.*   *
Plaintiffs,   *
  *
v.   *    CIVIL ACTION No. B-02-132
  *
GEORGE FELTON, III., DANIEL   *
ZAEHRINGER, PATRICK B. McDERMOTT, *
TWO UNKNOWN INS BORDER PATROL   *
AGENTS; U.S. DEPARTMENT OF   *
IMMIGRATION and NATURALIZATION;   *
UNITED STATES BORDER PATROL;   *
UNITED STATES OF AMERICA; and DOE   *
Defendants 1-10, inclusive,   *
Defendants.   *

## UNITED STATES OF AMERICA'S REQUESTS FOR ADMISSIONS TO PLAINTIFFS

TO:   Estate of Jose Vargas, through Maria H. Covarrubias, etc. by and through their
   attorney of record, Arnoldo Casillas, Attorney at Law, MORENO, BECERRA,
   GUERRERO & CASILLAS, 3500 West Beverly Boulevard, Montebello, CA
   90640.

   In accordance with Rule 36, Federal Rules of Civil Procedure, the United States of
America requests that Plaintiffs herein, respond to the attached Requests for Admission in
accordance with Rule 36(a) to the undersigned attorney for the United States of America at the
offices of the United States Attorney, 600 East Harrison, No. 201, Brownsville, Texas 78520, no
later than thirty (30) days from the date of service of this request.

       Respectfully submitted,
       MICHAEL T. SHELBY
       UNITED STATES ATTORNEY

       NANCY L. MASSO
       Assistant United States Attorney
       600 East Harrison, No. 201
       Brownsville, Texas  78520
       Tel:  956-548-2554
       Fax: 956-548-2549
       State Bar No. 00800490
       Fed. I.D. No. 10263

## REQUESTS FOR ADMISSIONS

1.      The incident at issue in this lawsuit occurred on July 1, 2000.

**ANSWER:**

2.      The incident at issue in this lawsuit occurred at the Anacua Wildlife Refuge located near the town of Santa Maria, Texas.

**ANSWER:**

3.      Jose Vargas died on July 1, 2000.

**ANSWER:**

4.      Guillermo Acosta Zamora died on July 1, 2000.

**ANSWER:**

5.      Jose Vargas had not been detained by United States Border Patrol agents at any time on July 1, 2000.

**ANSWER:**

6.      Guillermo Acosta Zamora had not been detained by United States Border Patrol Agents at any time on July 1, 2000.

**ANSWER:**

7.      None of the Border Patrol Agents present immediately before, during, or after the incident involving Jose Vargas drew their weapons on Jose Vargas.

**ANSWER:**

8.      None of the Border Patrol Agents present immediately before, during, or after the incident involving Jose Vargas drew their weapons on Guillermo Acosta Zamora.

**ANSWER:**

9.      None of the Border Patrol Agents present immediately before, during, or after the incident involving Jose Vargas drew their weapons on any of the persons detained at the scene of the drownings of Jose Vargas and Guillermo Acosta Zamora.

**ANSWER:**

10.      The United States, nor any of its employees or agents, did anything to prevent the possible rescue of Jose Vargas.

**ANSWER:**

11.      The United States, nor any of its employees or agents, did anything to prevent  the

possible rescue of Guillermo Acosta Zamora.

**ANSWER:**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "United States of America's Requests For Admissions to Plaintiffs" was mailed via certified mail, return-receipt requested to Plaintiffs' counsel:

Arnoldo Casillas
Attorney at Law
MORENO, BECERRA, GUERRERO & CASILLAS
3500 West Beverly Boulevard, Montebello, CA 90640

on this the 15 day of July, 2003.

NANCY L. MASSO, AUSA

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| ESTATE OF JOSE VARGAS, by and through MARIA H. COVARRUBIAS, *etc.* Plaintiffs, | * * * * | |
| v. | * * | CIVIL ACTION No. B-02-132 |
| FIVE UNKNOWN BORDER PATROL AGENTS; U.S. DEPARTMENT OF IMMIGRATION AND NATURALIZATION; UNITED STATES BORDER PATROL; UNITED STATES OF AMERICA, and DOE Defendants 1-10, inclusive, Defendants. | * * * * * * * * * | |

**UNITED STATES OF AMERICA'S NOTIFICATION AND SUBMISSION OF**
**RULE 26, FRCP, DISCLOSURES**

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, a defendant herein, by and through Michael T. Shelby, United States Attorney for the Southern District of Texas, submits the following to fulfill its obligations under Rule 26 of the Federal Rules of Civil Procedure:

1.   Names of individuals likely to have discoverable information in support of the United States defenses (Rule 26[a][1][A] and Rule 26 [a][3][A])

   •   Former BPA George F. Felton, III
       33501 FM 1577 Unit 2
       San Benito, Texas 78586
       (No local phone number available to INS)

   •   Former BPA Daniel Zaehringer–
       Presently an Immigration Inspector with the INS
       648 Mission Street, Room 110
       Ketchikan, Alaska 99901
       (907) 225-2380

   •   Senior PA Luis Flores
       United States Border Patrol
       3902 South Expressway 77
       Harlingen, Texas 78552
       (956) 366-3000

   •   BPA Patrick B. McDermott
       United States Border Patrol



        3902 South Expressway 77
        Harlingen, Texas 78552
        (956) 366-3000

- SBPA Edward T. Gonzalez
  United States Border Patrol
  3902 South Expressway 77
  Harlingen, Texas 78552
  (956) 366-3000

- Patrol Agent in Charge
  United States Border Patrol
  3902 South Expressway 77
  Harlingen, Texas 78552
  (956) 366-3000

- Former Field Operations Supervisor Stephen Johnson
  4030 South Avenue "A"
  Yuma, Arizona 85364
  (928) 726-8731

- Assistant Chief Patrol Agent Stephen Hill
  United States Border Patrol
  2301 South Main Street
  McAllen, Texas 78503
  (956) 984-3800

2.    Copies of documents as described at Rule 26 (a) (1) (B); see attached pages 1 - 16.

- *Note that 5 pages of E-mail communications authored by INS counsel have been withheld in accordance with the attorney work product exception/attorney client communication and as items prepared in anticipation of litigation.*

3.    The United States has not yet designated any expert witnesses. Rule 26 (a)(2)

                  Respectfully submitted,

                  MICHAEL T. SHELBY
                  UNITED STATES ATTORNEY

                  NANCY L. MASSO
                  Assistant United States Attorney
                  600 East Harrison St., No. 201
                  Brownsville, Texas 78520
                  Tel: (956) 548-2554
                  Fax: (956) 548-2549
                  State Bar No. 00800490
                  Fed. I.D. No. 10263

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the true and foregoing copy of the "United States of America's Notification and Submission of Rule 26, FRCP, Disclosures" was faxed and mailed via certified mail, return receipt requested, to Plaintiffs' attorneys at the following address:

Gregory Moreno
Arnoldo Casillas
MORENO, BECERRA, GUERRERO & CASILLAS
3500 West Beverly Blvd.
Montebello, CA 90640
Fax:    (323) 725-0350

January 7, 2003
Date

NANCY L. MASSO
Assistant United States Attorney

HRL # 37

U.S. Department of Justice
Immigration and Naturalization Service

**Record of Deportable/Inadmissible Alien**

| Family Name (CAPS) | First | Middle | | | Sex | Hair | Eyes | Complxn |
|---|---|---|---|---|---|---|---|---|
| DEL RIO-VARGAS, Fernando | | | | | M | BRN | BRN | LT |

| Country of Citizenship | Passport Number and Country of Issue | Case No: HRL0007000012 | File Number | | Height | Weight | Occupation |
|---|---|---|---|---|---|---|---|
| MEXICO | | | | | 65 | 140 | CAMPOS |

| U.S. Address | Scars and Marks |
|---|---|
| | None Visible |

| Date, Place, Time, and Manner of Last Entry | Passenger Boarded at | F.B.I Number | ☐ Single ☐ Divorced ☐ Married ☐ Widower ☐ Separated |
|---|---|---|---|
| 07/01/2000, 1710, 7.5 mile(s) W of LOI | | | |

| Number, Street, City, Province (State) and Country of Permanent Residence | Method of Location/Apprehension |
|---|---|
| ZAMORA, MICHOACAN MEXICO | PB 518.3 |

| Date of Birth | Date of Action | Location Code | At/Near Santa Maria, Texas | Date/Hour |
|---|---|---|---|---|
| 10/24/1979   Age: 20 | 07/01/2000 | MCA/HRL | | 07/01/2000 1710 |

| City, Province (State) and Country of Birth | AR | Form: (Type and No.) | Lifted ☐ | Not Lifted ☐ | By |
|---|---|---|---|---|---|
| FRESNAD,JALISCO, MEXICO | | | | | See Narrative |

| NIV Issuing Post and NIV Number | Social Security Account Name | Status at Entry | Status When Found |
|---|---|---|---|
| | | PWA Mexico | TRAVEL/SEEK LING |

| Date Visa Issued | Social Security Number | Length of Time Illegally in U.S. |
|---|---|---|
| | | AT ENTRY |

| Immigration Record | Criminal Record |
|---|---|
| POSITIVE - See Narrative | None known |

| Name, Address, and Nationality of Spouse (Maiden Name, if Appropriate) | Number and Nationality of Minor Children |
|---|---|
| PETRA ABUNDIZ MICHOACAN, MEXICO, S.A.S. | |

| Father's Name, Nationality, and Address, if Known   Nationality: MEXICO | Mother's Present and Maiden Name, Nationality, and Address, if Known |
|---|---|
| DEL RIO, Luis | VARGAS, REYNA   Nationality: MEXICO |

| Monies Due/Property in U.S. Not in Immediate Possession | Fingerprinted? Yes ☐ No ☒ | INS Systems Check: | Charge Code Word(s) |
|---|---|---|---|
| | | | 16A |

| Name and Address of (Last)/(Current) U.S. Employer | Type of Employment | Salary Hr. | Employed from/to |
|---|---|---|---|
| | | | |

Narrative (Outline particulars under which alien was located/apprehended. Include details not shown above regarding time, place and manner of last entry, attempted entry, or any other entry, and elements which establish administrative and/or criminal violation. Indicate means and route of travel to interior.)

```
FIN #: 2434739

APPREHENDED BY
LUIS FLORES
DANIEL ZAEHRINGER

FUNDS IN POSSESSION          F. d V
100.00     US - Dollar
200.00     MEXICO - New Peso
```

1 OF 11

| Alien has been advised of communication privileges. _____ (Date/Initials) | AGUSTIN PEREZ   (Signature and Title of INS Official) |
|---|---|

| Distribution: | Received: (Subject and Documents) (Report of Interview) |
|---|---|
| IDENT 18/13 6 | Officer: AGUSTIN PEREZ |
| | on: July 1,   2000   1752   (time) |
| | Disposition: Voluntary Return |
| | Examining Officer: EDWARD T. GONZALEZ |

U.S. Department of Justice
Immigration and Naturalization Service

HRL# 38

# Record of Deportable/Inadmissible Alien

| Family Name (CAPS) | First | Middle | | Sex M | Hair BLK | Eyes Brn | Cmplxn Med |
|---|---|---|---|---|---|---|---|
| VARGAS-Vargas, Roberto Veto | | | | | | | |
| Country of Citizenship MEXICO | Passport Number and Country of Issue | Case No: HRL0007000012 | File Number | Height 52 | Weight 160 | Occupation Laborer | |
| U.S. Address | | | | Scars and Marks N/V | | | |
| Date, Place, Time, and Manner of Last Entry 07/01/2000, 1600, 7.5 mile(s) W of LOI | | Passenger Boarded at | | F.B.I. Number | | ☒ Single ☐ Married ☐ Divorced ☐ Married ☐ Widower ☐ Separated | |
| Number, Street, City, Province (State) and Country of Permanent Residence TINGUINDIN, MICHOACAN MEXICO | | | | Method of Location/Apprehension PB 518.3 | | | |
| Date of Birth 02/19/1981　Age: 19 | Date of Action 07/01/2000 | Location Code MCA/HRL | | At/Near Santa Maria, Texas | | Date/Hour 07/01/2000 1630 | |
| City, Province (State) and Country of Birth TINGUINDIN, MICHOACAN, MEXICO | AR ☐ | Form (Type and No.) | Lifted ☐　Not Lifted ☐ | By See Narrative | | | |
| NIV Issuing Post and NIV Number | Social Security Account Name | | | Status at Entry EWI Mexico | | Status When Found TRAVEL/SEEK ING | |
| Date Visa Issued | Social Security Number | | | Length of Time Illegally in U.S. AT ENTRY | | | |
| Immigration Record NEGATIVE | | Criminal Record None known | | | | | |
| Name, Address, and Nationality of Spouse (Maiden Name, if Appropriate) | | | | Number and Nationality of Minor Children | | | |
| Father's Name, Nationality, and Address, if Known Nationality: MEXICO ° Sancos | | | | Mother's Present and Maiden Names, Nationality, and Address, if Known Eduarda Nationality: MEXICO | | | |
| Monies Due/Property in U.S. Not in Immediate Possession | | Fingerprinted? Yes ☐　No ☒ | INS Systems Checks | Charge Code Word(s) 16A | | | |
| Name and Address of (Last)/(Current) U.S. Employer | | Type of Employment | | Salary Hr. | Employed from/to | | |

Narrative (Outline particulars under which alien was located/apprehended. Include details not shown above regarding time, place and manner of last entry, attempted entry, or any other entry, and elements which establish administrative and/or criminal violation. Indicate means and route of travel to interior.)

APPREHENDED BY
GEORGE FELTON
DANIEL ZAEHRINGER

Alien has been advised of communication privileges. WA 7/1/2000 (Date/Initials)

WILFREDO ANGLERO
BORDER PATROL AGENT
(Signature and Title of INS Official)

Distribution:

Ident # 175617

Received: (Subject and Documents) (Report of Interview)
Officer: WILFREDO ANGLERO
on: July 1,　2000　hour at　1746　(time)
Disposition: Voluntary Return
Examining Officer: EDWARD T. GONZALEZ

PAGE 2　　　Form I-213 (Rev.4/1/97)Y

11/11/2002 13:04 FAX 856388 791   USBP MCALLEN SECTOR HQS   MCALLEN SECTOR   ☒009
Case 1:02-cv-00132   Document 66   Filed in TXSD on 08/30/2004   Page 28 of 45   ☒002



**U.S. Department of Justice**
Immigration and Naturalization Service

MCA/HRL 50/3.6

901 Rangerville Rd.
*Harlingen, Texas*

*July 1, 2000*

MEMORANDUM FOR:     JOSE E. GARZA
                    CHIEF PATROL AGENT

FROM:      Edward T. Gonzalez
           Supervisory Border Patrol Agent

SUBJECT:   Drowning Incident near Santa Maria, Texas

On July 1, 2000, at approximately 4:00 PM, Border Patrol Agents Daniel E. Zaehringer, George F. Felton, and Patrick B. McDermott advised that they observed two subjects in the Rio Grande River in distress. Agents Zaehringer, Felton, and McDermott were responding to sensor traffic south of Anacua Road, near Santa Maria, Texas.

Agents Zaehringer and Felton advised that when they approached the main landing on the river, they observed and apprehended nine undocumented aliens that had just entered illegally into the United States. Agents then observed several other subjects jump in the river and swim back to Mexico. As Agent Zaehringer searched the landing by the river, he observed two male subjects concealed in the river's brush just down river from his location. These subjects without any provocation from Agent Zaehringer jumped in the river and attempted to swim back to Mexico. Agent Zaehringer also observed several other subjects that were upriver and concealed from him jump in the river and swum back to Mexico. Agent Zaehringer searched this area and observed two subjects concealed in the heavy brush near the river. Agent Zaehringer asked both subjects to come up. Agent Zaehringer pulled up one of the subjects up. The other subject jumped in the river and swam back to Mexico.

Agents Zaehringer and Felton advised that one of the subjects began to struggle in the river several yards before reaching the Mexican side of the river's bank. Agents observed this subject go

PAGE 3

MEMORANDUM FOR CPA JOSE E. GARZA                                    PAGE 2
SUBJECT: <u>Drowning Incident in Santa Maria, Texas</u>

under the water. Agents immediately attempted to aid this subject by throwing empty and partially filled water jugs for this subject to use as a floatation device. This subject was unable to grab the water jugs thrown to him. Within a minute, Agents Zaehringer and Felton advised that another subject, at the same location where the first subject went under, started to struggle in the river. Again, Agents Zaehringer and Felton immediately started throwing empty and partially filled water jugs in his direction so that he could use them as a floatation device; however, just like the first subject, he was unable to grab one. Agent McDermott was walking south on the trail and arrived on the scene and assisted Agents Zaehringer and Felton.

Agent McDermott immediately requested assistance from Emergency Medical Services, Border Patrol Air Units, advised the Harlingen Supervisors, and assistance from other agents working nearby. Cameron County Sheriff's Department was also contacted. Agents maintained surveillance of the river for over one hour in the event that these subjects resurfaced. Agents were able to see a large section of the river from their locations. These two subjects were not seen again. It is highly suspected that these two subjects drowned.

An additional two other undocumented aliens were apprehended at this location 30 minutes later. These two aliens were identified as DEL RIO-Vargas, Fernando and VARGAS-Vargas, Roberto Veto. These two aliens stated that one of the drowning victims was their cousin. They identified him as VARGAS-Valencia, Jose 26 years old from Pueblo Jacona, Michoacan, Mexico. The identity of the other drowning victim is unknown. None of the apprehended aliens claimed to have known him.

The Mexican Consular was notified of the incident. He requested that he debrief all the aliens apprehended at that location. After processing these aliens, they were taken to the Consulate's Office in Brownsville, Texas. After debriefing them, the Mexican Consular requested that the victim's cousins stay with him, which was granted. The Mexican Consular asked for the location of the drownings, and I advised him that it was approximately 5 miles west of the Los Indios Port of Entry. The Mexican Consular also asked me if we were attempting to locate the drowning victims. I advised him that I would notify the Border Patrol Air Units with the location and see if they could locate the bodies.

I do not feel that Agents Zaehringer, Felton, and McDermott were negligent or at fault for these drownings. When these agents initially encountered the undocumented aliens, they were all on foot. Thus, the availability of their life saving disc in this situation was not possible. Agents did not provoke or encourage the subjects to jump in the river. Agents in fact attempted to persuade the subjects to come back to this side once they were in the river. Once the agents noticed that there were subjects in the river in distress, they took immediate action to aid these subjects. Since both these subjects went under at the same location in the river, it is highly suspected that they succumbed to a strong undercurrent in the river.

Field Operations Supervisor Stephen Johnson was contacted and advised of this incident. Assistant Chief Patrol Agent Stephen Hill and Chief Patrol Agent Jose E. Garza were also advised of this incident. Len Cosentine from Dallas Command Center was contacted. She advised that she would contact INS Command Center of this incident.

MEMORANDUM FOR CPA JOSE E. GARZA                    PAGE 3
SUBJECT: <u>Drowning Incident in Santa Maria, Texas</u>

---

Office of the Patrol Agent in Charge                    July 1, 2000
Harlingen, Texas


Memorandum forwarded for your consideration.


John C. Brinning
Patrol Agent in Charge



U.S. Department of Justice
Immigration and Naturalization Service

＼

MCA/HRL50/3.6

*901 Rangerville Road*
*Harlingen, Texas 78550*

July 2, 2000

MEMORANDUM FOR JOSE E. GARZA
                 CHIEF PATROL AGENT

FROM:       George F. Felton III    *George Felton*
              Border Patrol Agent

, •

SUBJECT:     <u>Drowning Incident near Santa Maria, Texas</u>

       On July 1, 2000 at approximately 3:45 P.M. Agents Zaehringer, McDermott and I, George F. Felton III, were responding to sensor traffic in the Anacua Wildlife Refuge area near Santa Maria, Texas. After several minutes had passed, Agent McDermott walked the trail from the north and Agent Zaehringer and I walked down the river road to the landing.

       We reached the trail to the landing and we split up. I heard Agent Zaehringer giving commands in Spanish and quickly went to his location. He had six persons detained and I went upriver and detained three more. Agent Zaehringer went down to the river's edge and two persons, who were hiding in the dense brush, jumped into the river. I had not seen these subjects until after they had jumped. There were also several other persons in the water upriver from Agent Zaehringer. We shouted at them to come back but they did not.

       They swam about half way across the river when two of them began to struggle at the same location in the river. We began throwing partially full water jugs to assist them as floatation devices. The only other floatation devices that we had were in our vehicles, which were parked north of the levee. Since the vehicles were parked approximately a half of a mile away, the time that it would have taken to get to the vehicle, retrieve the rescue disk, and return to the river, would not have changed the outcome.

MEMORANDUM FOR CPA JOSE E. GARZA                    PAGE 2
SUBJECT: <u>Drowning Incident near Santa María, Texas</u>


    I attempted to contact agent Agent McDermott, but due to the terrain, my radio
would not get out. The subjects went down once, came back up briefly, and went down
again. They never came back up. I went downriver to try to maintain visual contact with
the subjects, but could only see the jugs and clothing in the water.

---

Office of the Patrol Agent in Charge                    July 2, 2000
Harlingen, Texas


Memorandum forwarded for your information.


John C. Brinning
Patrol Agent in Charge



**U.S. Department of Justice**
Immigration and Naturalization Service

MCA/HRL 50/3.6

*901 Rangerville Rd.*
*Harlingen. Texas 78550*

July 2, 2000

MEMORANDUM FOR JOSE E. GARZA
                 CHIEF PATROL AGENT

FROM:       Daniel E. Zaehringer
               Border Patrol Agent

SUBJECT:    <u>Drowning Incident in Santa Maria, Texas</u>

On July 1, 2000 Border Patrol Agent McDermott and I, Daniel E. Zaehringer, were assigned line watch duties west of Los Indios Port of Entry. While on duty at approximately 3:30 p.m., a sensor went off with several hits south of Santa Maria, Texas. We met up with BPA Felton and together we traveled to set up for any possible traffic. We went south on Anacua Road and parked our vehicles north of the levee road.

After several minutes and no further sensor hits, BPA Felton and I decided to walk down to the landing. BPA McDermmott stayed on the levee road in case the traffic had already gone north of the landing.

When BPA Felton and I arrived at the trail that would lead to the landing, we stopped and listened for any movement. When none was heard, we proceeded to the landing to check for any sign. The trail split in two and BPA Felton took the left path while I took the right.

After a few steps, I began hearing running in the brush and splashes in the water. As I made my way to the landing, I ran into several dressed individuals of whom were undocumented aliens. I told them to sit down on the ground and not to move while I began to search for any others. I saw several persons in the water and told them to come back ashore. They did not heed my call and swam to the Mexican side.

PAGE 8

MEMORANDUM FOR CPA JOSE E. GARZA          PAGE 2
SUBJECT: Drowning Incident In Santa Maria, Texas

While I was searching, BPA Felton had apprehended two other individuals and sent them over to me. BPA Felton also came to where I was positioned. At this point I believed that we had apprehended all that was left on our side of the river. While I was searching the river's bank, I came across two men down river from my location. Both of them looked at me. I instructed them to come, and without any provocation from me, they jumped into the river. At that same time, I heard more splashes as two to three other subjects jumped in the river upriver of my location. I told them to come back, but once more they did not heed to my call.

While searching upriver of the river bank, I saw two other individuals and instructed them to come with me. One of the individuals took my hand and came to the bank with the rest of the apprehended group. The other individual jumped in the river and began to swim across. About two minutes later, I began to hear commotion on the south side, and I looked up and saw one man struggling in the water. I found some empty water jugs and threw them towards the individual. He failed to grab the jugs and the individual went under the water.

Less than a minute afterwards, another male subject began to struggle in the water at the same spot as the previous. Again, I threw in some jugs but the man went under. Neither of the two men who were struggling in the river were seen again.

About this time, BPA McDermott arrived on the scene and began radio communications for assistance. BPA Felton began to walk the river's bank in case they came up. I took the group back to the road and waited for assistance. SPA Flores arrived on the scene and shortly afterwards SBPA Gonzalez.

At this point the apprehended aliens where taken to the station. None of the apprehended subjects claimed to have any knowledge of who the two drowning individuals were or where they came from.

It should be noted that the Border Patrol vehicle that I was assigned to was parked more than a half mile away and the response time to have retrieved the floatation device that was in my vehicle would not have been quick enough to have helped the two individuals. All that could have been done was done to try to save them from drowning.

---

Office of the Patrol Agent in Charge          July 2, 2000
Harlingen, Texas

Memorandum forwarded for your information.

John C. Brinning
Patrol Agent in Charge

U.S. Department of Justice
Immigration and Naturalization Service

MCA/HRL 50/3.6

*901 Rangerville Road*
*Harlingen, Texas 78550*

July 2, 2000

ORANDUM FOR JOSE E. GARZA
            CHIEF PATROL AGENT

1:      Patrick B. McDermott
        Border Patrol Agent

ECT:    Drowning Incident Near Santa Maria, Texas

    On July 01, 2000 Agent Zaehringer and I, Patrick B. McDermott, were performing line
duties in the Santa Maria area when we were alerted to possible alien traffic near Anacua
We arrived at Anacua Road and met with Agent Felton. It was decided that Agents
1 and Zaehringer would proceed directly to the landing and walk north and I would go to
ad of the trail and walk south in an attempt to apprehend the traffic between us.

    I had walked the trail about half way to the landing when I heard Agent Felton on the
saying he saw the suspected aliens moving down river. I started running down the trail.
eared Agent Felton's position, I heard Agent Felton and Agent Zaehringer giving orders to
bjects to stop and sit down. I slowed down believing that everything was under control and
the subjects had been apprehended. As I got closer to them, I heard frantic shouting from
ides of the river. When I arrived at the landing, I observed one individual climbing up the
on the Mexican side of the river. Agent Felton informed me that two more individuals had
ed back in the river and both had gone under and had not resurfaced. Our service vehicle
quiped with a life saving disc, but it was parked approximately half a mile away. Agent
1 tried to reach me via radio before I got all of the way to the landing but radio reception in
articular area is extremely poor. All three of us, our nine detainees, and the people on the
:an side, scanned the river for a moment. I attempted to use my cell phone to contact
1gen Station but was unsuccessful due to lack of service in the area. After several attempts

## MEMORANDUM FOR CHIEF PATROL AGENT         Page 2
Subject: <u>Drowning Incident Near Santa Maria, Texas</u>

to contact Harlingen Station via radio, I was finally able to request EMS and a helicopter to the scene. I was informed that the helo was out of the area and could not respond but EMS was on the way. After approximately one hour without any sight of the two victims, it was decided that nothing more could be done.

        The detainees were transported to the station for processing while Agents Felton, Zaehringer and I took pictures of the area and gave our account of the events to Supervisory Border Patrol Agent Gonzalez.

Office of the Patrol Agent in Charge                 July 2, 2000
-Harlingen, Texas

Memorandum forwarded for your information.


John C. Brinning
Patrol Agent in Charge

DATE AND TIME: *07/01/00    17:40*

Under Article 31, Subsection b(3) of the Collective Bargaining Agreement between the National Border Patrol Council and the Immigration and Naturalization Service, you are provided with the following information:

The Civil Service Reform Act gives employees in units represented by an exclusive labor organization the right to have a union representative present at a meeting which involves an examination by a representative of the agency in connection with an investigation if the employee believes the examination may result in disciplinary action.

Section 7114(a)(2) of the Civil Service Reform Act of 1978 states:

"(2) An exclusive representation of an appropriate unit in an agency shall be given the opportunity to be represented at-

(B) any examination of an employee in the unit by a representative of the agency in connection with an investigation if-

(i) the employee reasonably believes that the examination may result in disciplinary action against the employee and

(ii) the employee requests representation."

_____
Receipt of Notice

_____
Signature of Supervisor

DATE AND TIME: _07- 01- 00_ _☺ 17:45_

Under Article 31, Subsection b(3) of the Collective Bargaining Agreement between the National Border Patrol Council and the Immigration and Naturalization Service, you are provided with the following information:

The Civil Service Reform Act gives employees in units represented by an exclusive labor organization the right to have a union representative present at a meeting which involves an examination by a representative of the agency in connection with an investigation if the employee believes the examination may result in disciplinary action.

Section 7114(a)(2) of the Civil Service Reform Act of 1978 states:

"(2) An exclusive representation of an appropriate unit in an agency shall be given the opportunity to be represented at-

(B) any examination of an employee in the unit by a representative of the agency in connection with an investigation if-

(i) the employee reasonably believes that the examination may result in disciplinary action against the employee and

(ii) the employee requests representation."


_____
Receipt of Notice

_____
Signature of Supervisor

DATE AND TIME: _____7/1/00_____      1757_____

Under Article 31, Subsection b(3) of the Collective Bargaining Agreement between the
National Border Patrol Council and the Immigration and Naturalization Service, you
are provided with the following information:

The Civil Service Reform Act gives employees in units represented by an exclusive
labor organization the right to have a union representative present at a meeting which
involves an examination by a representative of the agency in connection with an
investigation if the employee believes the examination may result in disciplinary action.

Section 7114(a)(2) of the Civil Service Reform Act of 1978 states:

"(2) An exclusive representation of an appropriate unit in an agency shall be
given the opportunity to be represented at-

(B) any examination of an employee in the unit by a representative of the
agency in connection with an investigation if-

(i) the employee reasonably believes that the examination may result in
disciplinary action against the employee and

(ii) the employee requests representation."

_____
Receipt of Notice

_____
Signature of Supervisor

DATE AND TIME: *8·2·00  10:20 A.M.*

Under Article 31, Subsection b(3) of the Collective Bargaining Agreement between the National Border Patrol Council and the Immigration and Naturalization Service, you are provided with the following information:

The Civil Service Reform Act gives employees in units represented by an exclusive labor organization the right to have a union representative present at a meeting which involves an examination by a representative of the agency in connection with an investigation if the employee believes the examination may result in disciplinary action.

Section 7114(a)(2) of the Civil Service Reform Act of 1978 states:

"(2) An exclusive representation of an appropriate unit in an agency shall be given the opportunity to be represented at-

(B) any examination of an employee in the unit by a representative of the agency in connection with an investigation if-

(i) the employee reasonably believes that the examination may result in disciplinary action against the employee and

(ii) the employee requests representation."

_____
Receipt of Notice

_____
Signature of Supervisor

01/03/2003 16:42 FAX 956 928 8205     USBP MCALLEN SECTOR HQS     @025

11/11/2002 13:05 FAX 956302 Case 1:02-cv-00132 Document 66 BORDER PATROL Filed in TXSD on 08/30/2004 MCALLEN Page 41 of 45 SECTOR @003

**Date:** 11/8/2002 11:13 AM
**Sender:** Jose R Villarreal
**To:** #HRL_FOS; #HRL_INTEL; #HRL_PAIC; #HRL_SUP
**Priority:** Urgent
<u>**Subject:**Aliens Drowning June 30, 2002</u>
Hello Everyone,

      I need any information on two possible drowning victims in the Santa Maria, Texas area on or around June 30, 2002.     This incident supposedly occurred just after some agents deterred a group of aliens, who jumped back into the Rio Grande River and returned to Mexico.    Allegedly, two aliens in the group, Guillermo Acosta Zamora and Jose Guadalupe Vargas, drowned while attempting to swim in the river.

      Does anyone remember this incident reported to them? If so, please respond and provide any paperwork related to this indent.

Thanks,
J.R.

Law Offices of

# MORENO, BECERRA, GUERRERO & CASILLAS

**A Professional Law Corporation**
3500 West Beverly Boulevard
Montebello, California 90640
Telephone (323) 725-0917
Facsimile (323) 725-0350

GREGORY W. MORENO
DANILO J. BECERRA
MICHAEL A. GUERRERO*
ARNOLDO CASILLAS
FRANK PEREZ

*Certified Specialist - Family Law*
*The State of California*
*Board of Legal Specialization*

February 12, 2003

*Via Federal Express*

Nancy Masso, AUSA
United States Attorney's Office
Southern District of Texas, Brownsville Division
600 E. Harrison St., Suite #201
Brownsville, TX 78520

**Re:**   **Covarrubias v. Five Unknown Border Patrol Agents**
**First Amended Complaint**

Dear Ms. Masso:

Thank you so much for your assistance with the particular manner of doing things in the Southern District of the Federal Court. As with state courts, I am amazed that the different federal courts handle things so differently.

Enclosed you will find the First Amended Complaint in the above-entitled matter. I am sending the original directly to the court clerk for filing via Federal Express. The document, therefore, should be filed by tomorrow February 13, 2003.

Should you have any questions or comments please do not hesitate to call. Again, thank you for your continuing courtesy and cooperation as to this matter.

Very Truly Yours,

MORENO, BECERRA, GUERRERO & CASILLAS
A Professional Law Corporation

ARNOLDO CASILLAS

AC/lm
Enclosure



## AFFIDAVIT OF ERNESTO CASTILLO

My name is Ernesto Castillo and I am the Patrol Agent In Charge of the Brownsville Border Patrol Station of the McAllen Sector in Texas.  I have been in charge of the Brownsville Station for several years and before that was the Patrol Agent In Charge of the Port Isabel, now the Fort Brown, Station.

The McAllen Sector is divided into nine separate stations.  Each station along the Rio Grande River is divided into zones for working purposes.  The Brownsville Station controls zones 4, 5, and 6 along the river which consists of 25 miles of river boundary. Zone 4 is the zone on the east boundary of the Brownsville Station and zone 6 is the zone on the western boundary of the Brownsville Station.

The next station to the west is Harlingen which controls zones 7, 8, and 9.  Zone 7 is the eastern boundary of the Harlingen Station and zone 9 is the western boundary of the Harlingen Station.

The Agents in each station are assigned to zones within their stations only.  In normal working situations, Agents working in the zones 7, 8, and 9 in Harlingen would not be working in the Brownsville zones 4,5, and 6.  While it might be possible for Agents in neighboring zones to meet, as from Brownsville zone 6 and Harlingen zone 7, during regular operations Agents from Harlingen zone 9 would not be found working in or near Brownsville zones 4, 5, or 6.

Attached to this affidavit is a copy of the zone map for the McAllen Sector covering the 284 river miles in the Sector.

Pursuant to 28 U.S.C. 1746, I hereby declare under penalty of perjury that the foregoing statement is true and correct.





Signed on this the _____*27*_____ day of August, 2004.

Ernesto Castillo
Patrol Agent In Charge
Brownsville Border Patrol Station
McAllen Sector Border Patrol
1124 BP Central Boulevard
Brownsville, Texas 78520

